UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ROBERT K. HEINRICH and DAVID PATZER,
*personal representatives of the Estate of Robert C. Heinrich*,

        Appellants,

                    Case No. 18-cv-1308-pp

   v.

ALAN R. BAGG and MAUREEN E. BAGG,

        Appellees.

---

**ORDER AFFIRMING DECISION OF BANKRUPTCY COURT
AND DISMISSING CASE**

---

Robert C. Heinrich, a creditor/appellant who unsuccessfully sought to have his claim declared non-dischargeable in a Chapter 7 bankruptcy filed an appeal to this court. The proceedings stemmed from land disputes between neighbors on abutting properties. Heinrich sought to sell his property to a developer. The appellees/debtors, Alan and Maureen Bagg, filed suit in state court, claiming title to a portion of the land under adverse possession. The state court concluded that the Baggs had adversely possessed a garden portion of the land but awarded Heinrich $407,400 on his counterclaims for intentional interference with contract and unlawful harvesting of forest products.

Following the state court judgment, the Baggs filed for bankruptcy. Heinrich filed an adversary complaint asserting that the judgment awarded him in the state-court litigation was nondischargeable under 11 U.S.C.

1

§523(a)(6) because it arose from willful and malicious injury to him or his property.[1] Heinrich moved for summary judgment, asserting that the jury in the state court case had found "willful and malicious injury" and that the Baggs were precluded from contesting that finding in bankruptcy court. After denying summary judgment, the bankruptcy court held a two-day bench trial and ruled that the Baggs' debt was dischargeable. Heinrich timely filed an appeal; this court affirms the decisions of the bankruptcy court.

## I.    Factual & Procedural Background

### A.    Underlying Facts and State Court Case

In 1986, the Baggs purchased their current residence at 3230 Lathrop Avenue in Elmwood Park, Wisconsin from Heinrich. Dkt. No. 4-4 at 39; Dkt. No. 4-3 at 30. Within a year, the Baggs bought from Heinrich an additional half-acre of land that sat to the west of their home. Dkt. No. 4-4 at 39. At that time, Heinrich retained land next to the Baggs' and continued to live there. Dkt. No. 6-4 at 190. It appears that for the next twenty-five years, Heinrich and the Baggs had a "friendly, neighborly" relationship and were on reasonably good terms. Dkt. No. 4-4 at 40. During that period, the Baggs used portions of Heinrich's abutting property, cutting down trees and bushes to make brush piles and firewood and planting a garden, all without informing Heinrich and "apparently without any objection from Heinrich." Dkt. No. 4-3 at 116; Dkt. No. 2-3 at 170.

---

[1] "The Bankruptcy Code does not permit the discharge of debts incurred because of 'willful and malicious injury by the debtor to another entity or to the property of another entity.'" In re Calvert, 913 F.3d 697, 700 (7th Cir. 2019) (quoting 11 U.S.C. §523(a)(6)).

2

In May 2011, Heinrich sought an appraisal of his land located at 3128 Lathrop Avenue in Elmwood Park. Dkt. No. 2-2 at 488–89; Dkt. No. 4-3 at 12–13. Sometime after, around fall of 2011, the president of Gatlin Development Company, Inc. ("Gatlin") informed Heinirch that Gatlin was interested in purchasing the entire property. Id. at 17; Dkt. No. 6-4 at 190. Heinrich indicated that he was willing to sell and went over the details with the developer. Dkt. No. 4-3 at 17. On October 19, 2011, Heinrich and Gatlin entered into a purchase agreement for Heinrich's 3.82-acre parcel of land, directly adjoining the Baggs' property, for $900,000. Dkt. No. 2-2 at 19. Gatlin planned to develop the land into a Walmart.

The Baggs were not pleased with the idea of having a Walmart next door and losing their garden, so on April 18, 2012, they filed an adverse possession claim. Dkt. No. 2-3 at 170 (citing Alan Bagg and Maureen Bagg v. Robert Heinrich, Racine County Circuit Court, Case No. 12-CV-1408); Dkt. No. 2-2 at 9. The complaint alleged that the Baggs had adversely possessed a portion of Heinrich's land through actions such as clearing and tilling the soil, planting vegetables, cutting trees, clearing brush, mowing and otherwise improving the appearance and available use of the land. Dkt. No. 2-2 at 10. As required by Wisconsin law, the Baggs also filed a *lis pendens* on the property. Id. at 172. Heinrich denied the Baggs' adverse possession allegations and filed counterclaims alleging unauthorized harvesting of timber, tortious interference with a contract and slander of title. Id. at 13–16. On August 27, 2012, Gatlin

3

sent a letter to Heinrich terminating the purchase agreement. Dkt. No. 2-2 at 608.

In August 2015, the case went to trial before a jury in Racine County Circuit Court; Judge Emily Mueller presided over the trial. Dkt. No. 2-2 at 211. The parties asked that Judge Mueller decide the Baggs' adverse possession claim and that the jury decide Heinrich's slander of title and tortious interference with contractual relations counterclaims. Id. at 212. Judge Mueller concluded that the Baggs "had established an adverse possession claim to the garden portion of the disputed property[2] but . . . had not established adverse possession of the other portions . . . ." Id. Accordingly, Judge Mueller dismissed Heinrich's slander of title claim. Id. The parties then stipulated that the court also would decide Heinrich's claim of unauthorized harvesting of forest products. Id. at 59, 212. Judge Mueller submitted only Heinrich's "tortious interference with a contract" claim to the jury, with the following instructions:

> Question 1 of the Special Verdict asks whether the Baggs interfered with the contractual relationship Mr. Heinrich had with Gatlin Development Company for the purchase of Mr. Heinrich's real estate located at 3128 Lathrop Avenue, Elmwood Park, Wisconsin.
>
> An interference consists of any conduct or words conveying to Gatlin Development Company the Baggs' desire to influence Gatlin Development Company to refrain from dealing with Mr. Heinrich. It could be a simple request or persuasion, exerting only moral pressure, as well as threats or promises of some benefit to Gatlin Development Company. A lawsuit can be an actionable interference. Interference does not require ill will or expression of malice towards Mr. Heinrich.

---

[2] This portion constituted 1,375.98 square feet, or 0.0316 acres. Dkt. No. 2-2 at 38–39.

Question 2 of the Special Verdict asks whether that interference on the Baggs' part was intentional.

In determining the Baggs' intent, you may consider their actions and statements. Ordinarily, it is reasonable to infer that a person intends the natural and probable consequences of his or her acts.

Although other reasons may appear, Mr. Heinrich must prove that the Baggs' prime purpose was to interfere with the contractual relationship Mr. Heinrich had with Gatlin Development Company or the Baggs knew or should have known that such interference was substantially certain to occur as a result of their conduct.

It is not necessary that the Baggs had actual knowledge of the specific contract between Mr. Heinrich and Gatlin Development Company. It is sufficient that the Baggs had knowledge of facts which, if followed by inquiry ordinarily made by a reasonable and prudent person, would have led to a disclosure of the contractual relationship between Mr. Heinrich and Gatlin Development Company. This is sometimes referred to as "constructive knowledge."

Question 3 asks whether a causal connection existed between the interference by the Baggs and the damages claimed by Mr. Heinrich.

Before you can find that the Baggs' conduct was a cause of the claimed damages, you must find that the Baggs' conduct was a substantial factor; that is, it had a substantial influence in producing the damages claimed by Mr. Heinrich In other words, there must be a real causal connection between the Baggs' conduct and Mr. Heinrich's claimed damages.

Question 4 asks whether the Baggs were privileged to interfere with the contractual relationship Mr. Heinrich had with Gatlin Development Company.

In determining whether the Baggs' conduct was privileged, you should weigh all the circumstances of the case. Among the factors you should consider are (1) the nature, type, duration, and timing of the conduct; (2) whether the Baggs had an improper motive; (3) whether the Baggs were motivated by self-interest as opposed to a public interest; (4) the type of interest allegedly interfered with; (5) society's interest in protecting both freedom of action on the Baggs' part and contractual relationship of parties; (6) the closeness or remoteness of the Baggs' conduct to the alleged interference; and

5

(7) whether the Baggs' conduct, even though intentional, was fair and reasonable under the circumstances.

A party has a privilege to protect what he believes to be his legal interest. The protection, however, is subject to two conditions: 1) the pleader must have a reasonable ground for believing the truth of the pleading, and 2) the statements made in the pleading must be reasonably calculated to accomplish the privileged purpose. If that party's position ultimately is demonstrated to be incorrect, liability should not be imposed on that lone factor.

The Baggs' conduct may only be found privileged if the means employed by them were lawful. The Baggs' conduct cannot be privileged if they acted from ill will or an improper motive towards Mr. Heinrich. Some ill will does not preclude the possibility of justification, so long as the Baggs acted in substantial part with a proper motive in mind.

Question 5 asks you to determine the amount of damages caused by the Baggs' alleged interference with Mr. Heinrich's contract with Gatlin Development Company.

The burden of proof as to questions 1,2,3 and 5 is on Mr. Heinrich. The burden of proof as to question 4 is on the Baggs. In questions [sic] 4, the Baggs contend the question should be answered "yes," and so must satisfy you, by the greater weight of the credible evidence, to a reasonable certainty, that "yes" should be your answer.

Before you may answer "yes" to questions 1, 2 or 3, Mr. Heinrich must satisfy you by evidence that is clear, satisfactory, and convincing, to a reasonable certainty, that "yes" should be your answer as to the questions under consideration.

Dkt. 2-2 at 145–47. The jury returned the following verdict:

1. Did the Baggs' lawsuit interfere with Mr. Heinrich's contract with Gatlin development? Yes

2. If you have answered Question 1 "yes" answer this question: Did the Baggs intend to interfere with Mr. Heinrich's contract? Yes

3. If you have answered Question 2 "yes," answer this question: Was the Baggs' interference a cause of damages to Mr. Heinrich? Yes

6

> 4.  If you have answered Question 3 "yes," answer this question: Was the interference by the Baggs privileged? No

Dkt. No. 2-2 at 34–35. The jury awarded Heinrich $405,000. Id. at 35. Judge Mueller also found that the Baggs had violated Wis. Stat. §26.05 (prohibiting the cutting, removing or transporting of raw forest products without the consent of the owner), entered judgment in favor of Heinrich on his counterclaim for unlawful harvesting of timber and awarded Heinrich $2,400 in damages. Id. at 37. See also Dkt. No. 2-2 at 59 n.2. The Clerk of Court entered the judgment against the Baggs for $407,400, plus $10,322.49 in taxable costs and interest, for a total of $417,722.49. Dkt. No. 2-2 at 39–40.

B.  Adversary Case

On May 11, 2017, the Baggs' filed for Chapter 7 bankruptcy. In re Alan R. Bagg and Maureen E. Bagg, Case No. 17-00247-bhl (Bankr. E.D. Wis.). Heinrich filed a proof of claim in the amount of $425,324.05 and an adversary complaint. Dkt. No. 2-2 at 1–6. Heinrich asserted that because the Baggs' debt from the state court judgment arose from their willful and malicious injury to him or his property, under 11 U.S.C. §523(a)(6) their debt was not dischargeable in bankruptcy. Id. at 3, 5. The Baggs filed a motion to dismiss the adversary complaint, dkt. no. 22-2 at 52–54, which the bankruptcy court denied, id. at 150.

1.  *Summary Judgment Decision*

On October 16, 2017, Heinrich filed a motion for summary judgment, again asserting that the Baggs' judgment debt was nondischargeable because it

7

arose from a willful and malicious injury under 11 U.S.C. §523(a)(6). Dkt. No. 2-2 at 57–69. Heinrich relied on the doctrine of issue preclusion, arguing that the state-court jury's verdict constituted a finding of "willful and malicious injury" such that the Baggs were precluded from contesting the issue in the bankruptcy court. Id. at 64–66.

In an oral ruling on March 28, 2018, the bankruptcy court denied the motion. Dkt. No. 2-2 at 416. The court described the issue as "whether the jury's verdict in Heinrich's favor on his tortious interference with cont[r]act claim actually litigated and necessarily determined that the Baggs caused a willful and malicious injury to him or his property within the meaning of Section 523(a)(6)." Dkt. No. 4-2 at 5. The court concluded:

> Here, the jury instructions pretty clearly require the jury to find an intentional, purposeful action that led to an injury to Heinrich and his property. That concept and that finding was made contrary to the Baggs by the state court and I don't think they can re-litigate it. But I cannot conclude as a matter of law that the jury necessarily found an intention to inflict injury on Mr. Heinrich or his property. The jury instructions and special verdict questions concerning whether the Baggs' conduct was privileged touch on a lot of similar concepts, but they don't necessarily -- they did not necessarily require the jury to have found that there was a motive to injure Mr. Heinrich or his property in an attempt to cause injury.
>
> It's really close, but I don't think as a matter of law that was necessarily decided. It's quite possible that if the jury had been asked to make this finding, they would have done so. And such a finding would be consistent with the rest of their findings, but nothing in the verdict would necessarily preclude them from having found otherwise. And I don't think they were asked to find that specific thing.

Dkt. No. 4-2 at 7–8. The bankruptcy court found that the Baggs were not collaterally estopped from disputing that the debt arose from a willful and

8

malicious injury within the meaning of §523(a)(6) and denied summary judgment. Dkt. No. 4-2 at 8. <u>See also</u> Dkt. No. 2-2 at 416 (summarizing the bankruptcy court's ruling as "concluding that the jury's verdict in Heinrich's favor on his tortious interference with contract claim did not necessarily determine that the Baggs caused a 'willful and malicious injury to Heinrich or his property' within the meaning of 11 U.S.C. §523(a)(6)").

   2. *Trial*

  The bankruptcy court held a two-day bench trial on the issue of whether the Baggs willfully and maliciously intended to inflict injury on Heinrich or his property. As the party seeking an exception to discharge, Heinrich bore the burden to prove by a preponderance of the evidence that the Baggs acted willfully and maliciously.[3] Heinrich and both Maureen and Alan Baggs testified; Frank Gatlin's deposition testimony was read into evidence (Dkt. No. 4-4 at 4-27).

  Maureen Bagg testified that she was upset about the Walmart development because she was worried about the land she and her husband had cultivated:

> Q. Were you shocked to learn that a Wal-Mart might go up so close to your house?
>
> A: Dismayed.
>
> Q: Okay.

---

[3] <u>In re Calvert</u>, 913 F.3d 697, 700 (7th Cir. 2019); <u>First Weber Grp., Inc. v. Horsfall</u>, 738 F.3d 767, 774 (7th Cir. 2013); <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991).

9

A: Because my garden was there and a lot of area that we had tended to for a long period of time.

Q: Was that your only concern, your garden?

A: That was major.

Q: Uh-huh. What were some of your other concerns?

A: The area that we had spent a lot of time weeding, cultivating, chipping, cutting out dead stuff, and we had really attempted to manage and beautify it, so that the area around our house, as the area our house exists on, was natural, beautiful, tended to.

Dkt. No. 4-3 at 33–34. Ms. Bagg stated that she had two concerns regarding the Walmart development: "Number one, that area we cultivated, managed, for over 20 years, was going to be occupied. And secondly, a major concern that no one else in the village seems to be aware of this." Id. at 37.

The Baggs were involved with and members of the Friends of Elmwood Park Group, a group of residents who raised concerns with the village board about issues such as potential rezoning; the group formed to oppose Gatlin's Walmart development. Id. at 45, 48. Ms. Bagg explained the group's concerns about rezoning residential areas as commercial and the lack of transparency regarding the project: "Opposed to certain things happening. The rezoning of residential property within the village, the lack of transparency that was coming from our village officials, and a sense that there was no commitment to a land use document that said no additional commercial in our village up through 2035." Id. at 44. During her second day of testimony, Ms. Bagg described the purpose of the Friends of Elmwood Park Group and testified that the primary concern was preserving the residential character of the

10

neighborhood: "To keep the village as it was. There was a very strong feeling that we were a park-like setting, for the most part residential. There wasn't a desire to change that. We had a land use document that said no additional commercial up to 2035." Dkt. No. 4-4 at 40.

Alan Bagg gave similar testimony:

When we moved into the property, we wanted it to be as the village goes by its brand, park-like setting, and there was only one small piece of commercial property in the village, and when we moved in next to Mr. Heinrich, it was all residential, and we assumed it would stay residential, unless somebody made a zoning change.

Dkt. No. 4-3 at 106. Mr. Bagg testified to his understanding of some of the potential consequences of filing his adverse possession lawsuit:

Q: And you understood that by making this claim to a part of Mr. Heinrich's property that Mr. Heinrich wouldn't be able to convey title to Gatlin for the development. Correct?

A: Yes.

Q: And you understood that Gatlin wouldn't want to purchase [Mr. Heinrich's property if you had a claim to part of it. Correct?

A: No.

. . .

Q: So then, you know, you understood that a likely outcome of your lawsuit was that Gatlin would abandon the Wal-Mart project altogether. Correct?

A: I honestly didn't know what he was going to do.

Q: But you knew he wouldn't be able to build without that parcel. Correct?

A: That's what he told us.

. . .

11

> Q: And by filing the lawsuit, you knew that Mister -- you knew that Gatlin couldn't build a Wal-Mart on that property. Correct?
>
> A: No, he could have, but he would have had to move it to -- he wouldn't have been able to use that portion.

Dkt. No. 4-3 at 111–13.

Mr. Bagg also testified that he became concerned when he realized the land was not going to be used as residential property:

> Q: So you knew as of October, 2011, that Mr. Heinrich's property was being looked at for a commercial development. Correct?
>
> A: No. I didn't know what it was. I -- honestly, I thought Mr. Heinrich was going to sell it to someone to build a house. That would have been the logical conclusion I came to.
>
> Q: Why would that have been the logical conclusion?
>
> A: Because it's zoned residential.

Id. at 107. An April 5, 2012 email Mr. Bagg sent to a member of the village board reflects that the Baggs "became alarmed, outraged, and suspicious" only when they discovered village officials "had been meeting in secret with the Wal-Mart developer . . . ." Id. at 107–09.

Ms. Bagg also testified about why the Baggs filed the adverse possession claim, stating that it was only to protect what the Baggs had tended, cared for and cultivated:

> Q: And you filed this adverse possession claim?
>
> A: Yes.
>
> Q: And why did you do that?
>
> A: Our intent was always to protect that which we had cared for, cultivated, possessed, for more than 20 years, and saw this as a legitimate claim.

12

> Q: Okay. You weren't intending to harm Mr. Heinrich in any way?
>
> A: No, we were not.

Dkt. No. 4-4 at 43. Mr. Bagg echoed this testimony:

> Q: Why did you file the claim?
>
> A: We wanted to protect the property that we felt we had a legal right to.
>
> Q: Was it directed at Mr. Heinrich personally in any respect?
>
> A: Not at all.

Id. at 52. At the conclusion of the trial, the bankruptcy court took the matter under advisement. Id. at 67.

### 3. Bankruptcy Court Decision

On August 10, 2018, the bankruptcy court issued its verdict, concluding that the Baggs' debts to Heinrich arising from the state court case were dischargeable. Dkt. No. 2-3 at 169. Noting that Heinrich's claim arose from two separate injuries, the bankruptcy court separately analyzed the debt resulting from the Baggs' tortious interference with contract and the debt resulting from the Baggs' unlawful harvesting of timber. Id. at 174.

The bankruptcy court concluded that the Baggs' debt for tortious interference was dischargeable because Heinrich had not proven that the Baggs had a specific intent to injure or harm him within the meaning of "willful and malicious" in §523(a)(6). Id. The bankruptcy court found credible the Baggs' testimony regarding their motives and noted that Heinrich had not presented credible evidence that in their adverse possession claim, the Baggs

13

purposefully had overreached with the intent of injuring Heinrich or his property. Id. at 174–75.

Similarly, the bankruptcy court found that Heinrich had not proven that the Baggs' debt for unlawful harvesting of timber was nondischargeable under §523(a)(6). Dkt. No. 2-3 at 176. The bankruptcy court recounted that none of the witnesses had testified about the Baggs' intentions with respect to the timber and that there was no evidence from which the court could conclude that the Baggs had harvested the timber "willfully and maliciously" for the purposes of §523(a)(6). Id. The bankruptcy court found that "the paucity of evidence" required it to conclude that Heinrich had failed to carry his burden of showing a willful and malicious injury. Id. The bankruptcy court ruled that both debts were dischargeable and dismissed the adversary complaint.

C.    Appeal

1.    *Heinrich's Arguments*

Generally, Heinrich argues that it is "impossible to reconcile the state court jury instructions, special verdict, judgment and evidence in the record with the bankruptcy court's determination" that the debt is dischargeable. Dkt. No. 5 at 18. Heinrich asserts that the bankruptcy court's application of issue preclusion on summary judgment and in its adversary proceeding verdict was clearly erroneous, based on "clear errors in the application of law to facts." Id. He contends that the bankruptcy court clearly erred in "refusing" to find that the elements of §523(a)(6) were satisfied, "whether based on issue preclusion, the undisputed facts, or a combination of both." Id. at 18-19. Heinrich insists

14

that this court must dismiss the bankruptcy court's decisions and declare the Baggs' debts to him nondischargeable. Id.

As to the bankruptcy court's denial of summary judgment, Heinrich argues that the jury in the state court case had found that the Baggs "*intentionally—i.e.*, willfully" interfered with Heinrich's contract; he argues that the jury concluded either that the Baggs' prime purpose was to interfere with his contractual relationship with Gatlin or that they knew or should have known that such interference was substantially likely to occur. Id. at 19. He makes the same argument regarding the state court jury's finding that the Baggs were not privileged to act, asserting that in making that finding, the jury "necessarily determined" that the Baggs intentionally interfered 'in conscious disregard of one's duties or without just cause or excuse'—*i.e.*, maliciously— because the Baggs acted from ill will or an improper motive" toward him. Id. Heinrich argues that because the state court jury made the above findings, the bankruptcy court erred in not giving those findings preclusive effect at summary judgment. Id. at 25.

As to the bankruptcy court's verdict in favor of the Baggs following the adversary trial, Heinrich's arguments are similar. He criticizes the bankruptcy court's determination that the Baggs' testimony that they did not intend to harm him, harbored no animus toward him and filed the adversary complaint in good faith was credible. Id. at 26. He also argues that the bankruptcy court placed "inappropriate significance" on the state court's conclusion that the Baggs had adversely possessed the garden portion of the land. Id. Heinrich

15

emphasizes that the state court jury was aware that the Baggs had adversely possessed the garden, but that the jury still concluded that the Baggs' adverse possession was unlawful. Id. at 27.

Finally, asserting that the point of the two-day adversary trial was to determine whether the Baggs' conduct toward Heinrich was willful (with no mention of "malicious"), Heinrich contends that the bankruptcy court created a "*new standard* for non-dischargeability—'sufficient intent'—that has no basis in the law, to minimize the impact of the State Court Findings." Id. at 28. Heinrich argues that the bankruptcy court's conclusion that the Baggs did not act with "sufficient intent to inflict injury" or with "sufficient malice" constituted an error of law; he asserts that "the level or sufficiency of the Baggs' intent is wholly irrelevant," and that §523(a)(6) does not require any "quantification" of a debtor's intent. Id. He maintains that "[t]he correct legal standard is simply whether the debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." Id. Citing several things that the Baggs had testified that they knew or felt, Heinrich says that the evidence is "overwhelming" that the Baggs' "prime motive in filing the State Court Action was to prevent Gatlin from purchasing" Heinrich's property, "which the Baggs knew would result in Heinrich not getting paid." Id. at 28-29.

Heinrich briefly argues that he met his burden in proving at the adversary trial that the Baggs harvested timber from the property willfully and maliciously. Id. at 30. He asserts that the Baggs "stole" his timber, which "easily constitutes 'willful and malicious injury' under § 523(a)(6)." Id.

16

## 2. *The Baggs' Arguments*

The Baggs generally contend that Heinrich's arguments constitute an attempt to "remove ill-will or malice" from §523(a)(6). Dkt. No. 7 at 7-8. They argue that the Heinrich has confused their actions with their motives. Id. at 9. They disagree that the bankruptcy court tried to measure the quantity of ill-will or malice, only that it tried to determine whether the Baggs bore ill-will or malice. Id. at 10. The Baggs summarize what happened this way:

> The Baggs filed a lawsuit for adverse possession and a lis pendens to stop Heinrich from selling property to Gatlin that the Baggs believed that they owned. They prevailed in that lawsuit and were giving ownership of a portion of the property. Gatlin deciding that it would only purchase real estate from Heinrich if it included the portion that was actually owned by the Baggs was both foreseeable and entirely outside of the Baggs' control. Although in practical terms, Heinrich's injury is the same (the sale to Gatlin being canceled) whether caused by the Baggs acting with the motive to protect their own property or acting with the motive to harm Heinrich. In bankruptcy, these two motives cause two very different types of injuries—the first injury is dischargeable, the second is not.

Id. at 10-11.

As to issue preclusion, the Baggs argue that the bankruptcy court's summary judgment decision is beyond review, given that the court held a trial on the merits. Id. at 11. They argue that even if the decision were subject to review, the bankruptcy court got it right because there was a genuine dispute of material fact regarding whether Heinrich's injury was the result of the Baggs' ill-will or malice and argue that issue preclusion did not apply because the state court judgment did not answer that question. Id. at 11–12. The Baggs recount that the bankruptcy court observed that if they had tried to re-litigate

17

the questions of whether Heinrich suffered an injury and whether their conduct was intentional, issue preclusion would have barred those arguments. Id. at 12. They reiterate that the issue before the bankruptcy court was whether there was a genuine dispute as to the issue of material fact of whether their motive in filing the state suit and *lis pendens* was ill will or malice. Id.

The Baggs argue that issue preclusion requires the first court to actually have litigated the issue in question, and they argue that the jury in the state case was not asked to find ill will or malice. Id. at 14. They distinguish cases cited by Heinrich. Id. at 15. And they assert that it was Heinrich, not the Baggs, who was trying to relitigate in the bankruptcy court facts resolved in the state court proceeding—whether Heinrich was injured and whether the Baggs had acted intentionally in making the state court filings. Id. at 16.

Finally, as to the harvested timber, the Baggs assert that nothing in the state court judgment indicated that they harvested the timber willfully or maliciously and argue that Heinrich presented no evidence in bankruptcy court that they did so. Id.

3.    *Heinrich's Reply*

Heinrich replies that the Baggs "intentionally and unlawfully filed a lawsuit against Heinrich to encumber his Real Estate and stop him from selling it to a developer of whom they disapproved." Dkt. No. 10 at 4. He contends that the Baggs knew when they filed the state court suit that he would lose "the anticipated sale proceeds because of their lawsuit." Id. And he argues that they achieved their intended result—"the lawsuit caused the developer to rescind

18

the contract to purchase Heinrich's Real Estate resulting in $405,000 in damages to Heinrich." Id. Heinrich maintains that the state court jury was not persuaded by the Baggs' "defenses and minimal success on their adverse possession claim," and that the jury concluded that the Baggs had acted "without legal justification and with an improper motive towards Heinrich. . . ." Id. Heinrich maintains that the bankruptcy court did not consider the jury's findings "as a whole" and committed error in concluding that the Baggs did not intend to harm him. Id. at 5.

## II.    Standard of Review

This court has jurisdiction to hear appeals from final judgments, orders and decrees issued by the bankruptcy court. 28 U.S.C. §158(a)(1). District courts review the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. First Weber Group, Inc. v. Horsfall, 738 F.3d 767, 776 (7th Cir. 2013) (citing Fed. R Bankr. P. 7052 and Freeland v. Enodis Corp., 540 F.3d 721, 729 (7th Cir 2008)).

> The question whether an actor behaved willfully and maliciously is one of fact. [*Matter of*] *Thirtyacre*, 36 F.3d [697,] at 700 [(7th Cir. 1994)]. "When there are two permissible views of the evidence, the [court]'s choice between them cannot be clearly erroneous." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir 2010). We must be especially deferential toward a trial court's assessment of witness credibility. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 . . . (1985).

Id.

"Under the clearly erroneous standard, if the bankruptcy court's factual findings are plausible in light of the record viewed in its entirety, a reviewing

court may not reverse even if it would have weighed the evidence differently."

Mungo v. Taylor, 355 F.3d 696, 974 (7th Cir. 2004) (citing Matter of Love, 957

F.2d 1350, 1354 (7th Cir. 1992)). But "[a] factual finding is clearly erroneous if

[the reviewing court is] left with the definite and firm conviction that a mistake

has been committed." *In re* Veluchamy, 879 F.3d 808, 814 (7th Cir. 2018)

(citing In re Kempff, 847 F.3d 444, 448 (7th Cir. 2017)).

## III.  Analysis

### A.  The Bankruptcy Court's Summary Judgment Decision

#### 1.  *Whether the Bankruptcy Court's Decision is Subject to Review*

Heinrich did not address one of the Baggs' arguments: that because the

bankruptcy court conducted a trial on the merits of the §523(a)(6)

nondischargeability claim, its prior denial of Heinrich's summary judgment

motion no longer is subject to review. "'[C]ourts normally do not review the

denial of a summary judgment motion after a trial on the merits[.]'" Ortiz v.

Jordan, 562 U.S. 180, 183 (2011) (quoting Ortiz v. Jordan, 316 F. App'x 449,

453 (7th Cir. 2009)). As the Seventh Circuit has explained,

> [a]fter a case goes to trial, as happened here, an earlier summary-judgment denial is "old news." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019); *see also Ortiz v. Jordan*, 562 U.S. 180, 184 . . . (2011). We have noted a possible exception to that rule of non-reviewability, for "purely legal issues." *Mimms v. CVS Pharmacy, Inc.*, 889 F. 3d 865, 869 (7th Cir. 2018); *see also Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 404 (7th Cir. 2018) (discussing the "controversial exception"); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 n.2 (7th Cir. 2014) (noting "a split of authority on this point").

Case 2:21-cv-01438-PP   Filed 03/24/23   Page 20 of 39   Document 87

Valbruna Slater Steel Corp. v. Joslyn Mfg. Co., 934 F.3d 553, 560 (7th Cir. 2019). The Valbruna court described a case that might fit into the "possible" exception—one in which "[t]he facts are undisputed and the district court's preclusion and limitations decisions were as a matter of law." Id.

There is a disputed fact here—the Baggs dispute that the injury they inflicted on Heinrich was "willful and malicious" as that phrase is defined for the purpose of §523(a)(6). Arguably that factual dispute makes unavailable the exception to the general rule that an appellate court does not review a denial of summary judgment when there has been a subsequent trial on the merits. That said, in an abundance of caution the court will assume for the purposes of this appeal that the bankruptcy court's legal ruling on whether issue preclusion barred the Baggs from opposing summary judgment by arguing that their conduct was not willful and malicious falls within the exception described in Valbruna.

### 2. *The Law Governing Issue Preclusion*

"Federal courts apply the preclusion law of the state where the judgment was rendered, so long as the state in question satisfies the applicable requirements of the Due Process clause." Savory v. Cannon, 947 F.3d 409, 418 (7th Cir. 2020) (citing Kremer v. Chemical Constr. Corp., 456 U.S. 461, 481-82 (1982)).

> A state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court. *Allen v. McCurry*, 449 U.S. 90, 96 . . . (1980); see 28 U.S.C. § 1738. This rule applies with equal force to bankruptcy cases. *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir. 1987).

<u>Horsfall</u>, 738 F.3d at 772.

The bankruptcy court was required to apply Wisconsin's preclusion law in deciding whether the state-court rulings barred the Baggs from arguing that their debt to Heinrich was not the result of willful and malicious conduct. The bankruptcy court did exactly that, stating at the March 28, 2018 hearing that

> [u]nder 28 U.S.C. Section 1738, which is the Full Faith and Credit Act, a state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court.
>
> So we need to look at Wisconsin issue preclusion law. And under Wisconsin law, . . . .

Dkt. No. 4-2 at 4.

> Under Wisconsin law, "[c]ollateral estoppel, or issue preclusion, is a doctrine designed to limit the relitigation of issues that have been contested in a previous action between the same or different parties. *Michelle T. by Sumpter v. Crozier*, 173 Wis. 2d 681, 495 N.W. 2d 327, 329 (Wis. 1993)). Wisconsin courts apply the following general rule: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Hlavinka v. Blunt, Ellis & Loewi, Inc.,* 174 Wis. 2d 381, 497 N.W.2d 756, 762 (Wis. Ct. App. 1993) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980)).
>
> In Wisconsin (as in most states), the question whether issue preclusion applies depends on two criteria. The first (the "actually litigated" step) requires that "the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and [have been] necessary to the judgment." *Mrozek v. Intra Fin. Corp.*, 281 Wis. 2d 448, 699 N.W. 2d 53, 61 (2005). The second (the "fundamental fairness" step) requires the court to "determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Id.* Relevant factors for the latter inquiry include the availability of review of the first judgment, differences in the quality or extensiveness of the proceedings, shifts in the burden of persuasion, and the adequacy of the loser's incentive to obtain a

full and fair adjudication of the issue. *Id.* at 61-62. The fundamental fairness step eschews formalistic requirements in favor of "a looser, equities-based interpretation of the doctrine." *Michelle T.*, 495 N.W.2d at 330.

In order to know what was "actually litigated," [the appellate court] must take a closer look at what the state court decided.

Horsfall, 738 F.3d at 772-73.

[The appellate court] review[s] determinations of the preclusive effect of state law *de novo*. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011) (bankruptcy appeal); *Donald v. Polk Cnty.*, 836 F.2d 376, 382-83 (7th Cir. 1988) (applying Wisconsin law).

Id., 738 F.3d at 772.

      3.    *The Issue that Heinrich Asserts Is Precluded by the State Court Judgment*

The bankruptcy court correctly articulated in its summary judgment ruling that the issue Heinrich claimed was precluded by the state-court judgment:

So the issue here essentially comes down to the [state court] jury verdict and whether the jury's verdict in Heinrich's favor on his tortious interference with contract claim actually litigated and necessarily determined that the Baggs caused a willful and malicious injury to him or his property within the meaning of Section 523(a)(6).

Dkt. No. 4-2 at 5.

      4.    *Whether the Bankruptcy Court Was Precluded from Considering that Issue by the State Court Verdict*

To prove a claim of intentional—or tortious—interference with contract under Wisconsin law, a plaintiff must prove the following elements:

(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal

23

23

23

connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere.

Cox v. Med. College of Wis., Inc., No. 22-CV-553-JPS, 2023 WL 199216, at 40 (E.D. Wis. Jan. 17, 2023) (quoting Henson v. Stroede, 364 Wis. 2d 527, 868 N.W. 2d 198, ¶6 (Wis. Ct. App. 2015)).

Under federal bankruptcy law, in determining whether a debt was "for willful and malicious injury by the debtor to another entity or to the property of another entity" under 11 U.S.C. §523(a)(6), "[b]ankruptcy courts in this circuit have focused on three points: (1) an injury caused by the debtor (2) willfully and (3) maliciously." Horsfall, 738 F.3d at 774 (citation omitted). See also In re Calvert, 913 F.3d at 700 ("By its terms, [§523(a)(6)'s] exception to the general discharge rule requires '(1) an injury caused by the debtor (2) willfully and (3) maliciously.'").

A comparison of the elements of a tortious interference claim and the requirements for §523(a)(6) reveals no identical elements. Tortious interference does not specifically require proof of "injury," though it does appear to require proof of damages, which result from injury. Tortious interference does not require the interfering person to cause "willful" or "malicious" damages to the contracting person. But assuming that tortious interference requires an injury that results in damages, the bankruptcy court found—and the Baggs do not dispute—that Heinrich suffered an injury (Gatlin's termination of the contract to buy his property for more than its appraised value). See Dkt. No. 2-3 at 174.

The dispute before the bankruptcy court was whether, in finding in Heinrich's favor that the Baggs *intentionally* interfered with the contract

24

between Heinrich and Gatlin, and in finding in Heinrich's favor that the Baggs were not *privileged or justified* to interfere, "the jury necessarily found a willful and malicious injury to Heinrich or his property" as a matter of law. Dkt. No. 4-2 at 6. The bankruptcy court asked, "was there a finding by the state court of—state court jury that the conduct was intentional and that there was an intention to inflict injury, which is basically what willful and malicious injury both mean?" Id.

The Seventh Circuit has stated "that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." Jendusa-Nicolai v. Larsen, 677 F.3d 320, 324 (7th Cir. 2012). The point is that to allow someone to "shirk liability by discharging his judgment debt in those circumstances" would undermine one of the Bankruptcy Code's "principal" purposes: that of granting "a fresh start to the *honest but unfortunate debtor.*" Id. (quoting Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007)).

a.     "Malicious"

The parties spill much ink parsing the instructions Judge Mueller gave the state-court jury, and the wording of the jury's special verdict, to support their respective arguments that the verdict did (Heinrich) or did not (the Baggs) equate to a finding of "maliciousness" as that word is interpreted in the context of §523(a)(6). But Heinrich also argues that in its 2013 decision in Horsfall, the

25

Seventh Circuit held a finding that someone's conduct was not privileged for the purposes of tortious interference with contract definitively establishes the "malicious" prong of the §523(a)(6) and precludes any litigation of "maliciousness" in the bankruptcy court. The facts of Horsfall help to understand this argument.

Horsfall worked as a real estate agent for First Weber; after he left First Weber and went out on his own, he completed a sale that he'd started while with First Weber and collected the commission in violation of his agreement with First Weber and of Wisconsin law. Horsfall, 738 F.3d at 771. First Weber sued Horsfall in state court for breach of contract, tortious interference and unjust enrichment. Id. at 772. The state court granted summary judgment and awarded First Weber $10,978.91. Id. Horsfall then filed for Chapter 7 protection and listed First Weber as a creditor. Id. First Weber asserted that Horsfall's debt was nondischargeable under §523(a)(6) and that the state court judgment established—by issue preclusion—all the elements for satisfying §523(a)(6); the bankruptcy court denied summary judgment and scheduled a trial. Id. After hearing the evidence at trial, the bankruptcy court "concluded that Horsfall never harbored animosity toward First Weber" and that he believed that his obligations to First Weber had ended before he collected the commission. Id. The bankruptcy court found that First Weber had not proved an injury or that it was willful or malicious, and the district court affirmed. Id.

On appeal, the Seventh Circuit first noted that of all the theories First Weber had raised in state court, only the "intentional torts of interference and

26

conversion could plausibly constitute willful and malicious injury." Id. at 773. The Seventh Circuit ruled that the state court's conclusion that Horsfall had tortiously interfered with the contract between First Weber and the seller "precluded relitigation of the issue of maliciousness." Id. at 775. Having earlier listed the elements of a Wisconsin tortious interference claim, the Seventh Circuit explained that

> [f]or the purposes of section 523(a)(6), maliciousness exists when one acts in "conscious disregard of one's duties or without just cause or excuse." *Thirtyacre*, 36 F.3d at 700. First Weber's state-law tortious interference claim required a finding that Horsfall was "not justified or privileged to interfere" with its contractual rights. *Briesemaster* [*v. Lehner*, 295 Wis. 2d 429], 720 N.W.2d [531,] at 542 [(Wis. Ct. App. 2006)]. The state court thus determined that Horsfall's interference was intentional and that he was neither justified nor privileged to interfere with First Weber's rights. In order to reach this conclusion, the state court had to find that Horsfall's actions were not reasonable or taken in good faith. This inquiry substantially mirrored the federal test for maliciousness.

Id. The court also held that, as to the "fundamental fairness" step of the issue preclusion analysis, there was "nothing fundamentally unfair about holding Horsfall to this finding." Id.

Horsfall did not involve state court jury instructions or a state court verdict; the state court had granted summary judgment on the tortious interference claim, so there no tea leaves of a jury verdict for the bankruptcy court or the Seventh Circuit to interpret. The Seventh Circuit appears to have based its analysis entirely on the elements of a Wisconsin intentional interference with contract claim and its comparison of those elements— particularly the privilege element—with its understanding of the §523(a)(6) "maliciousness" requirement. But its language appears definitive; the court

27

held that a fact-finder's finding of no privilege in a tortious interference claim equates to a finding of maliciousness under §523(a)(6), precluding any litigation of that issue in bankruptcy court.[4]

Granted, the <u>Horsfall</u> decision discusses the slipperiness of the requirements for demonstrating "willful and malicious injury," <u>id.</u> at 774, and perhaps counter-intuitively, it states that in the context of §523(a)(6), maliciousness does not "require ill-will or specific intent to do harm." <u>Id.</u> (quoting <u>Thirtyacre</u>, 36 F.3d at 700). But however §523(a)(6) maliciousness is defined, the appellate court seems to have concluded that a state-court finding that conduct was not privileged in the context of a tortious interference claim meets that definition.

The Baggs argue that the state-court jury was not asked to decide whether their conduct was malicious; the word "malicious" doesn't appear in the jury instructions Judge Mueller gave or in the verdict. <u>See</u> Section I(A) above). But as the bankruptcy court noted, the Seventh Circuit has held that this doesn't resolve the issue. The Seventh Circuit has held in the context of jury instructions that did not use the words "willful and malicious" "that the failure of the statutory text of § 523(a)(6) to appear in the state court proceedings does not bar the application of issue preclusion." <u>Gerard v. Gerard</u>, 780 F.3d 806, 810 (7th Cir. 2015). Rather, the court "must assess whether the

---

[4] In this case, the jury instructions given in the state-court trial provided the jury with a non-exhaustive list of seven factors to consider when deciding whether the Baggs' actions were privileged. One cannot determine from the "no" answer on the verdict form which of those factors, if any, the jury found persuasive. Given the Seventh Circuit's ruling in <u>Horsfall</u>, that does not appear to matter.

28

jury's findings satisfy the 'willful and malicious' standard within the meaning of § 523(a)(6)." Id. That is what the Horsfall court did.

The jury's finding in favor of Heinrich on the tortious interference counterclaim, particularly its "no" answer to the special verdict question of whether the Baggs' actions were privileged, constituted a finding that mirrored the federal test for maliciousness. The Baggs have not demonstrated any fundamental unfairness in effectuating that finding. Having considered the issue *de novo*, the court concludes that the jury's verdict precluded litigation of "maliciousness" in the bankruptcy court.

b.  "Willful"

Horsfall requires a different conclusion regarding the "willfulness" requirement of §523(a)(6). Horsfall explained that willfulness means "either a motive to inflict injury or an act substantially certain to result in injury." Horsfall, 738 F.3d at 775. It stated that "[w]illfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.'" Id. at 774 (emphasis in the original) (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). "'Willfulness' can be found either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.'" Id. (quoting Bukowski v. Patel, 266 B.R. 838, 844 (E.D. Wis. 2001)). Since deciding Horsfall, the Seventh Circuit has emphasized "that one must act with the specific intent to cause a certain result in order to prove willfulness." Gerard, 780 F.3d at 811.

29

Heinrich emphasizes those portions of the jury instructions that he believes required the jury to make a finding of willful conduct:

> Question 2 of the special verdict asks whether that interference on the Baggs' part was intentional . . . .
>
> In determining the Baggs' intent, you may consider their actions and statements. *Ordinarily, it is reasonable to infer that a person intends the natural and probable consequences of his or her acts.*
>
> Although other reasons may appear, *Mr. Heinrich must prove that the Baggs' prime purpose was to interfere with the contractual relationship Mr. Heinrich had with Gatlin Development Company or the Baggs knew or should have known that such interference was substantially certain to occur as a result of their conduct.*
> . . .

Dkt. No. 5 at 8-9 (quoting Dkt. No. 2-2 at 59–60) (emphasis in Heinrich's brief).

Heinrich also points to the state court jury's verdict:

> 1.     Did the Baggs' lawsuit interfere with Mr. Heinrich's contract with Gatlin development? Yes
>
> 2.     If you have answered Question 1 "yes" answer this question: Did the Baggs intend to interfere with Mr. Heinrich's contract? Yes
>
> 3.     If you have answered Question 2 "yes," answer this question: Was the Baggs' interference a cause of damages to Mr. Heinrich? Yes

Id. at 10 (quoting Dkt. No. 2-2 at 61.

Heinrich argues that the jury's findings established several things. He argues that the jury's findings show that the Baggs conveyed to Gatlin, either through conduct or words, that they wanted to influence Gatlin to "refrain from dealing with" Heinrich. Dkt. No. 5 at 10. The jury instruction regarding Question 1—whether the Baggs' lawsuit interfered with the contract between Heinrich and Gatlin—told the jury that interference consisted of any conduct or

30

words conveying to Gatlin the Baggs' desire to influence Gatlin to refrain from dealing with Heinrich, and that a lawsuit could constitute an actionable interference. The jury answered Question 1 in the affirmative.

Heinrich contends that the jury's findings establish that the Baggs' "prime purpose" was to interfere with the contractual relationship between he and Gatlin, or that they knew or should have known that their conduct likely would result in interference. Dkt. No. 5 at 10. The state court's instruction as to Question 2—whether the Baggs intended to interfere with Heinrich's contract—told the jury that Heinrich was required to prove that the Baggs' "prime" purpose was to interfere with Heinrich's contract with Gatlin, or that they knew or should have known that their conduct would cause such interference, and the jury answered Question 2 in the affirmative.

Heinrich argues that the jury's "yes" answer to these to questions "goes beyond intent to take action and addresses a specific intent to cause a certain result—a result that inevitably would cause economic harm to Heinrich." Dkt. No. 5 at 24–25. The Horsfall court concluded otherwise. The court recounted that the third element of a Wisconsin tortious interference claim is that "the interference was intentional." Horsfall, 738 F.3d at 775. The court found that this element requires "only intent to act, not intent to injure." Id. It observed that the tortious interference claim did not require a showing of intent to injure, "and thus that finding was not necessary to the state court's judgment." Id. The Seventh Circuit went on to explain that

> [i]f accepted, First Weber's position would risk transforming every state-law intentional tort into a non-dischargeable debt, contrary

31

to the Supreme Court's opinion in *Geiger*. That problem, added to "the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start,' see *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994), leads us to conclude that the state court's decision did not preclude Horsfall from litigating the issue of willfulness in the bankruptcy case.

Id.

The jury's verdict established that the Baggs' filing of the state-court lawsuit conveyed to Gatlin that they wanted to influence him not to deal with Heinrich, and that they intended to interfere with Heinrich's contractual relationship with Gatlin (or knew the lawsuit likely would interfere). But these findings do not establish that the Baggs intended to *injure* Heinrich. Because the jury's verdict does not establish an intent to injure, the verdict did not preclude litigation of the willfulness component in bankruptcy court.

The bankruptcy court did not commit an error of law in denying summary judgment on the ground that the state-court jury's verdict did not preclude litigation in the bankruptcy court of at least one of the elements of a §523(a)(6) claim.

B.    August 10, 2018 Verdict After Trial

Heinrich challenges the bankruptcy court's decision following the testimony at trial, asserting that the bankruptcy court again "improperly ignored" the state court findings and failed to apply the doctrine of issue preclusion. Dkt. No. 5 at 26. This argument fails for the reasons that Heinrich's preclusion argument regarding summary judgment fails—the state court jury verdict did not preclude the Baggs from litigating the question of willfulness.

32

Heinrich also argues, in essence, that preclusion aside, the bankruptcy court's conclusion that the Baggs' conduct was not willful and malicious was contrary to the evidence presented at trial. Heinrich asserts that there was "ample evidence" for the bankruptcy court to find that the Baggs had acted willfully and maliciously. Id. at 28–31. "The question of whether an actor behaved willfully . . . is one of fact." Horsfall, 738 F.3d at 776 (citing Thirtyacre, 36 F.3d at 700). That means this court reviews the bankruptcy court's findings for clear error. Id.

The sole issue before the bankruptcy court was "whether the Baggs had a specific intent to injure or harm Heinrich (whether as part of proving 'maliciousness' or proving 'willfulness')." Dkt. No. 2-3 at 174. This court agrees, noting only that under Horsfall, the "specific intent to injure or harm" determination appears to relate to willfulness rather than maliciousness. The bankruptcy court stated it was "not persuaded that the Baggs acted with a sufficient intent to inflict injury (or with sufficient malice) to render their debts to Heinrich nondischargeable under section 523(a)(6)." Id. That court found credible the Baggs' testimony that they did not act to harm Heinrich, recounting that the Baggs had explained that they wanted to preserve the residential character of their neighborhood and that they harbored no animus against Heinrich personally or his property. Id. The bankruptcy court found that the Baggs had filed the adverse possession lawsuit and lis pendens in good faith. Id. After weighing all the evidence, the bankruptcy court concluded that Heinrich had not proven by a preponderance of the evidence that the Baggs

33

intended to inflict injury on him or his property. Much of the evidence was the parties' testimony, and the bankruptcy court found the Baggs' testimony regarding their motivations credible. Dkt. No. 2-3 at 174.

Heinrich asserts that it was improper for the bankruptcy court to even consider this testimony because the jury's verdict was preclusive on the issue. Dkt. No. 5 at 26. This court has found otherwise. The bankruptcy court found that Heinrich did not present any credible evidence that the Baggs' adverse possession claim was intentionally inflated to kill the Walmart deal and cause Heinrich harm. Dkt. No. 2-3 at 175. "When there are two permissible views of the evidence, the [court]'s choice between them cannot be clearly erroneous." Horsfall, 738 F.3d at 776 (alteration in original) (quoting Dexia Credit Local v. Rogan, 629 F.3d 612, 628 (7th Cir. 2010)). And the reviewing court "must be especially deferential toward a trial court's assessment of witness credibility." Id. (citing Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985)). This court defers to the bankruptcy court's assessment of the witnesses' credibility, including the credibility of the parties, and finds no clear error in that assessment.

The bankruptcy court also opined that the Baggs' lawsuit and *lis pendens* were not frivolous, because the state court ultimately "ruled that the Baggs had indeed adversely possessed a portion of Heinrich's land . . . ." Dkt. No. 2-3 at 175. The bankruptcy court stated that the Baggs "were thus plainly within their rights," which "undercuts Heinrich's argument that the injury was willful and malicious." Id. On appeal, Heinrich asserts that this conclusion was

34

inappropriate because in finding that the Baggs were not privileged to interfere, the state court jury had determined that the Baggs had overreached in filing their lawsuit and *lis pendens*. Dkt. No. 5 at 26–27. While it was the state court *judge*, not the jury, who decided the adverse possession claim in favor of the Baggs, see Dkt. No. 2-2 at 212, Heinrich contends that "[t]he jury considered the Baggs' limited success on their adverse possession claim and still found that the Baggs had no basis for the vast majority of their adverse possession claim." Dkt. No. 5 at 27. But the bankruptcy court found in the bankruptcy trial, thatHeinrich did not present any credible evidence demonstrating that the Baggs purposefully overreached in their adverse possession claim with the intent of injuring Heinrich or his property. Dkt. No. 2-3 at 175. And while it concluded that the Baggs' success on the adverse possession claim showed that the state-court lawsuit was not frivolous, it also observed that "[t]he mere partial success" of the Baggs' adverse possession claim was not dispositive, because a party in the Baggs' position could have acted with an intent to injure (which the bankruptcy court characterized as acting "maliciously") even if that party had had a valid adverse possession claim. Id. The bankruptcy court emphasized that Heinrich had the burden of proof, but that he had "offered no evidence the Baggs' claim was intentionally inflated to kill the Walmart deal and cause him harm." Id.

The bankruptcy court addressed Heinrich's argument (which he reasserts on appeal) that the Baggs acted willfully and maliciously because their conduct in filing the adverse possession lawsuit was "substantially

35

certain" to result in harm to Heinrich or his property. Id. The bankruptcy court found that this argument misconstrued the language used in the case law: "While a person is certainly held to have intended all consequences that are substantially certain to result from his actions, this is not the same thing as having an intent to inflict injury, as required to sustain a nondischargeability complaint under section 523(a)(6)." Id. The bankruptcy court explained— repeating the reasoning the Seventh Circuit used in Horsfall—that Heinrich's construction would "water down" §523(a)(6)'s requirements and risk "transforming every state-law intentional tort into a non-dischargeable debt, contrary to the Supreme Court's opinion in *Geiger*." Id. (quoting Horsfall, 738 F.3d at 775).

The bankruptcy court also recounted that in closing argument, *Heinrich* had identified three potential outcomes from the Baggs' lawsuit:

> First, the Baggs might prevail and have their adverse possession rights vindicated. While this would deprive Heinrich of the proceeds from the proposed sale to Gatlin, he would not have been harmed in the legal sense; an inability to complete the sale of land one does not rightfully own is not a legal injury. Second, Heinrich might prevail in the lawsuit and then proceed with the Walmart deal. In this instance, he would recover the sale price and suffer no injury (other than perhaps for some delay, assuming the delay had financial consequences). Third, Heinrich might prevail in the lawsuit, but only after the deal fell through (as actually happened). In this circumstance, the Baggs' lawsuit would have resulted in injury.

Dkt. No. 2-3 at 175–76. These scenarios—Heinrich's own scenarios—illustrate that the Baggs filing the lawsuit was *not* substantially certain to result in harm to Heinrich. The bankruptcy court pointed out that Heinrich would not have been wrongfully injured if the first outcome (the Baggs prevailed on their

36

adverse possession claim) or the second outcome (Heinrich prevailed and proceeded with the Walmart deal) had transpired. Id. at 176. This court notes that Alan Bagg had testified at the adversary trial that he was not sure what the result would be when he filed the adverse possession claim and the *lis pendens*. See Dkt. No. 4-3 at 111–13. This supports the bankruptcy court's finding that the Baggs did not believe it was substantially certain that Heinrich would suffer harm. See Bukowski, 266 B.R. at 844 (quoting Supreme Court's affirmation in Geiger "that the willfulness requirement was satisfied if the debtor 'believed that it was substantially certain that [the creditor] would suffer harm'").

The bankruptcy court did not commit clear error in concluding that Heinrich had not proven by a preponderance of the evidence that the Baggs had interfered with the Gatlin contract with the intent to injure Heinrich—a finding necessary to prove willfulness.

Although Heinrich's primary focus was on the tortious interference claim, he also claims on appeal that he met his burden with respect to the timber harvesting claim and that the bankruptcy court improperly found the debt was dischargeable. Dkt. No. 5 at 30. The state court determined that the Baggs had violated Wis. Stat. §26.05 by unlawfully harvesting timber from Heinrich's land and awarded Heinrich $2,400 in damages. Dkt. No. 2-3 at 176. The bankruptcy court found that the state court judgment itself established that the Baggs had cut timber on Heinrich's land and that Heinrich had suffered injury as a result, and that Heinrich therefore met his burden on two of the

three required statutory elements under §523(a)(6). Id. The bankruptcy court found, however, that "the paucity of evidence requires the court to conclude that Heinrich failed to carry his burden of showing a willful and malicious injury on this debt too." Id. The bankruptcy court explained that "[n]one of the witnesses testified about the Baggs' intentions with respect to the timber, other than that they burned some of it in their fireplace." Id. Therefore, "[t]here was nothing from which the court could conclude that the unlawful timber harvesting was done willfully and maliciously for purposes of section 523(a)(6)." Id.

Heinrich asserts that the Baggs supplemented the state court findings at the bankruptcy trial when they testified that they knew the timber belonged to Heinrich, they did not ask him for permission, they took the timber for their personal use and they did not pay Heinrich for the timber. Dkt. No. 5 at 30. Heinrich asserts that "stealing" his timber "easily constitutes 'willful and malicious injury' under §523(a)(6)." Id. Again, the testimony Heinrich highlights does not prove that the Baggs intended to injure him; it does not prove that the Baggs had any motive beyond their repeated testimony regarding improving the appearance and available use of the land. It was Heinrich's burden to provide evidence of willfulness and the bankruptcy court found that he provided none. That finding did not constitute clear error.

The bankruptcy court did not commit clear error in finding that Heinrich had not met the requirements for a §523(a)(6) nondischargeability claim, either as to the tortious interference judgment or the timber-harvesting judgment.

38

C.  The "New Standard"

Finally, Heinrich's argument that the bankruptcy court created a "*new standard* for non-dischargeability—'sufficient intent'—that has no basis in the law, to minimize the impact of the State Court Findings," dkt. no. 5 at 28, has no merit. The bankruptcy court's conclusion that the Baggss did not act with "sufficient intent to inflict injury" or with "sufficient malice" was an articulation of its conclusion that Heinrich had not carried his burden to prove by a preponderance of the evidence that the Baggs acted with the intent to injure him. Heinrich is correct that "[t]he correct legal standard is simply whether the debtor's motive was to inflict the injury," id., but as the bankruptcy court and this court have found, Heinrich did not meet that standard.

IV.  **Conclusion**

The court **AFFIRMS** the decision of the bankruptcy court and **DISMISSES** the appeal. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 24th day of March, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

39