# United States District Court
## Eastern District of Wisconsin

---

## Estate of Collins v. Milwaukee County

### 21 CV 1438



Video Deposition of

**Russell Palmer**

Recorded 03/15/2023 in Pewaukee, WI

11:03 am - 12:01 pm, 58 mins. elapsed

---

## Magne-Script

(414) 352-5450

*23208 Standard transcript with index and exhibits*

Witness

Russell Palmer


Wednesday 03/15/2023 at 09:00 by: Jeff Joseph


Gende Law Office, S.C.

N28 W23000 Roundy Dr.

Pewaukee, WI  53072


Estate of Collins v. Milwaukee County

21 CV 1438

United States District Court

Eastern District of Wisconsin

1          A P P E A R A N C E S

2     James J. Gende

3     Gende Law Office, S.C.

4     N28 W23000 Roundy Dr.

5     Pewaukee, WI  53072

6     On behalf of the Plaintiffs

7

8     Andrew A. Jones

9     Hansen Reynolds, LLC

10    301 N. Broadway, Suite 400

11    Milwaukee, WI  53202

12    On behalf of Milwaukee County Defendants

13

14    Adam M. Fitzpatrick

15    Corneille Law Group, LLC

16    615 S. Monroe Ave.

17    Green Bay, WI  54301

18    On behalf of Armor Correctional Health Services, Inc.

19    Defendants

20

21

22

23

24

25

1    John J. Reid

2    Cassiday Schade, LLP

3    330 E. Kilbourn Ave., Suite 575

4    Milwaukee, WI  53202

5    On behalf of Jonathan Brodie, M.D.

6

7    Kevin F. Geary

8    Gass Turek LLC

9    241 N. Broadway, Suite 300

10   Milwaukee, WI  53202

11   On behalf of Injured Patients and Families Compensation

12   Fund

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   EXAMINATION BY                              PAGE NO.

 3   Mr. Gende . . . . . . . . . . . . . . . . . . 4, 66

 4   Mr. Jones . . . . . . . . . . . . . . . . . .   66

 5   EXHIBIT NO.                                  PAGE NO.

 6   55 - Notice of Video Deposition . . . . . . . .   34

 7   56 - Summary of report. . . . . . . . . . . .   41
```

```
 8       (The exhibits were attached to the transcripts)

 9                    ===========

10                  E X A M I N A T I O N

11       BY MR. GENDE:

12   Q   Sir, please state your name and spell your last name

13       for the record.

14   A   Russell Palmer, Jr., P-a-l-m-e-r.

15   Q   Mr. Palmer, I'm going to ask you a series of questions

16       regarding your interactions with Mr. Collins back in

17       December of 2018.  If you don't understand my

18       question, please tell me so and I'll attempt to

19       rephrase it in a manner that's more clear.  Okay?

20   A   Okay.

21   Q   If you answer my question, I will assume that you

22       understood it.  Is that fair?

23   A   Yes, sir.

24   Q   All your answers must be in a verbal manner because

25       the court reporter cannot take down nods of the head
```

1      or shrugs of the shoulders.  Okay?

2   A  Okay.

3   Q  Finally, please allow me to ask my entire question

4      before you attempt to answer and I'll afford you the

5      same courtesy so that we can keep the record clear.

6      All right?

7   A  Okay.

8   Q  What is your current place of employment?

9   A  Milwaukee County Sheriff's Office?

10  Q  In what capacity are you employed there?

11  A  I'm a correctional sergeant.

12  Q  And how long have you been with Milwaukee County in

13     the Corrections Department?

14  A  Going on five years.

15  Q  When did you get promoted to sergeant?

16  A  I want to say August of last year.

17  Q  And what was your position with the department back in

18     December of 2018?

19  A  A correction officer.

20  Q  What shift were you working?

21  A  First shift.

22  Q  And was that your normal shift?

23  A  Yes.

24  Q  Do you recall Brian Collins?  Can you put a name to

25     the face?

1    A    Yes.

2    Q    Was the first time you met him in December of 2018, or

3         were you familiar with him prior to that?

4    A    No, the first -- my first interaction.

5    Q    Was in --

6    A    Yes.

7    Q    -- December 18th, 2018?

8    A    Yes.

9    Q    All right.  Did you review any documents in

10        preparation for your deposition here this morning?

11   A    Just the documents in front of me.

12   Q    And those are your Answers to Interrogatories?

13   A    Yes.

14   Q    May I see those, please.  So what you've given me are

15        your initial Responses to Interrogatories, your

16        Amended Responses, and the Amended Notice of Video

17        Deposition Duces Tecum.  Those are the three documents

18        you reviewed, correct?

19   A    Correct.

20   Q    Did you see any testimony from other depositions taken

21        in this case?

22   A    No.

23   Q    Since the case has started, have you spoke to any of

24        the other defendants in this case about what happened

25        with Mr. Collins or the case?

1    A    No.

2    Q    Did you meet with your attorney in preparation for

3         your deposition?

4    A    Yes.

5    Q    On how many occasions?

6    A    I met with him twice, I want to say.

7    Q    All right.  Was there anybody else present during the

8         course of those meetings?

9    A    No.

10   Q    How long was the first meeting?

11   A    I want to say they normally last about an hour'ish.

12   Q    How about the second meeting, how long was that?

13   A    Around the same time.

14   Q    All right.  During the first meeting, the hour that

15        you spent with your attorney, did you look at any

16        documents?

17   A    No.

18   Q    How about the second meeting, did you look at any

19        documents?

20   A    No.

21   Q    Did you look at any video?

22   A    Not for the deposition, no.

23   Q    Okay.  Have you looked at video in this case?

24   A    Yes.

25   Q    Okay.  What video have you looked at?

1    A    Just the camera footage of the incident of the -- my

2         time in the housing unit.

3    Q    Okay.  Prior to responding to Mr. Collins' emergency

4         call or after or both?

5    A    No, it was just during the -- what we -- walking into

6         the housing unit and then from them -- from him

7         rolling -- getting out of the housing unit.

8    Q    At some point, there was an investigation done into

9         his death.  Do you recall that?

10   A    Yes.

11   Q    Do you recall being interviewed by a detective

12        relative to your interactions with Collins?

13   A    Yes.

14   Q    And do you recall what you told the detective was true

15        at the time?

16   A    Yes.

17   Q    Did you review what the detective wrote in his

18        statement regarding your conversation with him?

19   A    Did I -- no.

20   Q    You've never seen that statement as it was recorded by

21        the detective?

22   A    No.  My written statement?

23   Q    Not a written statement.  You had an interview with

24        the detective, right?

25   A    Yeah.

1   Q   All right.  He reduced it to a summary.  Have you ever

2       seen that summary?

3   A   Not that I recall, no.

4   Q   But in any event, when you sat down with the

5       detective, you were telling him the truth about what

6       happened on the night in question, correct?

7   A   Yes.

8   Q   All right.  So what time did you arrive to work on the

9       morning in question?

10  A   I honestly don't remember the exact time I arrived to

11      work, but I know work starts at 6:00 for roll call.

12  Q   Okay.  And are usually there before roll call starts?

13  A   Yes.

14  Q   Okay.  Do you recall what was said at the roll call on

15      the morning in question?

16  A   No, I do not.

17  Q   Did you recall whether or not any information was

18      provided regarding Mr. Collins on the morning in

19      question prior to you going to his cell?

20  A   No, I do not.

21  Q   How did you become aware that Mr. Collins was

22      suffering from a medical emergency?

23              MR. JONES:  Objection to the form.  You can

24          go ahead and answer.

25  A   I didn't know he was suffering.  But I was made aware

1   of his medical emergency once I walked into the pod in

2   the -- doing my initial inspection, that's when the

3   celly -- well, his cellmate notified me that he was

4   having trouble breathing.

5   BY MR. GENDE:

6   Q   And you understand, based on your training with

7       Milwaukee County Sheriff's Department, that somebody

8       who is having problems breathing, that's a serious

9       medical condition, correct?

10              MR. JONES:  Form.

11  BY MR. GENDE:

12  Q   You can answer.

13              MR. JONES:  You can answer.

14  A   Due to my training, if it's deemed necessary, yeah.

15  BY MR. GENDE:

16  Q   If what's deemed necessary, breathing?

17  A   No, the emergency all-call.  Like there are certain

18      things we look for during a medical emergency.

19  Q   Okay.  Well, did you look for something with Mr.

20      Collins to tell whether or not he was having problems

21      breathing?

22  A   Yes.

23  Q   And what did you look for, sir?

24  A   Just like how -- if he was actually breathing, or was

25      he in the immediate -- had any immediate concerns.

1    Q    Okay.  Did you go in the cell?

2    A    No.

3    Q    Okay.  So what did you see of Mr. Collins on the

4         morning in question when his cellmate told you he

5         couldn't breathe?

6              MR. JONES:  Objection to form.

7    BY MR. GENDE:

8    Q    You can answer.

9    A    He was alert, and he was breathing, so --

10   Q    How do you know he was breathing?

11   A    I saw him breathing.

12   Q    Where was he laying?

13   A    He was not laying; he was sitting up.

14   Q    Where?

15   A    On his cell -- in his cell, he was sitting up from the

16        bottom bunk with his back against the wall.

17   Q    Did you ask him any questions?

18   A    Yes.

19   Q    What did do you ask him?

20   A    I asked him, are you okay?  He said he was having

21        trouble breathing.  So that's when I told him I'm

22        going to finish my round and I'll call the emergency

23        when I'm done.

24   Q    So when he told you he was having trouble breathing,

25        are you medically trained?

1   A    No.

2   Q    Do you know if in fact whether he was having problems

3        breathing?

4   A    I don't know.

5   Q    Did you go in the cell to check his pulse?

6   A    No.

7   Q    Did you go in the cell to check his respirations?

8   A    No.

9   Q    Did you make any attempt to determine what his vital

10       signs were?

11  A    No, I'm not trained for that.

12  Q    Okay.  So when he told you you couldn't breathe -- I'm

13       sorry -- when he told you he couldn't breathe, you

14       told him you're going to go finish your rounds.

15       That's what you did, right?

16            MR. JONES:  Objection to form, mistakes what

17         he's told you.  You can go ahead and answer.

18            MR. GENDE:  Mr. --

19            THE WITNESS:  I --

20            MR. GENDE:  Hold on a second.  Mr. Jones,

21         legal objections only.  Don't start giving

22         direction to the deponent on how he should answer

23         questions.  That's totally inappropriate.

24            MR. JONES:  I'm not giving him direction.

25            MR. GENDE:  You are.

1           MR. JONES:  Don't mischaracterize --

2           MR. GENDE:  Legal objections only.

3           MR. JONES:  Don't mischaracterize what he

4      told you 30 seconds ago.

5           MR. GENDE:  I'm not.

6   Q   You can answer the question.

7   A   Would you restate the question?  I'm sorry.

8   Q   Yeah.

9           MR. GENDE:  Jeff, can you read it back,

10     please?

11          THE REPORTER:  Sure.  Let's go off the

12     record.

13              (Off the record)

14          THE REPORTER:  Okay.  We've replayed the

15     previous question.  We're back on the record.

16  BY MR. GENDE:

17  Q   You can answer.

18  A   Okay.  So from my training, what I seen --

19  Q   No, I just want to know what was said, sir.  When he

20     told you "I can't breathe," what did you say to him?

21     That's the question.

22  A   I told him that I was going to call his emergency once

23     I'm done with my rounds, yes.

24  Q   Okay.  So he told you, "I can't breathe."  You said,

25     "I'm going to go finish my rounds, then I'll call a

1  medical emergency."  Is that what you told him?

2  A    Yes.

3            MR. JONES:  Object to form.

4  BY MR. GENDE:

5  Q    And because you're not medically trained, you don't

6       know if in fact he was having problems breathing,

7       correct?

8  A    Correct.

9  Q    You do know, though, as an officer based on your

10      training, that somebody who is having difficulty

11      breathing could be suffering from a medical emergency,

12      true?

13 A    Yes.

14 Q    You know that somebody who is reporting trouble

15      breathing could be suffering from a serious medical

16      condition, true?

17           MR. JONES:  Object to form.  Go ahead.

18 A    Not all the time, no.

19 BY MR. GENDE:

20 Q    I didn't say all the time.  You know that somebody who

21      is reporting difficulty breathing could be suffering

22      --

23 A    Yeah, could be.

24 Q    -- from a serious medical condition, right?

25 A    Yes, they could be.  Yes.

1    Q    And because you're not trained, you're supposed to
2         alert medical personnel if you are aware that somebody
3         might be suffering from a serious medical condition,
4         true.
5    A    True.
6    Q    But you walked away, didn't you?
7              MR. JONES:  Objection to form.
8         BY MR. GENDE:
9    Q    You walked away, didn't you?
10             MR. JONES:  Same objection.
11   A    Yeah.  If that's what you want to call it, yes.
12        BY MR. GENDE:
13   Q    Well, did you run away?
14   A    No.
15   Q    Did you take a bike away?
16             MR. JONES:  Don't ask rhetorical questions,
17          Mr. Gende.  It's just a waste of time.
18             MR. GENDE:  Well, he said if that's what I
19          want to call it.
20   Q    Did you walk away?  Yes or no.
21   A    Yes.
22             MR. JONES:  Objection to form.
23        MR. GENDE:
24   Q    The answer is yes, correct?
25   A    Uh-huh.

1    Q    You have to say yes or no, sir.

2    A    Yes.

3    Q    Were you given any information regarding Mr. Collins

4         at roll call?

5    A    No.

6    Q    Were you told to check on Mr. Collins during roll

7         call?

8    A    No.

9    Q    If you had been told to check on Mr. Collins during

10        roll call, would that have changed your behavior on

11        the morning in question?

12             MR. JONES:  Objection, form, speculation.

13          Go ahead.

14   A    No.

15   BY MR. GENDE:

16   Q    Did anybody advise you that Mr. Collins had been

17        pressing the emergency button or his cellmate had been

18        pressing the emergency button throughout the course of

19        the evening before you arrived?

20   A    It was -- I don't know if it was throughout the course

21        of the evening, but they told me he pressed the --

22        someone in that cell pressed it prior to me going into

23        the housing unit, yes.

24   Q    Who told you that, sir?

25   A    It was Officer Kintop and Officer Martina.  I don't

1     know which one, but they were working the floor

2     controls that night, giving a debrief when I arrived

3     on the floor control.

4    Q   All right.  Slow down a little bit.  I appreciate the

5     information.  You spoke to two correctional officers

6     that Mr. Collins had been pressing -- somebody pressed

7     the emergency button several times during the course

8     of the evening, correct?

9           MR. JONES:  Objection to form.

10   A   I never said "several."

11     BY MR. GENDE:

12   Q   All right.  How many times?

13   A   I don't know.

14   Q   All right.  What --

15   A   I wasn't there.

16   Q   I know you weren't there, but you talked to the

17     correctional staff in charge of the control panel,

18     right?

19   A   Correct.

20   Q   What did they tell you?  Let's start with the first

21     officer.  Give me his full name.

22   A   I don't remember his first name.  It was two officers

23     on the floor control.  It was Officer Martina and

24     Officer Kintop.

25   Q   Okay.  Martina is spelled how?

1    A    I think it's M-a-t -- M-a-n-t -- I don't know the

2         spelling of his name.

3    Q    Give me your best estimate, sir.

4    A    M-a-r -- I'd spell it M-a-r-t-a-n.

5    Q    And the other one, Kinsop, did you say?

6    A    Kintop, K-i-n-d-t-o-p.

7    Q    And say it one more time.  K-i-n-d-t-o-p,

8    A    t-o-p, yeah.

9    Q    When did you have this discussion with them, sir?

10   A    This was right after roll -- well, shortly after roll

11        call, I made it up to the floor control.

12   Q    So after roll call, you went to floor control, you saw

13        Martin and Kintop, and they told you that what?  What

14        had happened --

15   A    They --

16   Q    Hold on.  Let me finish the question.

17   A    Oh, sorry.

18   Q    What did they tell you was happening in Brian Collins'

19        cell over the course of the evening?

20   A    They told me that -- once I arrived on the floor

21        control, that there was nothing -- no issues in --

22        because I was working housing 5B, there was no issues.

23        The only thing was that someone in the cell he was in

24        pressed the button.  But due to the static, they

25        really couldn't hear what he -- what they were saying.

1          So -- and that was pretty much it.

2     Q    Okay.  Did they tell you how many times he had pressed

3          the button?

4     A    No.

5     Q    Did they tell you that they ever went to the cell to

6          see what the medical emergency was?

7               MR. JONES:  Objection to form.

8     A    There was no medical emergency.

9          BY MR. GENDE:

10    Q    Sir, did they ever tell you they went to the cell to

11         check anything out?  Yes or no.

12    A    Yes.

13    Q    And did they go to the cell?

14    A    I'm not sure.

15    Q    Well, I just asked you if they told you, and you said

16         yes.  What did they tell you about --

17    A    I don't know if they went.  They can say, but I don't

18         know if they actually did it, but --

19    Q    I don't know if they actually did it either.

20    A    Right --

21    Q    Did they tell you they --

22              MR. JONES:  Hang on.  Just wait for him to

23           ask you the question and finish the question.

24           Okay?  Make sure he asks the full question, then

25           respond.

```
1        BY MR. GENDE:

2    Q   What did they tell you about what they did in response

3        to the emergency button being pushed in Brian Collins'

4        cell over the course of the evening?

5    A   They told me that they did the rounds.  She just

6        finished her round and nothing was reported at that

7        time.  But then when they -- I don't know when

8        throughout the course of that he hit his button, but

9        they said -- when the button was hit, it was staticy.

10       And so when I went in, that's to go check on that

11       cell.

12   Q   You went in to checkout on the cell.

13   A   No, they were saying when I got into the housing unit

14       to check on that cell.

15   Q   I apologize.  I'm confused.  I want to know what they

16       said to you.  So --

17   A   That's what they said.

18   Q   Hold on.  I'm going to ask the question and make sure

19       it's clear.

20   A   Okay.

21   Q   Because I'm trying to understand your answer.  The

22       female correctional officer said that she heard the

23       button was pushed, right?

24   A   Uh-huh.

25   Q   Is that a yes?
```

1    A    Yes, I'm sorry.

2    Q    But whatever the cellmate or inmate was trying to say

3         they couldn't understand, correct?

4    A    Correct.

5    Q    Did she say she then went to the cell to try and

6         determine why the emergency button had been pushed?

7         Yes or no.

8    A    I don't remember her saying that.

9    Q    Okay.  And is "she" Martin or Kintop?

10   A    That's Kintop.

11   Q    Okay.  Do you know Kintop?  Have you worked with her

12        before?

13   A    Yes.

14   Q    Okay.  What about Martin?

15   A    Martina --

16   Q    Martina.

17   A    -- he -- he stopped working shortly after he retired

18        shortly after.

19   Q    All right.  Did they tell you what the medical

20        emergency was, if any, in Brian Collins' cell relative

21        to that button being pushed?

22   A    No.

23   Q    Did they tell you that they did anything to try and

24        determine what Mr. Collins was suffering from relative

25        to the emergency button being pushed?

1  A   No.

2  Q   Did they tell you how many times that button was

3      pushed?

4  A   No.

5  Q   Did they tell you what, if anything, they understood

6      through the course of the intercom in trying to

7      communicate with that cell?  What, if anything, did

8      they hear?

9  A   I don't recall.  I didn't say anything about that.

10 Q   Did they then advise you that based on that button

11     being pushed and their lack of understanding about

12     what was happening in Collins' cell, that you should

13     go check on him?  Yes or no.

14             MR. JONES:  Object to form.  Go ahead.

15 A   They -- yes.

16     BY MR. GENDE:

17 Q   The wanted you to go check on him, right?

18 A   Yes.

19 Q   Okay.  And is that first thing you did?

20 A   No.

21 Q   What's first thing I did?

22 A   I went in, got to the desk, just start setting up for

23     logging into computers, getting a -- getting my pod

24     sheet so I can get ready to start my initial count.

25             THE REPORTER:  I'm sorry, I didn't get that.

1          Could you repeat that?

2     A    I arrived at the -- when I first walked into the

3          housing unit, I arrived at the desk, logged into the

4          computers, logged into the CMS system that we use to

5          document everything.  And then I grabbed the pod sheet

6          so I can start my initial inspection.

7     Q    Then what did you do next?

8     A    I started my initial inspection.

9     Q    Where?

10    A    So started with cell one checking on each cell.

11    Q    How far down the line did it take you to get to Mr.

12         Collins' cell?

13    A    I want to say he was cell five or six.

14    Q    So from the time that the night shift at the control

15         panel told you that Mr. Collins or his cellmate had

16         pushed or been pushing the emergency button until you

17         went to check on Mr. Collins, how much time elapsed?

18         More than ten minutes, less than ten minutes?

19              MR. JONES:  Objection to form.

20    A    I wouldn't know, because I wasn't in there that long.

21         I don't know how long that it take.

22         BY MR. GENDE:

23    Q    But how long did it take you to do your initial

24         check-in at your desk?  Five minutes?

25    A    Roughly, not even.

1    Q    About five minutes?

2    A    I wouldn't even say that.

3    Q    Well, what's your best estimate, sir?

4    A    I want to say probably -- I mean, just log into the

5         computer, probably a couple minutes, if five minutes.

6    Q    Do you get a coffee before you head out on your

7         rounds?

8    A    No.

9    Q    Did you talk with anybody else before you head out on

10        your rounds?

11   A    No.

12   Q    How far was your desk from the control panel?

13   A    It's kind of hard to explain, but it's inside the

14        housing unit.  So this hallway, it'd be just a hallway

15        in between.

16   Q    Okay.  Did you have to pass through any security

17        doors?

18   A    Yes, there's two doors I gotta go through.

19   Q    Okay.  So you went to the control panel.  You had the

20        conversation with the two night correctional officers.

21        They told you to check on Collins.  You then went to

22        your desk.  You had to go through two controlled

23        doors, correct?

24   A    Uh-huh.

25   Q    That takes at least a couple of minutes, doesn't it?

1    A    No.

2    Q    How long does that take?

3    A    A minute.  It's not far a distance at all.

4    Q    But you still have to get through the two doors,

5         right?

6    A    Uh-huh.

7    Q    All right.  So a minute or two to get to your desk?

8    A    Uh-huh.

9    Q    And then --

10             MR. JONES:  Make sure you respond verbally.

11   A    Oh, I'm sorry.  Yes.

12        BY MR. GENDE:

13   Q    A minute or two to get to your desk.

14   A    Yes.

15   Q    And then five minutes, approximately, to get logged in

16        and get the information for the day and start your

17        rounds, correct?

18             MR. JONES:  Objection, asked and answered.

19          You may answer again.

20   A    Yes.

21        BY MR. GENDE:

22   Q    And then once you start your rounds, how many doors do

23        you have to get through before you're on the pod where

24        Mr. Collins is?

25   A    What do you mean?  Once I'm inside the housing unit,

1     that's where I do my rounds at.

2   Q   Okay.  That's where your desk is?

3   A   Yeah.

4   Q   Okay, very good.  So then once you're all checked in

5       on the computer, and you've got your information, you

6       can begin rounds immediately.

7   A   Yes.

8   Q   You don't get past through any more doors, correct?

9   A   No.

10  Q   All right.  And you didn't know what medical

11      emergency, if any, Mr. Collins was suffering from

12      after the report from the two correctional officers

13      that were on the control panel during the prior

14      evening, correct?

15  A   Correct.

16  Q   And they didn't know because they didn't tell you

17      anything about what his potential medical emergency

18      was, correct?

19  A   Correct.

20  Q   They didn't tell you whether or not he was having --

21      he was suffering from a serious medical condition, did

22      they?

23  A   No.

24  Q   They had no idea what was happening in Mr. Collins'

25      cell, did they?

1   A   No.

2   Q   You had no idea what's happening in Mr. Collins' cell,

3       did you?

4   A   No.

5   Q   And then you went through the activities that we've

6       discussed thus far that then takes you to the first

7       cell in pod one, correct.

8   A   Uh-huh.

9   Q   Is that a yes?

10  A   Yes, I'm sorry.

11  Q   So --

12          MR. JONES:  You mean pod five?

13  BY MR. GENDE:

14  Q   I'm sorry.  Pod five, cell one.  I apologize.

15  A   Oh.  The housing at 5B in cell one, yeah.

16  Q   Okay.  I've got that written down.  I just didn't call

17      it 5B.  I apologize.  All right.  And then when you

18      finally get to Collins' door, you've been told -- or

19      the cellmate tells you, we've been pressing the

20      emergency button all night, right?

21          MR. JONES:  Objection to form.  You can

22          answer.

23  A   From my memory, he said something to that.

24  BY MR. GENDE:

25  Q   Said something along the lines, we were pressing the

1    emergency button all night, right?

2  A    Correct.

3  Q    And he said, we've been pressing it because Mr.

4    Collins is having a hard time breathing, right?

5  A    Correct.

6  Q    And he said nobody came to his cell to check out Mr.

7    Collins, right?

8  A    I don't remember him saying that, no.

9  Q    Did he say somebody came to check on Mr. Collins?

10  A    I don't remember him saying that, no.

11  Q    But he did tell you nobody responded to the emergency

12    button, correct?

13  A    Correct.

14  Q    And he did tell you that they were pressing it

15    throughout the course of the evening, correct?

16            MR. JONES:  Asked and answered.

17            MR. GENDE:  I just want to make sure that

18        we're on the same page.

19            MR. JONES:  Still asked and answered.

20            MR. GENDE:  Yes.

21  A    Yes, sir.

22    BY MR. GENDE:

23  Q    Could you have called a medical emergency at that

24    time?

25  A    I'm sorry, what you mean by that?

1  Q    If you were concerned that somebody in the cell was

2       suffering from a serious medical condition, you can

3       call a medical emergency, right?

4  A    Prior to me visually seeing the inmate?

5  Q    No.  If you believe that somebody is suffering from a

6       serious medical condition, or could be suffering,

7       there's nothing that prevents you from calling for

8       medical help, is there?

9  A    No.

10 Q    In fact, you're trained that in the event you believe

11      an inmate is having a serious medical condition or

12      suffering from a medical emergency, you're to call

13      medical immediately, right?

14 A    Correct.

15 Q    And why are you supposed to do that?

16 A    So they can come and medically assess them.

17 Q    And see whether or not he needs help.

18 A    Correct.

19 Q    And what kind of help he needs.

20 A    Correct.

21 Q    Because you can't provide it, right?

22 A    No.

23 Q    Okay.  So then you leave the cell and you go complete

24      your rounds, correct?

25 A    Correct.

1  Q  How many more cells did you go observe before you

2     completed your rounds?

3  A  One round, it was a total of 64 inmates, but there's

4     only 48 cells.  So some cells have -- are doubled, and

5     then some on the top tier are single.

6  Q  But all contained within 5B.

7  A  Yes.

8  Q  All right.  So you walked the rest of the lower tier

9     and then you went to the upper tier.

10 A  Correct.

11 Q  How much time did that take you?

12 A  Normally, around -- it takes a couple minutes.

13 Q  Well, what are you supposed to do during your rounds?

14    Are you supposed to count inmates and make sure

15    they're moving?

16 A  Uh-huh.

17 Q  Is that a yes?

18 A  Yes.

19 Q  Communicate with inmates if they're not moving?

20 A  Correct.

21 Q  All right.  Tell them it's time to get up and get

22    moving for the day, right?

23 A  Not so much that.  You're just checking to make sure

24    your count is accurate, and then that they are alert

25    and breathing.

1    Q    Okay.  So you got to look into each cell, right?

2    A    Correct.

3    Q    You got to count and make sure every inmate's in that

4         cell, right?

5    A    Correct.

6    Q    You got to make sure that you can see respirations and

7         they're breathing.

8    A    Correct.

9    Q    Got to do that at each cell?

10   A    Correct.

11   Q    And how many cells did you say there were?

12   A    48.

13   Q    All right.  So you'd only see in the first five.  That

14        means you had 43 to go before you completed your

15        rounds, right?

16   A    Correct.

17   Q    And you got to stop at the door each time, right?

18   A    Yes.

19   Q    And how long does that take?

20   A    A couple minutes.

21   Q    At each door cell, right?

22   A    No, for total.

23   Q    No, I want to talk about each time.  When you stop in

24        the front of each cell and you look in there and you

25        verify that they're breathing, how long does that take

1      you?

2    A    At that point, I can do it in a couple of seconds.

3    Q    A couple seconds per cell?

4    A    Yes.

5    Q    So you stop at each cell and you look in?

6    A    Uh-huh.

7    Q    Is that true?

8    A    Yes.

9    Q    So the video is going to show you stopping at each

10         cell and looking in every time.

11   A    Glance -- yeah, just glancing in, yes.  All you have

12        to really do is just look into this cell.  You can

13        pretty much see everything through the window.

14   Q    Okay.  So you stop or you just walk by them?

15   A    I'm doing it all at once.  I'm walking and looking

16        into the cell at the same time.

17   Q    I'm asking you, do you stop and look into the cells?

18   A    No.  I'm walking -- I'm walking and looking in at the

19        same time.

20   Q    So how much time do you think it took you to complete

21        your round?

22   A    It took a couple --

23              MR. JONES:  Asked and answered several

24         times.  You can go ahead.

25   A    A couple minutes.

1    BY MR. GENDE:

2    Q    A couple minutes.  All right.  Once you completed your
3         round, what did you do next?

4    A    Once I completed the round, I called for medical over
5         the radio.

6    Q    So you had a radio on your chest, or you went down to
7         your desk?

8    A    It was on my shoulder.

9    Q    Okay.  And who'd you call?

10   A    I notify master control of a medical emergency in
11        housing unit 5B.

12   Q    And why did you say it was a medical emergency?

13   A    That's what we call it.

14   Q    Because somebody said they couldn't breathe, right?

15   A    Correct.

16   Q    All right.  So you called out a medical emergency
17        because you were uncertain why the guy was having
18        trouble breathing, right?

19   A    Correct.

20   Q    So for you at that time, it was a medical emergency,
21        right?

22   A    Correct.

23   Q    Not something you could handle, right?

24   A    Correct.

25   Q    Not something you're medically trained to evaluate or

1       treat, correct?

2  A    Correct.

3  Q    And that's why you called for help, right?

4  A    Correct.

5  Q    All right.  What happened next?

6  A    Once I called out, arrived at my desk, and I just

7       waited till the additional staff arrived to let them

8       in.

9  Q    Okay.  How much time did that take?

10  A    I don't recall the exact time.

11  Q    More than five minutes, less than five minutes?

12  A    Less than five minutes.

13  Q    And after you called the medical emergency, you just

14       sat at your desk, right?

15  A    Correct.

16  Q    Didn't go back to check on Collins to see whether or

17       not he was still having trouble breathing, right?

18  A    Right.

19              (Exhibit 55 identified)

20  Q    Just for housekeeping purposes, I'm going to show you

21       what we've marked as Exhibit No. 55, which is the

22       Notice of Video Deposition here this morning.  You

23       don't need to look at it because you already looked at

24       it.  All right.  Once the medical emergency was called

25       and personnel showed up in five minutes or less, what

1  did you do next?

2  A  As they was arriving into the housing unit, I was just

3     letting them in.

4  Q  And then did you ever go to Mr. Collins' cell to see

5     what was happening?

6  A  No.

7  Q  Did you see Mr. Collins again after that initial

8     encounter with him where he was having difficulty

9     breathing and you questioned him what was going on?

10  A  Once they rode -- only once they rode him out of the

11     cell.

12  Q  And how did they take them out of the cell?

13  A  Via wheelchair.

14  Q  And how did he look then?

15  A  I don't remember.

16  Q  Did he communicate with you?

17  A  No.

18  Q  Was he conscious?

19  A  Yes.

20  Q  Could you tell if he was breathing?

21  A  Yes.

22  Q  How could you tell?

23  A  Just he was up -- sitting upright breathing.

24  Q  How many people responded to the medical emergency?

25  A  Total or just amount as far as officers or nurses?

1    Q    I want to know everybody that showed up --

2    A    I want to say --

3    Q    -- once you called the medical emergency.

4    A    I want to say it was a total of five people, including

5         nurses and officers.

6    Q    All right.  Was there any delay getting in the cell?

7    A    No.

8    Q    Did you leave the door open?

9    A    No.

10   Q    All right.  Tell me how the cell was opened when the

11        medical emergency was called and people arrived.

12   A    Once the supervisor arrived on scene, him and the

13        nurse went to the cell.  I opened the cell from the

14        computer monitor.

15   Q    So as soon as people arrived, you opened the cell

16        door?  There was no delay going in?

17   A    No.

18   Q    And then once you saw Collins wheeled out in the

19        wheelchair, did you ever find out what happened to

20        him?

21   A    No.

22   Q    Never asked any more questions?

23   A    No.

24   Q    Weren't concerned about an inmate that was on your pod

25        that got wheeled out in a chair after you called

1    medical emergency; you weren't concerned about what

2    happened to him.  Is that your testimony?

3              MR. JONES:  Objection to form.  You can

4        answer.

5    A   I wouldn't say concerned.  It's just, I have other

6        stuff I have to focus on in that day.

7        BY MR. GENDE:

8    Q   Okay.  Anybody else get pulled out by a wheelchair on

9        a medical emergency from your pod?

10   A   No.

11   Q   Did you know that Mr. Collins was eventually taken to

12       the hospital?

13   A   I was made aware later on.

14   Q   Who made you aware later on?

15   A   I don't remember the exact person who told me.

16   Q   Was it a roll call?

17   A   No, it was just while socializing with other officers.

18

19   Q   Same day or --

20   A   Different day.

21   Q   And socializing with the other officers, what did they

22       tell you?

23   A   Just about, did you -- do you work -- they asked me,

24       was I working 5B that day that I had the medical

25       emergency.  Say yes.  Oh, did you know about Collins,

1  that was him that went to the hospital.

2  Q  And what else do they tell you?

3  A  That was pretty much it that I remember.

4  Q  Didn't tell you that he died?

5  A  No, I didn't find that out until later on.

6  Q  Later on when?

7  A  Like the next day.

8  Q  I thought this was the next day when you were

9     socializing with the officers.

10 A  No, I'm saying like, yeah, but that was like later on

11    that day, like later.

12 Q  All right.  So you're initially socializing with the

13    officers.  They want to know if you were the one

14    working in 5B on the morning Collins got pulled out on

15    medical emergency, right?

16 A  Correct.

17 Q  But they didn't tell you then he died?

18 A  They -- I don't think they -- this was prior to the

19    shift.  And so this is like right in the morning.  I

20    don't even think they probably knew that he-- that was

21    him that died.

22 Q  I just want to make sure we're talking about the day

23    after.

24 A  Yes.

25 Q  Right?

1   A   Yes.

2   Q   And the day after, when you came back to work, the

3       correctional officers on your shift --

4   A   Uh-huh, yes.

5   Q   -- were asking you about the medical emergency the

6       morning before, right?

7   A   Correct.

8   Q   And they told you that he went to the hospital?

9   A   Correct.

10  Q   Did they tell you anything else about what happened to

11      him?

12  A   No.

13  Q   All right.  And then later on that day, somebody else

14      started talking about Collins?

15  A   That's when everyone was made aware that the death in

16      custody was.  We knew about the death in custody.  We

17      just didn't know who it was.  But that's when we was

18      made aware that it was him.

19  Q   By who?  Who told you?

20  A   I don't remember the exact person who said it, but it

21      was like open to the -- to everyone be made aware.  I

22      think it was like a supervisor that said it.

23  Q   Okay.  Did they do it over roll call?  Did they put it

24      --

25  A   They made it -- they made it a roll call announcement,

1      yes.

2    Q   That was the morning after?

3    A   No, this was the -- it wasn't the same -- it was a

4        different shift.  I'm sorry.  Because I did overtime

5        that -- the day -- next day, so this -- I'm -- this is

6        second shift now.

7    Q   You're going to have to explain that to me.

8    A   Okay.  So --

9             MR. JONES:  Which day second shift?

10   A   This was -- so the next day after the medical

11       emergency, I was --

12       BY MR. GENDE:

13   Q   That's the 19th.

14   A   The 19th.  I worked first shift, then I worked also

15       second shift that day.  So it was a 12-hour shift that

16       day.  So --

17   Q   And you --

18   A   Overlapping onto second shift.  I'm sorry.

19   Q   All right.  So you didn't find out on first shift

20       Collins died, but then the roll call for second shift,

21       they made an announcement that the medical emergency

22       on your pod on the morning of the 18th, that gentleman

23       passed away.  That's when you found out?

24            MR. JONES:  Objection to the form.  You can

25          go ahead.

1    A    Yes.

2         BY MR. GENDE:

3    Q    And at that point in time, were you concerned about

4         whether or not you had called a medical emergency soon

5         enough for Mr. Collins?

6    A    Can you say that over?

7    Q    At the time you found out that Mr. Collins had passed

8         away, were you concerned about whether you had

9         properly and timely called a medical emergency?

10   A    No, I feel like I did it properly.

11   Q    Did you have any further discussions with correctional

12        staff after that roll call regarding your involvement

13        with Mr. Collins on the morning he passed away?

14   A    To my knowledge, I don't recall, no.  Like in what

15        depth, I don't know.

16   Q    Tell me specifically what your training is if you have

17        a concern as a correctional officer that an inmate is

18        suffering from a serious medical condition or a

19        medical emergency.  What are you trained to do?

20   A    We're trained to notify medical staff -- well, medical

21        personnel so they can come up and evaluate them.

22   Q    Immediately, right?  You're trained to do it

23        immediately.

24   A    Correct.

25                    (Exhibit 56 identified)

1   Q   Okay.  I want to show you what we've marked as Exhibit
2       No. 56.  And this is a summary of a report done by
3       Detective O'Toole.  Do you know Detective O'Toole?
4   A   I don't know the name, no.
5   Q   Doesn't sound familiar?  Waukesha County Sheriff's
6       Department came in?
7   A   If that's them, then, yes.
8   Q   So you know that the Waukesha County Sheriff's
9       Department came in to investigate, correct?
10  A   Correct.
11  Q   Who was the sheriff at that time?
12  A   The act -- I want to say it was --
13  Q   Schmidt?
14  A   -- Schmidt, yeah.
15  Q   Schmidt changed the policies to have Waukesha County
16      come in and do the internal death reviews, right?
17          MR. JONES:  Objection, foundation.
18  A   I don't --
19      BY MR. GENDE:
20  Q   Do you know?
21  A   I don't know.
22  Q   You also served under David Clarke, didn't you?
23  A   No.
24  Q   In any event, you didn't review the summary of your
25      statement to prepare for this deposition, did you?

1   A   No.

2   Q   Do you know why you didn't review it?

3   A   This right here?

4   Q   Yeah, that right there, Exhibit No. 56.

5   Q   No.

6   Q   You knew you gave the statement though, right?

7   A   Correct.  I know I gave a statement to an officer,

8       yes.

9   Q   All right.  And you gave it to him truthfully, right?

10  A   Correct.

11  Q   All right.  So let's start at the beginning.  This is

12      several days after the incident, 1/3/2019.  Detective

13      O'Toole performed a recorded interview with you while

14      in the Milwaukee County Sheriff's Office

15      administration conference room.  Does that refresh

16      your recollection regarding your interaction with the

17      detective?

18  A   Yes.

19  Q   Do you remember sitting in the conference room talking

20      to O'Toole?

21  A   Yes.

22  Q   Okay, good.

23              MR. JONES:  Counsel, you said January 3rd.

24          Where do you see that?

25              MR. GENDE:  At the top, summary of the

1      interview, 1/3/19 with Palmer.

2           MR. JONES:  Oh, we're looking at different

3           documents.  Sorry.  Okay, thank you.  Sorry.  Do

4           you have copies?

5           MR. GENDE:  No, there's Bates stamp 1873,

6           74.  Milwaukee County Bates stamp.  I don't make

7           copies for everyone.  You guys have it all on

8           your computers.

9    Q    In any event.  "During this interview, CO Palmer

10         stated that on 12/18/18, immediately after roll call,

11         he went directly to the fifth floor control."  Is that

12         what happened?

13   A    Yes.

14   Q    "Upon arrival to floor control, CO Palmer recalled

15         receiving a briefing from third shift staff asking

16         that he check on the inmates in either cell 4 or cell

17         5."  Is that what happened?

18   A    To my knowledge, yes.

19   Q    And we talked about that conversation, right?

20   A    Correct.

21   Q    Do you recall anything else about that conversation

22         that we haven't discussed yet?

23   A    No.

24   Q    "Upon arrival to the floor control" --  I'm sorry.

25         Your next comment was you could not recall which cell

1        it was that you were sent to, right?

2    A   Correct.

3    Q   "Those officers told CO Palmer that the inmate in the

4        cell had been hitting the emergency button, but they

5        could not hear anything said into the intercom due to

6        static."  Is that what you told the detective?

7    A   Yes.

8    Q   Is that a true statement?

9    A   Yes.

10   Q   So hitting the call button isn't just one, it's

11       multiple times, right?

12   A   Yes.  If that's how you want to phrase it, yes.

13   Q   Well, that's not how I want to phrase it.  That's what

14       you just told me you said to the detective, that you

15       were advised he had been hitting the call button

16       during the course of the evening, right?

17            MR. JONES:  Objection to form.

18   BY MR. GENDE:

19   Q   You can answer.

20            MR. JONES:  Mistakes what's written right in

21         front of you.

22   BY MR. GENDE:

23   Q   Okay.  Well, let's read it again.  "Those officers

24       told CO Palmer that the inmate in the cell had been

25       hitting" -- h-i-t-t-i-n-g -- "the emergency button,

1   right?

2   A    Correct.

3   Q    Okay.  And that would have been the night before,

4        right?

5             MR. JONES:  Objection to form.

6   A    It don't say.  I don't remember.

7   Q    Do you know if it was the night before?  Was it the

8        week before?

9   A    I don't -- because -- like third shift overlaps from

10       the -- it's still that same day.  I don't know if it

11       was the morning of or the night of.  I don't know.

12  Q    So you don't know if it was the night or the morning.

13       What's the difference?  I mean, we're talking about

14       between 10 p.m. and 6 a.m., right?

15  A    Correct.

16  Q    That's the night shift.

17  A    Right.

18  Q    Approximately.  So over the course of the night shift,

19       he'd been hitting the emergency call button, right?

20            MR. JONES:  Objection to form.

21  A    I don't recall.  If that's what I said, that's

22       probably what I was told, but I don't remember the

23       exact wording of it.

24  BY MR. GENDE:

25  Q    Okay.  Well, your memory would have been better on

1    January 3rd, 2019 than it is today, wouldn't it, sir?

2  A  Yes.

3  Q  So back on January 3rd, 2019, when you're being

4    interviewed by a Waukesha County detective relative to

5    an in-custody death, you wanted to be truthful and

6    accurate, right?

7  A  Right.

8  Q  Did you say hit the button or hitting the button?

9  A  If it's saying hitting, I said hitting.

10  Q  Hitting the button means more than one time, right?

11  A  Right.

12  Q  And that's what you were trying to relay to the

13    detective truthfully, that somebody had been hitting

14    that button over the course of the evening, right?

15      MR. JONES:  Objection to form.  You can

16    answer.

17  BY MR. GENDE:

18  Q  You can answer the question.

19  A  Yeah.  If that's what I said then, that's what I will

20    stand by.

21  Q  Okay.  I know that's what you're going to stand by,

22    but you were trying to let the --

23  A  Yes.

24  Q  -- detective know what was happening based on the

25    report from the prior officers, right?

1    A    Correct.

2    Q    That somebody was hitting the button between 10 p.m.

3         and 6 a.m. in Collins' cell, right?

4              MR. JONES:  Objection to form.

5         BY MR. GENDE:

6    Q    You can answer.

7    A    Correct.

8    Q    "Third shift" -- and this is, again, your report to

9         the detective -- "Third shift stated that they checked

10        on the inmate and stated he needed to see the nurse,

11        but CO Palmer was unsure if a nurse had been called."

12        Is that what you relayed to the detectives?

13   A    If that's what I said -- if that's what this says,

14        then yes.

15   Q    So you don't deny it?

16   A    I don't deny this, no.

17   Q    Okay.  In any event, third shift would have been the

18        -- how do you pronounce the name with the M?

19   A    Martina?

20   Q    Martina and Kintop.  Those are the two third-shift

21        people that you're referring to, correct?

22   A    Correct.

23   Q    Not anybody else, right?

24   A    Correct.

25   Q    Just those two.  All right.  So Martina and Kintop

1    told you that they checked on the inmate and he stated

2    he needed to see the nurse, but you don't know what

3    they did in response to that, correct?

4  A  Correct.

5  Q  Certainly a nurse wasn't called.  You're not aware of

6    that, right?

7  A  Correct.

8  Q  Because you were unsure if a nurse had been called.

9  A  Correct.

10 Q  And that's the information that you had before you

11    went to Collins' cell, right?

12 A  Correct.

13 Q  That was the information you had before you decided to

14    sit down at your desk and log in, correct?

15 A  Correct.

16 Q  That was the information you had before you decided to

17    do your other rounds first before you went to see

18    Collins, right?

19 A  Well, I didn't -- it was one round done.

20 Q  But that was the information you had before you

21    started your rounds and began at cell one and moved

22    your way down the block, right?

23 A  Correct.

24 Q  All right.  The next sentence indicates, "After he was

25    briefed, you went to the pod and Collins' cellmate,

1   Blakes, was at the door stating that Collins could not

2   breathe."  That's the information you had when you

3   were standing in front of the door, right?

4   A   Correct.

5   Q   "CO Palmer said that Blakes told him that they were

6   pushing the button all night, but no one responded."

7   That's what you were advised, correct.

8   A   Correct.

9   Q   And frankly, that was somewhat consistent with what

10  Martina and Kintop had told you that Collins was

11  hitting the button the night before, right?

12          MR. JONES:  Objection to form.  You can

13      answer.

14  BY MR. GENDE:

15  Q   You can answer.

16  A   Yes.

17  Q   All right.  Now, you told the detective everything

18  that was important about your interactions with

19  Collins and the third shift staff, right?

20  A   Correct.

21  Q   You told the detective everything that was important

22  about what you discussed and did with Collins on the

23  morning in question, right?

24  A   Correct.

25  Q   Tell me where in the statement you told the detective

1   that you conversed with Collins on the morning in

2   question.  Where is that in your statement?

3          MR. JONES:  This isn't a statement.

4   BY MR. GENDE:

5   Q  Well, where is that in the summary?  Is it in the

6      summary?

7          MR. JONES:  He's asking you where that is in

8            Exhibit 56.

9   A  Oh, I don't know.

10  BY MR. GENDE:

11  Q  And it's a recorded interview, so we can listen to the

12     interview.  You never told the detective on January

13     3rd, 2019 that you interacted with Collins and asked

14     him questions about his breathing, did you?

15  A  I'm going off of my memory.  I do not remember what I

16     told the detective.  From knowing me, the type officer

17     I am, I would have talked to the inmate prior to

18     calling the emergency.  So I don't know why I didn't

19     tell them, but I'm sure that I told -- I talked to

20     Collins before I just called a medical emergency for

21     him.

22  Q  We just want to deal with the evidence we have in

23     front of us right now.  We don't want you to guess

24     about anything.

25  A  Okay.

1   Q    All right.  So you agree that interaction that you're

2        testifying today with Collins was an important aspect

3        of your evaluation of Mr. Collins on the morning in

4        question, right?

5   A    Correct.

6   Q    It was important for you to talk to Collins to see

7        whether or not you believed he was suffering from a

8        serious medical condition or a medical emergency,

9        right?

10  A    Correct.

11  Q    And that was important because that's something you're

12       required to do when you have information that somebody

13       may be suffering from a serious medical condition or a

14       medical emergency, right?

15  A    Correct.

16  Q    But you never reported that in your interview with

17       O'Toole, did you?

18            MR. JONES:  Objection to form and asked and

19         answered.

20  BY MR. GENDE:

21  Q    The tape will speak for itself.  But as we sit here

22       today, you can't tell me you reported that information

23       to O'Toole on January 3rd, 2019, can you?

24            MR. JONES:  Same objections.

25  BY MR. GENDE:

1  Q    You can answer.

2  A    No.

3  Q    All right.  When Blakes was at the door stating

4       Collins could not breathe, did you have any reason to

5       disbelieve him?

6  A    Yeah, because he was sitting up breathing.

7  Q    So you didn't believe Blakes when he told you that

8       Collins could not breathe?

9  A    It's not that I didn't believe him.  I believed him.

10      I just -- it was the seriousness of it that's the --

11 Q    You were uncertain of?

12 A    Correct.  That's why I called for -- that's why I told

13      him, once I'm finished my round, I'm going to call for

14      the nurse.

15 Q    So you're uncertain as to the seriousness of the

16      medical condition or whether it's a medical emergency

17      when Collins or Blakes told you Collins can't breathe?

18 A    Correct.

19 Q    And you already had the other information we talked

20      about, and Blakes told you, "We're trying to get help

21      all night," right?

22 A    Right.

23 Q    Blakes told you, "We're trying to get help all night,

24      but no one responded," right?

25 A    Correct, that's what I said.

1    Q    And then you walked away and finished your rounds,

2       right?

3    A    Right.

4    Q    Go on to the next page.  The second sentence starts

5       with, "CO Palmer told Blakes that he would do his

6       initial inspection of the pod and then return to call

7       a medical emergency for Collins."  We've gone over

8       that part, right?

9    A    Correct.

10    Q    And that's in fact what you did?

11    A    Correct.

12    Q    It goes on to state, "CO Palmer did do that and then

13       immediately went to pod control to open the door for

14       responding staff."  We've handled that aspect, right?

15    A    Correct.

16    Q    "CO Palmer recalled his lieutenant responded to the

17       call, along with CO Grutza, who brought an orange

18       medical supply bag and an AED."  Is that in fact what

19       happened?

20    A    Correct.

21    Q    "He," meaning you, "also recalled that after some

22       time, Collins was transported to the clinic.  And

23       Blakes told CO Palmer that Collins had been sick for a

24       few days."  You had all that information, right?

25    A    From reading this, yes.

1    Q    And did you relay to anybody, other than Detective
2         O'Toole in this statement, about what Blakes had told
3         you?
4    A    I don't remember.  I don't ever remember him saying
5         that to me.
6    Q    Okay.  Well, now we know he said it because --
7    A    I don't remember.
8    Q    -- it's in your summary.
9    A    Yeah, I don't remember.
10   Q    Okay.  So a man died.  An internal investigation on an
11        in-custody death was conducted by an outside
12        department.  You were the officer that initially
13        responded to the cell on the morning in question and
14        walked away, right?
15   A    Uh-huh.
16   Q    Is that a yes?
17   A    Yes.
18   Q    All right.  And then subsequently, the man died,
19        right?
20   A    Yes.
21   Q    And you had information from the cellmate that they
22        had been pushing -- hitting the button that night and
23        nobody responded, correct?
24   A    Correct.
25   Q    And you didn't tell that to anybody in the Milwaukee

1   County Sheriff's Department, right?

2   A   The detective was told not to talk about it.

3   Q   Who told you not to talk about it?

4   A   That's just the -- once you're part of an

5       investigation, you're told -- you're supposed to --

6       not supposed to talk about it with anyone.

7   Q   Who told you not to talk about this incident with

8       anybody at the Milwaukee County Sheriff's Department?

9   A   It's not this incident.  It's just any incident.

10  Q   I want to talk about this incident.

11  A   Oh, I don't remember who said that, no, if anyone told

12      me that.  I just know from being a CO, that's how

13      you're supposed to handle it.

14  Q   You're not supposed to talk to anybody?

15  A   No.

16          MR. JONES:  That's not what he told you.  It

17      mischaracterizes the evidence.

18  BY MR. GENDE:

19  Q   Well, I want to understand what you told me.

20  A   What I'm saying is, when you get -- when you're going

21      through your training, once you're a part of an

22      investigation, they say, keep everything to yourself.

23      You don't want to talk to anyone about what you're

24      going through unless you are getting interviewed by

25      someone.

1   Q   Yeah, all right.  So let's talk about December 19th,
2       when you did your overtime shift, right?  Stayed on
3       for the second shift?
4   A   Correct.
5   Q   And at roll call, you were told Collins died, right?
6   A   Correct.
7   Q   At that point in time, you knew -- did you know that
8       an investigation had begun?
9   A   No.
10  Q   Did you know that Detective O'Toole was going to talk
11      to you four or five days later?
12  A   No.
13  Q   You had no idea an in-custody death investigation was
14      going to start, did you?
15  A   No.
16  Q   And nevertheless, you knew on December 19th on second
17      shift the information that Blakes had told you, that
18      they'd been hitting the emergency button on the
19      evening before, nobody came to see him, and Collins
20      was having a hard time breathing that night, right?
21  A   Yeah.
22  Q   And you didn't report that to superiors at the
23      Milwaukee County Sheriff's Department, did you?
24  A   I don't remember.
25  Q   Well, if you did, who would you have reported it to?

1  A   Any lieutenant or any supervisor.

2  Q   Well, who was the supervisor on the second shift?

3  A   I don't remember.

4  Q   You didn't think that information was important that a

5      man died?  You knew about it the next day.  You knew

6      that Blakes had told you nobody was responding to the

7      emergency button and that Collins was having a hard

8      time breathing.  You didn't think somebody at

9      Milwaukee County Sheriff's Department should have that

10     information, right?

11             MR. JONES:  Objection to form.  You can go

12        ahead.

13  A   I don't.  The thing is, by him being an inmate, it's

14     hard to take everything they say seriously.  So I just

15     kind of took it as -- I took it in, but I really

16     didn't retain the information.

17  BY MR. GENDE:

18  Q   You blew if off, didn't you?

19             MR. JONES:  Objection to form.

20  A   That's not what I said.

21  BY MR. GENDE:

22  Q   Well, you didn't retain the information, so you didn't

23     do anything with it.

24             MR. JONES:  Objection to form.

25  BY MR. GENDE:

1   Q   All right.  Let's move down to the bottom part of your

2       statement.  "CO Palmer also offered that sometime

3       between 0600 and 0615 hours, third shift did the last

4       check of the pod."  Who would have done the last check

5       of the pod on third shift?

6   A   One of the two officers.

7   Q   Martina or --

8   A   Or Kintop.

9   Q   -- Kintop, right?  "He recalled that the third shift

10      officer had written on the pod sheet, quote, "Keep an

11      eye on inmate, he faints," closed quote?

12            MR. JONES:  Objection to form.  You've

13        misread what it says.

14      BY MR. GENDE:

15   Q   All right.  Well, let me try it again.  "He recalled

16      that a third shift officer had written on the pod

17      sheet, quote, "Keep eye on inmate, he faints," closed

18      quote?  I don't think I misread it, but in any event,

19      it's now corrected.

20   A   I don't know if the third shift or -- I don't remember

21      who put it on pod sheet, but I know it was on the pod

22      sheet.  It would be hard for a third-shifter to write

23      that because they would be inside the cell the whole

24      night, so they wouldn't know that.

25   Q   Well, this is your statements, sir.  Are you denying

1          that you made this statement?

2     A    I'm not denying that.  I'm --

3               MR. JONES:  Objection to form.

4     A    I'm just --

5               MR. JONES:  This is not a statement by him.

6          It's a --

7               MR. GENDE:  It's a summary of a statement --

8               MR. JONES:  -- summary --

9               MR. GENDE:  -- and it's recorded.  Did you

10         listen to the interview tape?

11              MR. JONES:  I have.

12              MR. GENDE:  Okay, good.

13              MR. JONES:  Have you?

14              MR. GENDE:  None of your business.

15              MR. JONES:  I thought so.

16         BY MR. GENDE:

17    Q    Go ahead, sir.

18    A    Yeah.  So, yeah --

19              MR. JONES:  Hang on.

20         BY MR. GENDE:

21    Q    You recalled that a third shift officer --

22              MR. JONES:  Wait for his question.

23    Q    -- had written on the pod sheet, "Keep an eye on the

24         inmate, he faints"?  Yes or no.

25    A    I don't recall third shift saying that.

1  Q   So how do you recall having this information, sir?

2  A   It was on the pod sheet.

3  Q   But you don't know who wrote it?

4  A   No.

5  Q   Okay.  But you told the detective it was third shift,

6      right?

7  A   If that's what I stated in there, that's what I said,

8      yes.

9  Q   But you knew it was on the pod sheet, right?

10 A   Correct.

11 Q   When did you review the pod sheet?

12 A   When I started my shift when I first made it to the

13     floor control.

14 Q   Okay.  So you had the information from Martina and

15     Kintop, right?

16 A   Yes.

17 Q   You had the information on the pod sheet, "Keep an eye

18     on the inmate," right, because he faints.

19 A   Right.

20 Q   You had a lot of information on Mr. Collins on the

21     morning in question about a potential serious medical

22     condition and/or a medical emergency that he might be

23     suffering from before you went to his cell, didn't

24     you?

25 A   Yes.

1   Q   All right.  In your Answers to Interrogatories, the

2       first one asks you to identify each interaction you

3       had with Brian Collins in December 2018; the nature of

4       that interaction and what understanding, if any, that

5       you had in relation to the medical conditions Collins

6       suffered during the course of your interaction with

7       him.  You've reviewed these in preparation for your

8       deposition, right?

9   A   Yes.

10  Q   All right.  So the first Answer to the Interrogatory

11      after some objections is, "Palmer states that on the

12      morning of December 18th, 2018, he called for an

13      emergency medical response to pod 5B in the Milwaukee

14      County Jail for Collins after he learned that Collins

15      was complaining of having trouble breathing."  Is that

16      a true statement?

17  A   Yes.

18  Q   And you learned Collins was having trouble breathing

19      when you were in front of his cell for the first time,

20      right?

21  A   Correct.

22  Q   You didn't call for a medical emergency at that time,

23      did you?

24  A   No.

25  Q   So this answer is not true, is it?

1    MR. JONES:  Objection to form.  That makes

2    no sense, Mr. Gende.  But you can answer, Mr. --

3  A   I called the medical emergency shortly after leaving

4    his cell, yes.

5    BY MR. GENDE:

6  Q   Well, here's what you said.  "He learned that Collins

7    was complaining of having trouble breathing," and

8    that's when you called the medical emergency.  Is

9    that, in fact, what happened?

10 A   Yes.

11 Q   Did you call a medical emergency when you learned

12   Collins was having trouble breathing?  Yes or no.

13 A   After I finished my round, yes.

14 Q   But did you put that in your Interrogatory Answer that

15   you waited until you finished the rest of your rounds

16   on 43 other cells?

17 A   No.

18 Q   No.  When you signed these Answers, you verified they

19   were truthful and accurate, right?

20 A   Yes.

21 Q   Just like when you raised your hand today and you took

22   an oath to tell the truth, right?

23 A   Yes.

24 Q   All right.  Let's go on to your supplemental answers

25   to Interrogatory No. 5.  "Identify when you understood

1    Brian Collins was suffering from a serious medical

2    condition and/or a medical emergency and what, if

3    anything, you did in response thereto."  After some

4    objections, you answer again, or you supplemented,

5    "Palmer states that on the morning of December 18th,

6    2018, he called for an emergency medical response to

7    pod 5B in the jail for Collins after he learned that

8    Collins was complaining of having trouble breathing."

9    This is your supplemental answer that you raised your

10   hand, you took an oath and said you were telling the

11   truth, right?

12  A    Correct.

13  Q    But that's not what you did, is it, sir?

14  A    That's what I did.

15  Q    Did you call immediately after you found out he was

16   having trouble breathing?

17  A    After I finished my round, and that's what I told --

18   that's what I told them.  I told them --

19  Q    You've got to listen to the question, sir.  Your

20   answer in response to what you did is you called for

21   an emergency medical response to pod 5B in the jail

22   for Collins after he learned that Collins was

23   complaining of having trouble breathing.  You learned

24   of it when you're standing in front of his cell,

25   right?

1   A   Correct.

2   Q   You didn't call for the medical emergency until you

3       completed your rounds, right?

4   A   Right.

5   Q   So two times, you're not including in your sworn

6       responses to answers that you went and completed your

7       rounds and then called the medical emergency, are you?

8   A   No.

9   Q   Do you want to change your answer now or do you want

10      to leave these sworn under oath, these Answers to

11      Interrogatories?

12          MR. JONES:  Objection to form.

13  BY MR. GENDE:

14  Q   You can answer.  Because when we go to court, and we

15      go in front of a jury, do you want to go with these

16      answers, or do you want to amend them now as we sit

17      here today?

18          MR. JONES:  He's not amending his answer --

19          MR. GENDE:  I'm asking, does he want to.

20      You're not the client or the defendant.

21  Q   Do you want to amend your answers or do you want to

22      let him stand?

23  A   They can stand.

24          MR. GENDE:  Okay, I have nothing further.

25      That's it.

1      MR. JONES:  Does anyone else have questions?

2

3                E X A M I N A T I O N

4      BY MR. JONES:

5   Q   I just have two questions for you, Officer.  In terms

6       of what Officers Kintop and Martina relayed to you

7       when you first came on the fifth floor...

8   A   Yes.

9   Q   ...before you entered pod 5B, based on what they told

10      you, do you know when during their shift that someone

11      in cell 5 and pod 5B had pushed the intercom button?

12  A   No.

13  Q   And based on what they told you, do you know how many

14      times whoever pushed the button had pushed it?

15  A   No.

16             MR. JONES:  Okay.  That's all I have.  Thank

17          you.

18                E X A M I N A T I O N

19      BY MR. GENDE:

20  Q   But you did know, based on the pod sheet, that you

21      were to keep an eye on him because he had problems

22      fainting, right?

23  A   From someone, yes, but --

24  Q   You did know that, sir.

25  A   Yes.

1  Q   Just yes or no.  Did you know that?

2  A   Yes, yes.  But however, anyone can alter those pod

3      sheets.  So by it not coming from a medical person, I

4      didn't -- I wanted to do my own investigation on it.

5  Q   What investigation did you want to do on it?

6  A   I wanted to put eyes on him first before I looked into

7      anything.

8  Q   Before you looked into anything.  What do you mean?

9      Before you looked into whether he had problems

10     fainting?

11 A   Yeah, because I don't know who put that on the pod

12     sheet.

13 Q   Did an inmate put it on there?

14 A   No, but it can be any like -- any officer can do it,

15     so...

16 Q   Okay.  Did you not believe the information on the pod

17     sheet?

18 A   No.

19 Q   You didn't believe it?

20 A   No, because I didn't know nothing of it.

21 Q   But you were aware that somebody was trying to put you

22     on notice that he was having problems fainting over --

23     he was having fainting problems, right?  You knew

24     that.

25 A   I didn't know that because that's all that was saying

1      is, he faints --

2   Q   Okay.  And --

3   A   -- and that's it.

4   Q   And somebody's trying to alert you, or whoever's

5       supervising him, to keep an eye on him, right?

6   A   That's their intentions, yes.

7   Q   Okay.  Are you saying today that you think that

8       information on the pod sheet was falsified?

9   A   I'm not saying that, no.

10          MR. GENDE:  Okay.  That's all I want to

11      know.  Nothing more.

12          THE REPORTER:  Okay.  There being no further

13      questions, the deposition is concluded at 12:01

14      p.m.  Off the record.

**A**

accurate 30:24 47:6 63:19
act 42:12
activities 27:5
Adam 2:14
additional 34:7
administration 43:15
advise 16:16 22:10
advised 45:15 50:7
AED 54:18
afford 5:4
ago 13:4
agree 52:1
ahead 9:24 12:17 14:17 16:13 22:14 32:24 40:25 58:12 60:17
alert 11:9 15:2 30:24 68:4
allow 5:3
all-call 10:17
alter 67:2
amend 65:16,21
Amended 6:16,16
amending 65:18
amount 35:25
Andrew 2:8
and/or 61:22 64:2
announcement 39:25 40:21
answer 4:21 5:4 9:24 10:12,13 11:8 12:17,22 13:6,17 15:24 20:21 25:19 27:22 37:4 45:19 47:16,18 48:6 50:13,15 53:1 62:10,25 63:2,14 64:4,9 64:20 65:9,14

65:18
answered 25:18 28:16,19 32:23 52:19
answers 4:24 6:12 62:1 63:18,24 65:6,10,16,21
anybody 7:7 16:16 24:9 37:8 48:23 55:1,25 56:8,14
apologize 20:15 27:14,17
appreciate 17:4
approximately 25:15 46:18
Armor 2:18
arrival 44:14,24
arrive 9:8
arrived 9:10 16:19 17:2 18:20 23:2,3 34:6,7 36:11,12 36:15
arriving 35:2
asked 11:20 19:15 25:18 28:16,19 32:23 36:22 37:23 51:13 52:18
asking 32:17 39:5 44:15 51:7 65:19
asks 19:24 62:2
aspect 52:2 54:14
assess 29:16
assume 4:21
attached 4:8
attempt 4:18 5:4 12:9
attorney 7:2,15
August 5:16
Ave 2:16 3:3
aware 9:21,25 15:2 37:13,14 39:15,18,21

49:5 67:21
a.m 46:14 48:3

**B**

back 4:16 5:17 11:16 13:9,15 34:16 39:2 47:3
bag 54:18
based 10:6 14:9 22:10 47:24 66:9,13,20
Bates 44:5,6
Bay 2:17
began 49:21
beginning 43:11
begun 57:8
behalf 2:6,12,18 3:5,11
behavior 16:10
believe 29:5,10 53:7,9 67:16,19
believed 52:7 53:9
best 18:3 24:3
better 46:25
bike 15:15
bit 17:4
Blakes 50:1,5 53:3,7,17,20,23 54:5,23 55:2 57:17 58:6
blew 58:18
block 49:22
bottom 11:16 59:1
breathe 11:5 12:12,13 13:20 13:24 33:14 50:2 53:4,8,17
breathing 10:4,8 10:16,21,24 11:9,10,11,21,24 12:3 14:6,11,15 14:21 28:4 30:25 31:7,25 33:18 34:17 35:9,20,23

51:14 53:6 57:20 58:8 62:15,18 63:7 63:12 64:8,16 64:23
Brian 5:24 18:18 20:3 21:20 62:3 64:1
briefed 49:25
briefing 44:15
Broadway 2:10 3:9
Brodie 3:5
brought 54:17
bunk 11:16
business 60:14
button 16:17,18 17:7 18:24 19:3 20:3,8,9,23 21:6 21:21,25 22:2 22:10 23:16 27:20 28:1,12 45:4,10,15,25 46:19 47:8,8,10 47:14 48:2 50:6 50:11 55:22 57:18 58:7 66:11,14

**C**

C 2:1
call 8:4 9:11,12,14 11:22 13:22,25 15:11,19 16:4,7 16:10 18:11,12 27:16 29:3,12 33:9,13 37:16 39:23,25 40:20 41:12 44:10 45:10,15 46:19 53:13 54:6,17 57:5 62:22 63:11 64:15 65:2
called 28:23 33:4 33:16 34:3,6,13

34:24 36:3,11 36:25 41:4,9 48:11 49:5,8 51:20 53:12 62:12 63:3,8 64:6,20 65:7
calling 29:7 51:18
camera 8:1
capacity 5:10
case 6:21,23,24,25 7:23
Cassiday 3:2
cell 9:19 11:1,15 11:15 12:5,7 16:22 18:19,23 19:5,10,13 20:4 20:11,12,14 21:5,20 22:7,12 23:10,10,12,13 26:25 27:2,7,14 27:15 28:6 29:1 29:23 31:1,4,9 31:21,24 32:3,5 32:10,12,16 35:4,11,12 36:6 36:10,13,13,15 44:16,16,25 45:4,24 48:3 49:11,21 55:13 59:23 61:23 62:19 63:4 64:24 66:11
cellmate 10:3 11:4 16:17 21:2 23:15 27:19 49:25 55:21
cells 30:1,4,4 31:11 32:17 63:16
celly 10:3
certain 10:17
Certainly 49:5
chair 36:25
change 65:9
changed 16:10 42:15

charge 17:17
check 12:5,7 16:6
  16:9 19:11
  20:10,14 22:13
  22:17 23:17
  24:21 28:6,9
  34:16 44:16
  59:4,4
checked 26:4 48:9
  49:1
checking 23:10
  30:23
checkout 20:12
check-in 23:24
chest 33:6
Clarke 42:22
clear 4:19 5:5
  20:19
client 65:20
clinic 54:22
closed 59:11,17
CMS 23:4
coffee 24:6
Collins 1:10 4:16
  5:24 6:25 8:3,12
  9:18,21 10:20
  11:3 16:3,6,9,16
  17:6 18:18 20:3
  21:20,24 22:12
  23:12,15,17
  24:21 25:24
  26:11,24 27:2
  27:18 28:4,7,9
  34:16 35:4,7
  36:18 37:11,25
  38:14 39:14
  40:20 41:5,7,13
  48:3 49:11,18
  49:25 50:1,10
  50:19,22 51:1
  51:13,20 52:2,3
  52:6 53:4,8,17
  53:17 54:7,22
  54:23 57:5,19
  58:7 61:20 62:3
  62:5,14,14,18

63:6,12 64:1,7,8
  64:22,22
come 29:16 41:21
  42:16
coming 67:3
comment 44:25
communicate
  22:7 30:19
  35:16
Compensation
  3:11
complaining
  62:15 63:7 64:8
  64:23
complete 29:23
  32:20
completed 30:2
  31:14 33:2,4
  65:3,6
computer 24:5
  26:5 36:14
computers 22:23
  23:4 44:8
concern 41:17
concerned 29:1
  36:24 37:1,5
  41:3,8
concerns 10:25
concluded 68:13
condition 10:9
  14:16,24 15:3
  26:21 29:2,6,11
  41:18 52:8,13
  53:16 61:22
  64:2
conditions 62:5
conducted 55:11
conference 43:15
  43:19
confused 20:15
conscious 35:18
consistent 50:9
contained 30:6
control 17:3,17,23
  18:11,12,21
  23:14 24:12,19

26:13 33:10
  44:11,14,24
  54:13 61:13
controlled 24:22
controls 17:2
conversation 8:18
  24:20 44:19,21
conversed 51:1
copies 44:4,7
Corneille 2:15
correct 6:18,19
  9:6 10:9 14:7,8
  15:24 17:8,19
  21:3,4 24:23
  25:17 26:8,14
  26:15,18,19
  27:7 28:2,5,12
  28:13,15 29:14
  29:18,20,24,25
  30:10,20 31:2,5
  31:8,10,16
  33:15,19,22,24
  34:1,2,4,15
  38:16 39:7,9
  41:24 42:9,10
  43:7,10 44:20
  45:2 46:2,15
  48:1,7,21,22,24
  49:3,4,7,9,12,14
  49:15,23 50:4,7
  50:8,20,24 52:5
  52:10,15 53:12
  53:18,25 54:9
  54:11,15,20
  55:23,24 57:4,6
  61:10 62:21
  64:12 65:1
corrected 59:19
correction 5:19
correctional 2:18
  5:11 17:5,17
  20:22 24:20
  26:12 39:3
  41:11,17
Corrections 5:13
Counsel 43:23

count 22:24 30:14
  30:24 31:3
County 1:10 2:12
  5:9,12 10:7 42:5
  42:8,15 43:14
  44:6 47:4 56:1,8
  57:23 58:9
  62:14
couple 24:5,25
  30:12 31:20
  32:2,3,22,25
  33:2
course 7:8 16:18
  16:20 17:7
  18:19 20:4,8
  22:6 28:15
  45:16 46:18
  47:14 62:6
court 1:12 4:25
  65:14
courtesy 5:5
current 5:8
custody 39:16,16
CV 1:11

                D

D 4:1
David 42:22
day 25:16 30:22
  37:6,19,20,24
  38:7,8,11,22
  39:2,13 40:5,5,9
  40:10,15,16
  46:10 58:5
days 43:12 54:24
  57:11
deal 51:22
death 8:9 39:15
  39:16 42:16
  47:5 55:11
  57:13
debrief 17:2
December 4:17
  5:18 6:2,7 57:1
  57:16 62:3,12
  64:5

decided 49:13,16
deemed 10:14,16
defendant 65:20
defendants 2:12
  2:19 6:24
delay 36:6,16
deny 48:15,16
denying 59:25
  60:2
department 5:13
  5:17 10:7 42:6,9
  55:12 56:1,8
  57:23 58:9
deponent 12:22
deposition 4:6
  6:10,17 7:3,22
  34:22 42:25
  62:8 68:13
depositions 6:20
depth 41:15
desk 22:22 23:3
  23:24 24:12,22
  25:7,13 26:2
  33:7 34:6,14
  49:14
detective 8:11,14
  8:17,21,24 9:5
  42:3,3 43:12,17
  45:6,14 47:4,13
  47:24 48:9
  50:17,21,25
  51:12,16 55:1
  56:2 57:10 61:5
detectives 48:12
determine 12:9
  21:6,24
died 38:4,17,21
  40:20 55:10,18
  57:5 58:5
difference 46:13
different 37:20
  40:4 44:2
difficulty 14:10
  14:21 35:8
direction 12:22
  12:24

**directly** 44:11
**disbelieve** 53:5
**discussed** 27:6
  44:22 50:22
**discussion** 18:9
**discussions** 41:11
**distance** 25:3
**District** 1:12,13
**document** 23:5
**documents** 6:9,11
  6:17 7:16,19
  44:3
**doing** 10:2 32:15
**door** 27:18 31:17
  31:21 36:8,16
  50:1,3 53:3
  54:13
**doors** 24:17,18,23
  25:4,22 26:8
**doubled** 30:4
**Dr** 1:7 2:4
**Duces** 6:17
**due** 10:14 18:24
  45:5

**E**

**E** 2:1,1 3:3 4:1,10
  66:3,18
**Eastern** 1:13
**either** 19:19 44:16
**elapsed** 23:17
**emergency** 8:3
  9:22 10:1,17,18
  11:22 13:22
  14:1,11 16:17
  16:18 17:7 19:6
  19:8 20:3 21:6
  21:20,25 23:16
  26:11,17 27:20
  28:1,11,23 29:3
  29:12 33:10,12
  33:16,20 34:13
  34:24 35:24
  36:3,11 37:1,9
  37:25 38:15
  39:5 40:11,21

41:4,9,19 45:4
45:25 46:19
51:18,20 52:8
52:14 53:16
54:7 57:18 58:7
61:22 62:13,22
63:3,8,11 64:2,6
64:21 65:2,7
**employed** 5:10
**employment** 5:8
**encounter** 35:8
**entered** 66:9
**entire** 5:3
**Estate** 1:10
**estimate** 18:3
  24:3
**evaluate** 33:25
  41:21
**evaluation** 52:3
**evening** 16:19,21
  17:8 18:19 20:4
  26:14 28:15
  45:16 47:14
  57:19
**event** 9:4 29:10
  42:24 44:9
  48:17 59:18
**eventually** 37:11
**everybody** 36:1
**evidence** 51:22
  56:17
**exact** 9:10 34:10
  37:15 39:20
  46:23
**EXAMINATION**
  4:2
**Exhibit** 4:5 34:19
  34:21 41:25
  42:1 43:4 51:8
**exhibits** 4:8
**explain** 24:13
  40:7
**eye** 59:11,17
  60:23 61:17
  66:21 68:5
**eyes** 67:6

**F**

**F** 3:7
**face** 5:25
**fact** 12:2 14:6
  29:10 54:10,18
  63:9
**fainting** 66:22
  67:10,22,23
**faints** 59:11,17
  60:24 61:18
  68:1
**fair** 4:22
**falsified** 68:8
**familiar** 6:3 42:5
**Families** 3:11
**far** 23:11 24:12
  25:3 27:6 35:25
**feel** 41:10
**female** 20:22
**fifth** 44:11 66:7
**finally** 5:3 27:18
**find** 36:19 38:5
  40:19
**finish** 11:22 12:14
  13:25 18:16
  19:23
**finished** 20:6
  53:13 54:1
  63:13,15 64:17
**first** 5:21 6:2,4,4
  7:10,14 17:20
  17:22 22:19,21
  23:2 27:6 31:13
  40:14,19 49:17
  61:12 62:2,10
  62:19 66:7 67:6
**Fitzpatrick** 2:14
**five** 5:14 23:13,24
  24:1,5 25:15
  27:12,14 31:13
  34:11,11,12,25
  36:4 57:11
**floor** 17:1,3,23
  18:11,12,20
  44:11,14,24
  61:13 66:7

**focus** 37:6
**footage** 8:1
**form** 9:23 10:10
  11:6 12:16 14:3
  14:17 15:7,22
  16:12 17:9 19:7
  22:14 23:19
  27:21 37:3
  40:24 45:17
  46:5,20 47:15
  48:4 50:12
  52:18 58:11,19
  58:24 59:12
  60:3 63:1 65:12
**found** 40:23 41:7
  64:15
**foundation** 42:17
**four** 57:11
**frankly** 50:9
**front** 6:11 31:24
  45:21 50:3
  51:23 62:19
  64:24 65:15
**full** 17:21 19:24
**Fund** 3:12
**further** 41:11
  65:24 68:12

**G**

**Gass** 3:8
**Geary** 3:7
**Gende** 1:6 2:2,3
  4:3,11 10:5,11
  10:15 11:7
  12:18,20,25
  13:2,5,9,16 14:4
  14:19 15:8,12
  15:17,18,23
  16:15 17:11
  19:9 20:1 22:16
  23:22 25:12,21
  27:13,24 28:17
  28:20,22 33:1
  37:7 40:12 41:2
  42:19 43:25
  44:5 45:18,22

46:24 47:17
48:5 50:14 51:4
51:10 52:20,25
56:18 58:17,21
58:25 59:14
60:7,9,12,14,16
60:20 63:2,5
65:13,19,24
66:19 68:10
**gentleman** 40:22
**getting** 8:7 22:23
  22:23 36:6
  56:24
**Give** 17:21 18:3
**given** 6:14 16:3
**giving** 12:21,24
  17:2
**Glance** 32:11
**glancing** 32:11
**go** 9:24 11:1 12:5
  12:7,14,17
  13:11,25 14:17
  16:13 19:13
  20:10 22:13,14
  22:17 24:18,22
  29:23 30:1
  31:14 32:24
  34:16 35:4
  40:25 54:4
  58:11 60:17
  63:24 65:14,15
  65:15
**goes** 54:12
**going** 4:15 5:14
  9:19 11:22
  12:14 13:22,25
  16:22 20:18
  32:9 34:20 35:9
  36:16 40:7
  47:21 51:15
  53:13 56:20,24
  57:10,14
**good** 26:4 43:22
  60:12
**gotta** 24:18
**grabbed** 23:5

Green 2:17
Group 2:15
Grutza 54:17
guess 51:23
guy 33:17
guys 44:7

**H**

hallway 24:14,14
hand 63:21 64:10
handle 33:23
  56:13
handled 54:14
Hang 19:22 60:19
Hansen 2:9
happened 6:24
  9:6 18:14 34:5
  36:19 37:2
  39:10 44:12,17
  54:19 63:9
happening 18:18
  22:12 26:24
  27:2 35:5 47:24
hard 24:13 28:4
  57:20 58:7,14
  59:22
head 4:25 24:6,9
Health 2:18
hear 18:25 22:8
  45:5
heard 20:22
help 29:8,17,19
  34:3 53:20,23
hit 20:8,9 47:8
hitting 45:4,10,15
  45:25 46:19
  47:8,9,9,10,13
  48:2 50:11
  55:22 57:18
Hold 12:20 18:16
  20:18
honestly 9:10
hospital 37:12
  38:1 39:8
hour 7:14
hours 59:3

hour'ish 7:11
housekeeping
  34:20
housing 8:2,6,7
  16:23 18:22
  20:13 23:3
  24:14 25:25
  27:15 33:11
  35:2
h-i-t-t-i-n-g 45:25

**I**

idea 26:24 27:2
  57:13
identified 34:19
  41:25
identify 62:2
  63:25
immediate 10:25
  10:25
immediately 26:6
  29:13 41:22,23
  44:10 54:13
  64:15
important 50:18
  50:21 52:2,6,11
  58:4
inappropriate
  12:23
incident 8:1 43:12
  56:7,9,9,10
including 36:4
  65:5
indicates 49:24
information 9:17
  16:3 17:5 25:16
  26:5 49:10,13
  49:16,20 50:2
  52:12,22 53:19
  54:24 55:21
  57:17 58:4,10
  58:16,22 61:1
  61:14,17,20
  67:16 68:8
initial 6:15 10:2
  22:24 23:6,8,23

35:7 54:6
initially 38:12
  55:12
Injured 3:11
inmate 21:2 29:4
  29:11 36:24
  41:17 45:3,24
  48:10 49:1
  51:17 58:13
  59:11,17 60:24
  61:18 67:13
inmates 30:3,14
  30:19 44:16
inmate's 31:3
inside 24:13 25:25
  59:23
inspection 10:2
  23:6,8 54:6
intentions 68:6
interacted 51:13
interaction 6:4
  43:16 52:1 62:2
  62:4,6
interactions 4:16
  8:12 50:18
intercom 22:6
  45:5 66:11
internal 42:16
  55:10
Interrogatories
  6:12,15 62:1
  65:11
Interrogatory
  62:10 63:14,25
interview 8:23
  43:13 44:1,9
  51:11,12 52:16
  60:10
interviewed 8:11
  47:4 56:24
investigate 42:9
investigation 8:8
  55:10 56:5,22
  57:8,13 67:4,5
involvement
  41:12

in-custody 47:5
  55:11 57:13
issues 18:21,22
it'd 24:14

**J**

J 2:2 3:1
jail 62:14 64:7,21
James 2:2
January 43:23
  47:1,3 51:12
  52:23
Jeff 1:4 13:9
John 3:1
Jonathan 3:5
Jones 2:8 4:4 9:23
  10:10,13 11:6
  12:16,20,24
  13:1,3 14:3,17
  15:7,10,16,22
  16:12 17:9 19:7
  19:22 22:14
  23:19 25:10,18
  27:12,21 28:16
  28:19 32:23
  37:3 40:9,24
  42:17 43:23
  44:2 45:17,20
  46:5,20 47:15
  48:4 50:12 51:3
  51:7 52:18,24
  56:16 58:11,19
  58:24 59:12
  60:3,5,8,11,13
  60:15,19,22
  63:1 65:12,18
  66:1,4,16
Joseph 1:4
Jr 4:14
jury 65:15

**K**

keep 5:5 56:22
  59:10,17 60:23
  61:17 66:21
  68:5
Kevin 3:7

Kilbourn 3:3
kind 24:13 29:19
  58:15
Kinsop 18:5
Kintop 16:25
  17:24 18:6,13
  21:9,10,11
  48:20,25 50:10
  59:8,9 61:15
  66:6
knew 38:20 39:16
  43:6 57:7,16
  58:5,5 61:9
  67:23
know 9:11,25
  11:10 12:2,4
  13:19 14:6,9,14
  14:20 16:20
  17:1,13,16 18:1
  19:17,18,19
  20:7,15 21:11
  23:20,21 26:10
  26:16 36:1
  37:11,25 38:13
  39:17 41:15
  42:3,4,8,20,21
  43:2,7 46:7,10
  46:11,12 47:21
  47:24 49:2 51:9
  51:18 55:6
  56:12 57:7,10
  59:20,21,24
  61:3 66:10,13
  66:20,24 67:1
  67:11,20,25
  68:11
knowing 51:16
knowledge 41:14
  44:18
K-i-n-d-t-o-p 18:6
  18:7

**L**

lack 22:11
Law 1:6 2:3,15
laying 11:12,13

**learned** 62:14,18
63:6,11 64:7,22
64:23
**leave** 29:23 36:8
65:10
**leaving** 63:3
**legal** 12:21 13:2
**letting** 35:3
**let's** 13:11 17:20
43:11 45:23
57:1 59:1 63:24
**lieutenant** 54:16
58:1
**line** 23:11
**lines** 27:25
**listen** 51:11 60:10
64:19
**little** 17:4
**LLC** 2:9,15 3:8
**LLP** 3:2
**log** 24:4 49:14
**logged** 23:3,4
25:15
**logging** 22:23
**long** 5:12 7:10,12
23:20,21,23
25:2 31:19,25
**look** 7:15,18,21
10:18,19,23
31:1,24 32:5,12
32:17 34:23
35:14
**looked** 7:23,25
34:23 67:6,8,9
**looking** 32:10,15
32:18 44:2
**lot** 61:20
**lower** 30:8

───────

**M**

**M** 2:14 4:10 48:18
66:3,18
**man** 55:10,18
58:5
**manner** 4:19,24
**marked** 34:21

42:1
**Martin** 18:13
21:9,14
**Martina** 16:25
17:23,25 21:15
21:16 48:19,20
48:25 50:10
59:7 61:14 66:6
**master** 33:10
**mean** 24:4 25:25
27:12 28:25
46:13 67:8
**meaning** 54:21
**means** 31:14
47:10
**medical** 9:22 10:1
10:9,18 14:1,11
14:15,24 15:2,3
19:6,8 21:19
26:10,17,21
28:23 29:2,3,6,8
29:11,12,13
33:4,10,12,16,20
34:13,24 35:24
36:3,11 37:1,9
37:24 38:15
39:5 40:10,21
41:4,9,18,19,20
41:20 51:20
52:8,8,13,14
53:16,16 54:7
54:18 61:21,22
62:5,13,22 63:3
63:8,11 64:1,2,6
64:21 65:2,7
67:3
**medically** 11:25
14:5 29:16
33:25
**meet** 7:2
**meeting** 7:10,12
7:14,18
**meetings** 7:8
**memory** 27:23
46:25 51:15
**met** 6:2 7:6

**Milwaukee** 1:10
2:11,12 3:4,10
5:9,12 10:7
43:14 44:6
55:25 56:8
57:23 58:9
62:13
**minute** 25:3,7,13
**minutes** 23:18,18
23:24 24:1,5,5
24:25 25:15
30:12 31:20
32:25 33:2
34:11,11,12,25
**mischaracterize**
13:1,3
**mischaracterizes**
56:17
**misread** 59:13,18
**mistakes** 12:16
45:20
**monitor** 36:14
**Monroe** 2:16
**morning** 6:10 9:9
9:15,18 11:4
16:11 34:22
38:14,19 39:6
40:2,22 41:13
46:11,12 50:23
51:1 52:3 55:13
61:21 62:12
64:5
**move** 59:1
**moved** 49:21
**moving** 30:15,19
30:22
**multiple** 45:11
**M-a-n-t** 18:1
**M-a-r** 18:4
**M-a-r-t-a-n** 18:4
**M-a-t** 18:1
**M.D** 3:5

───────

**N**

**N** 2:1,10 3:9 4:1
4:10,10 66:3,3

66:18,18
**name** 4:12,12
5:24 17:21,22
18:2 42:4 48:18
**nature** 62:3
**necessary** 10:14
10:16
**need** 34:23
**needed** 48:10 49:2
**needs** 29:17,19
**never** 8:20 17:10
36:22 51:12
52:16
**nevertheless**
57:16
**night** 9:6 17:2
23:14 24:20
27:20 28:1 46:3
46:7,11,12,16,18
50:6,11 53:21
53:23 55:22
57:20 59:24
**nods** 4:25
**normal** 5:22
**normally** 7:11
30:12
**notice** 4:6 6:16
34:22 67:22
**notified** 10:3
**notify** 33:10 41:20
**nurse** 36:13 48:10
48:11 49:2,5,8
53:14
**nurses** 35:25 36:5
**N28** 1:7 2:4

───────

**O**

**O** 4:10 66:3,18
**oath** 63:22 64:10
65:10
**Object** 14:3,17
22:14
**objection** 9:23
11:6 12:16 15:7
15:10,22 16:12
17:9 19:7 23:19

25:18 27:21
37:3 40:24
42:17 45:17
46:5,20 47:15
48:4 50:12
52:18 58:11,19
58:24 59:12
60:3 63:1 65:12
**objections** 12:21
13:2 52:24
62:11 64:4
**observe** 30:1
**occasions** 7:5
**offered** 59:2
**Office** 1:6 2:3 5:9
43:14
**officer** 5:19 14:9
16:25,25 17:21
17:23,24 20:22
41:17 43:7
51:16 55:12
59:10,16 60:21
66:5 67:14
**officers** 17:5,22
24:20 26:12
35:25 36:5
37:17,21 38:9
38:13 39:3 45:3
45:23 47:25
59:6 66:6
**Oh** 18:17 25:11
27:15 37:25
44:2 51:9 56:11
**okay** 4:19,20 5:1
5:2,7 7:23,25
8:3 9:12,14
10:19 11:1,3,20
12:12 13:14,18
13:24 17:25
19:2,24 20:20
21:9,11,14
22:19 24:16,19
26:2,4 27:16
29:23 31:1
32:14 33:9 34:9
37:8 39:23 40:8

42:1 43:22 44:3
45:23 46:3,25
47:21 48:17
51:25 55:6,10
60:12 61:5,14
65:24 66:16
67:16 68:2,7,10
68:12
**once** 10:1 13:22
18:20 25:22,25
26:4 32:15 33:2
33:4 34:6,24
35:10,10 36:3
36:12,18 53:13
56:4,21
**open** 36:8 39:21
54:13
**opened** 36:10,13
36:15
**orange** 54:17
**outside** 55:11
**Overlapping**
40:18
**overlaps** 46:9
**overtime** 40:4
57:2
**O'Toole** 42:3,3
43:13,20 52:17
52:23 55:2
57:10

___

**P**

**P** 2:1,1
**page** 4:2,5 28:18
54:4
**Palmer** 1:2 4:14
4:15 44:1,9,14
45:3,24 48:11
50:5 54:5,12,16
54:23 59:2
62:11 64:5
**panel** 17:17 23:15
24:12,19 26:13
**part** 54:8 56:4,21
59:1
**pass** 24:16

**passed** 40:23 41:7
41:13
**Patients** 3:11
**people** 35:24 36:4
36:11,15 48:21
**performed** 43:13
**person** 37:15
39:20 67:3
**personnel** 15:2
34:25 41:21
**Pewaukee** 1:8 2:5
**phrase** 45:12,13
**place** 5:8
**Plaintiffs** 2:6
**please** 4:12,18 5:3
6:14 13:10
**pod** 10:1 22:23
23:5 25:23 27:7
27:12,14 36:24
37:9 40:22
49:25 54:6,13
59:4,5,10,16,21
59:21 60:23
61:2,9,11,17
62:13 64:7,21
66:9,11,20 67:2
67:11,16 68:8
**point** 8:8 32:2
41:3 57:7
**policies** 42:15
**position** 5:17
**potential** 26:17
61:21
**preparation** 6:10
7:2 62:7
**prepare** 42:25
**present** 7:7
**pressed** 16:21,22
17:6 18:24 19:2
**pressing** 16:17,18
17:6 27:19,25
28:3,14
**pretty** 19:1 32:13
38:3
**prevents** 29:7
**previous** 13:15

**prior** 6:3 8:3 9:19
16:22 26:13
29:4 38:18
47:25 51:17
**probably** 24:4,5
38:20 46:22
**problems** 10:8,20
12:2 14:6 66:21
67:9,22,23
**promoted** 5:15
**pronounce** 48:18
**properly** 41:9,10
**provide** 29:21
**provided** 9:18
**pulled** 37:8 38:14
**pulse** 12:5
**purposes** 34:20
**pushed** 20:3,23
21:6,21,25 22:3
22:11 23:16
66:11,14,14
**pushing** 23:16
50:6 55:22
**put** 5:24 39:23
59:21 63:14
67:6,11,13,21
**P-a-l-m-e-r** 4:14
**p.m** 46:14 48:2
68:14

___

**Q**

**question** 4:18,21
5:3 9:6,9,15,19
11:4 13:6,7,15
13:21 16:11
18:16 19:23,23
19:24 20:18
47:18 50:23
51:2 52:4 55:13
60:22 61:21
64:19
**questioned** 35:9
**questions** 4:15
11:17 12:23
15:16 36:22
51:14 66:1,5

68:13
**quote** 59:10,11,17
59:18

___

**R**

**R** 2:1
**radio** 33:5,6
**raised** 63:21 64:9
**read** 13:9 45:23
**reading** 54:25
**ready** 22:24
**really** 18:25 32:12
58:15
**reason** 53:4
**recall** 5:24 8:9,11
8:14 9:3,14,17
22:9 34:10
41:14 44:21,25
46:21 60:25
61:1
**recalled** 44:14
54:16,21 59:9
59:15 60:21
**receiving** 44:15
**recollection** 43:16
**record** 4:13 5:5
13:12,13,15
68:14
**recorded** 8:20
43:13 51:11
60:9
**reduced** 9:1
**referring** 48:21
**refresh** 43:15
**regarding** 4:16
8:18 9:18 16:3
41:12 43:16
**Reid** 3:1
**relation** 62:5
**relative** 8:12
21:20,24 47:4
**relay** 47:12 55:1
**relayed** 48:12
66:6
**remember** 9:10
17:22 21:8 28:8

28:10 35:15
37:15 38:3
39:20 43:19
46:6,22 51:15
55:4,4,7,9 56:11
57:24 58:3
59:20
**repeat** 23:1
**rephrase** 4:19
**replayed** 13:14
**report** 4:7 26:12
42:2 47:25 48:8
57:22
**reported** 20:6
52:16,22 57:25
**reporter** 4:25
13:11,14 22:25
68:12
**reporting** 14:14
14:21
**required** 52:12
**respirations** 12:7
31:6
**respond** 19:25
25:10
**responded** 28:11
35:24 50:6
53:24 54:16
55:13,23
**responding** 8:3
54:14 58:6
**response** 20:2
49:3 62:13 64:3
64:6,20,21
**responses** 6:15,16
65:6
**rest** 30:8 63:15
**restate** 13:7
**retain** 58:16,22
**retired** 21:17
**return** 54:6
**review** 6:9 8:17
42:24 43:2
61:11
**reviewed** 6:18
62:7

reviews 42:16
Reynolds 2:9
rhetorical 15:16
right 5:6 6:9 7:7
  7:14 8:24 9:1,8
  12:15 14:24
  17:4,12,14,18
  18:10 19:20
  20:23 21:19
  22:17 25:5,7
  26:10 27:17,20
  28:1,4,7 29:3,13
  29:21 30:8,21
  30:22 31:1,4,13
  31:15,17,21
  33:2,14,16,18,21
  33:23 34:3,5,14
  34:17,18,24
  36:6,10 38:12
  38:15,19,25
  39:6,13 40:19
  41:22 42:16
  43:3,4,6,9,9,11
  44:19 45:1,11
  45:16,20 46:1,4
  46:14,17,19
  47:6,7,10,11,14
  47:25 48:3,23
  48:25 49:6,11
  49:18,22,24
  50:3,11,17,19,23
  51:23 52:1,4,9
  52:14 53:3,21
  53:22,24 54:2,3
  54:8,14,24
  55:14,18,19
  56:1 57:1,2,5,20
  58:10 59:1,9,15
  61:6,9,15,18,19
  62:1,8,10,20
  63:19,22,24
  64:11,25 65:3,4
  66:22 67:23
  68:5
rode 35:10,10
roll 9:11,12,14

16:4,6,10 18:10
  18:10,12 37:16
  39:23,25 40:20
  41:12 44:10
  57:5
rolling 8:7
room 43:15,19
Roughly 23:25
round 11:22 20:6
  30:3 32:21 33:3
  33:4 49:19
  53:13 63:13
  64:17
rounds 12:14
  13:23,25 20:5
  24:7,10 25:17
  25:22 26:1,6
  29:24 30:2,13
  31:15 49:17,21
  54:1 63:15 65:3
  65:7
Roundy 1:7 2:4
run 15:13
Russell 1:2 4:14

― S ―
S 2:1,16
sat 9:4 34:14
saw 11:11 18:12
  36:18
saying 18:25
  20:13 21:8 28:8
  28:10 38:10
  47:9 55:4 56:20
  60:25 67:25
  68:7,9
says 48:13 59:13
scene 36:12
Schade 3:2
Schmidt 42:13,14
  42:15
second 7:12,18
  12:20 40:6,9,15
  40:18,20 54:4
  57:3,16 58:2
seconds 13:4 32:2

32:3
security 24:16
see 6:14,20 11:3
  19:6 29:17 31:6
  31:13 32:13
  34:16 35:4,7
  43:24 48:10
  49:2,17 52:6
  57:19
seeing 29:4
seen 8:20 9:2
  13:18
sense 63:2
sent 45:1
sentence 49:24
  54:4
sergeant 5:11,15
series 4:15
serious 10:8 14:15
  14:24 15:3
  26:21 29:2,6,11
  41:18 52:8,13
  61:21 64:1
seriously 58:14
seriousness 53:10
  53:15
served 42:22
Services 2:18
setting 22:22
sheet 22:24 23:5
  59:10,17,21,22
  60:23 61:2,9,11
  61:17 66:20
  67:12,17 68:8
sheets 67:3
sheriff 42:11
Sheriff's 5:9 10:7
  42:5,8 43:14
  56:1,8 57:23
  58:9
shift 5:20,21,22
  23:14 38:19
  39:3 40:4,6,9,14
  40:15,15,18,19
  40:20 44:15
  46:9,16,18 48:8

48:9,17 50:19
  57:2,3,17 58:2
  59:3,5,9,16,20
  60:21,25 61:5
  61:12 66:10
shortly 18:10
  21:17,18 63:3
shoulder 33:8
shoulders 5:1
show 32:9 34:20
  42:1
showed 34:25
  36:1
shrugs 5:1
sick 54:23
signed 63:18
signs 12:10
single 30:5
sir 4:12,23 10:23
  13:19 16:1,24
  18:3,9 19:10
  24:3 28:21 47:1
  59:25 60:17
  61:1 64:13,19
  66:24
sit 49:14 52:21
  65:16
sitting 11:13,15
  35:23 43:19
  53:6
six 23:13
Slow 17:4
socializing 37:17
  37:21 38:9,12
somebody 10:7
  14:10,14,20
  15:2 17:6 28:9
  29:1,5 33:14
  39:13 47:13
  48:2 52:12 58:8
  67:21
somebody's 68:4
somewhat 50:9
soon 36:15 41:4
sorry 12:13 13:7
  18:17 21:1

22:25 25:11
  27:10,14 28:25
  40:4,18 44:3,3
  44:24
sound 42:5
speak 52:21
specifically 41:16
speculation 16:12
spell 4:12 18:4
spelled 17:25
spelling 18:2
spent 7:15
spoke 6:23 17:5
staff 17:17 34:7
  41:12,20 44:15
  50:19 54:14
stamp 44:5,6
stand 47:20,21
  65:22,23
standing 50:3
  64:24
start 12:21 17:20
  22:22,24 23:6
  25:16,22 43:11
  57:14
started 6:23 23:8
  23:10 39:14
  49:21 61:12
starts 9:11,12
  54:4
state 4:12 54:12
stated 44:10 48:9
  48:10 49:1 61:7
statement 8:18,20
  8:22,23 42:25
  43:6,7 45:8
  50:25 51:2,3
  55:2 59:2 60:1,5
  60:7 62:16
statements 59:25
states 1:12 62:11
  64:5
static 18:24 45:6
staticy 20:9
stating 50:1 53:3
Stayed 57:2

**stop** 31:17,23 32:5
  32:14,17
**stopped** 21:17
**stopping** 32:9
**stuff** 37:6
**subsequently**
  55:18
**suffered** 62:6
**suffering** 9:22,25
  14:11,15,21
  15:3 21:24
  26:11,21 29:2,5
  29:6,12 41:18
  52:7,13 61:23
  64:1
**Suite** 2:10 3:3,9
**summary** 4:7 9:1
  9:2 42:2,24
  43:25 51:5,6
  55:8 60:7,8
**superiors** 57:22
**supervising** 68:5
**supervisor** 36:12
  39:22 58:1,2
**supplemental**
  63:24 64:9
**supplemented**
  64:4
**supply** 54:18
**supposed** 15:1
  29:15 30:13,14
  56:5,6,13,14
**sure** 13:11 19:14
  19:24 20:18
  25:10 28:17
  30:14,23 31:3,6
  38:22 51:19
**sworn** 65:5,10
**system** 23:4
**S.C** 1:6 2:3

___

**T**

**T** 4:10 66:3,18
**take** 4:25 15:15
  23:11,21,23
  25:2 30:11

31:19,25 34:9
  35:12 58:14
**taken** 6:20 37:11
**takes** 24:25 27:6
  30:12
**talk** 24:9 31:23
  52:6 56:2,3,6,7
  56:10,14,23
  57:1,10
**talked** 17:16
  44:19 51:17,19
  53:19
**talking** 38:22
  39:14 43:19
  46:13
**tape** 52:21 60:10
**Tecum** 6:17
**tell** 4:18 10:20
  17:20 18:18
  19:2,5,10,16,21
  20:2 21:19,23
  22:2,5 26:16,20
  28:11,14 30:21
  35:20,22 36:10
  37:22 38:2,4,17
  39:10 41:16
  50:25 51:19
  52:22 55:25
  63:22
**telling** 9:5 64:10
**tells** 27:19
**ten** 23:18,18
**terms** 66:5
**testifying** 52:2
**testimony** 6:20
  37:2
**thank** 44:3 66:16
**thereto** 64:3
**they'd** 57:18
**thing** 18:23 22:19
  22:21 58:13
**things** 10:18
**think** 18:1 32:20
  38:18,20 39:22
  58:4,8 59:18
  68:7

**third** 44:15 46:9
  48:8,9,17 50:19
  59:3,5,9,16,20
  60:21,25 61:5
**third-shift** 48:20
**third-shifter**
  59:22
**thought** 38:8
  60:15
**three** 6:17
**tier** 30:5,8,9
**till** 34:7
**time** 6:2 7:13 8:2
  8:15 9:8,10
  14:18,20 15:17
  18:7 20:7 23:14
  23:17 28:4,24
  30:11,21 31:17
  31:23 32:10,16
  32:19,20 33:20
  34:9,10 41:3,7
  42:11 47:10
  54:22 57:7,20
  58:8 62:19,22
**timely** 41:9
**times** 17:7,12 19:2
  22:2 32:24
  45:11 65:5
  66:14
**today** 47:1 52:2
  52:22 63:21
  65:17 68:7
**told** 8:14 11:4,21
  11:24 12:12,13
  12:14,17 13:4
  13:20,22,24
  14:1 16:6,9,21
  16:24 18:13,20
  19:15 20:5
  23:15 24:21
  27:18 37:15
  39:8,19 45:3,6
  45:14,24 46:22
  49:1 50:5,10,17
  50:21,25 51:12
  51:16,19 53:7

53:12,17,20,23
  54:5,23 55:2
  56:2,3,5,7,11,16
  56:19 57:5,17
  58:6 61:5 64:17
  64:18,18 66:9
  66:13
**top** 30:5 43:25
**total** 30:3 31:22
  35:25 36:4
**totally** 12:23
**trained** 11:25
  12:11 14:5 15:1
  29:10 33:25
  41:19,20,22
**training** 10:6,14
  13:18 14:10
  41:16 56:21
**transcripts** 4:8
**transported** 54:22
**treat** 34:1
**trouble** 10:4
  11:21,24 14:14
  33:18 34:17
  62:15,18 63:7
  63:12 64:8,16
  64:23
**true** 8:14 14:12,16
  15:4,5 32:7 45:8
  62:16,25
**truth** 9:5 63:22
  64:11
**truthful** 47:5
  63:19
**truthfully** 43:9
  47:13
**try** 21:5,23 59:15
**trying** 20:21 21:2
  22:6 47:12,22
  53:20,23 67:21
  68:4
**Turek** 3:8
**twice** 7:6
**two** 17:5,22 24:18
  24:20,22 25:4,7
  25:13 26:12

48:20,25 59:6
  65:5 66:5
**type** 51:16
**t-o-p** 18:8

___

**U**

**Uh-huh** 15:25
  20:24 24:24
  25:6,8 27:8
  30:16 32:6 39:4
  55:15
**uncertain** 33:17
  53:11,15
**understand** 4:17
  10:6 20:21 21:3
  56:19
**understanding**
  22:11 62:4
**understood** 4:22
  22:5 63:25
**unit** 8:2,6,7 16:23
  20:13 23:3
  24:14 25:25
  33:11 35:2
**United** 1:12
**unsure** 48:11 49:8
**upper** 30:9
**upright** 35:23
**use** 23:4
**usually** 9:12

___

**V**

**v** 1:10
**verbal** 4:24
**verbally** 25:10
**verified** 63:18
**verify** 31:25
**video** 4:6 6:16
  7:21,23,25 32:9
  34:22
**visually** 29:4
**vital** 12:9

___

**W**

**wait** 19:22 60:22
**waited** 34:7 63:15
**walk** 15:20 32:14

**walked** 10:1 15:6
  15:9 23:2 30:8
  54:1 55:14
**walking** 8:5 32:15
  32:18,18
**wall** 11:16
**want** 5:16 7:6,11
  13:19 15:11,19
  20:15 23:13
  24:4 28:17
  31:23 36:1,2,4
  38:13,22 42:1
  42:12 45:12,13
  51:22,23 56:10
  56:19,23 65:9,9
  65:15,16,19,21
  65:21 67:5
  68:10
**wanted** 22:17
  47:5 67:4,6
**wasn't** 17:15
  23:20 40:3 49:5
**waste** 15:17
**Waukesha** 42:5,8
  42:15 47:4
**way** 49:22
**Wednesday** 1:4
**week** 46:8
**went** 18:12 19:5
  19:10,17 20:10
  20:12 21:5
  22:22 23:17
  24:19,21 27:5
  30:9 33:6 36:13
  38:1 39:8 44:11
  49:11,17,25
  54:13 61:23
  65:6
**weren't** 17:16
  36:24 37:1
**we're** 13:15 28:18
  38:22 41:20
  44:2 46:13
  53:20,23
**we've** 13:14 27:5
  27:19 28:3

34:21 42:1 54:7
  54:14
**wheelchair** 35:13
  36:19 37:8
**wheeled** 36:18,25
**whoever's** 68:4
**WI** 1:8 2:5,11,17
  3:4,10
**window** 32:13
**Wisconsin** 1:13
**Witness** 1:1 12:19
**wording** 46:23
**work** 9:8,11,11
  37:23 39:2
**worked** 21:11
  40:14,14
**working** 5:20 17:1
  18:22 21:17
  37:24 38:14
**wouldn't** 23:20
  24:2 37:5 47:1
  59:24
**write** 59:22
**written** 8:22,23
  27:16 45:20
  59:10,16 60:23
**wrote** 8:17 61:3
**W23000** 1:7 2:4

       **X**
**X** 4:1,10 66:3,18

       **Y**
**yeah** 8:25 10:14
  13:8 14:23
  15:11 18:8 26:3
  27:15 32:11
  38:10 42:14
  43:4 47:19 53:6
  55:9 57:1,21
  60:18,18 67:11
**year** 5:16
**years** 5:14

       **0**
**03/15/2023** 1:4
**0600** 59:3

**0615** 59:3
**09:00** 1:4

       **1**
**1/3/19** 44:1
**1/3/2019** 43:12
**10** 46:14 48:2
**12-hour** 40:15
**12/18/18** 44:10
**12:01** 68:13
**1438** 1:11
**18th** 6:7 40:22
  62:12 64:5
**1873** 44:5
**19th** 40:13,14
  57:1,16

       **2**
**2018** 4:17 5:18 6:2
  6:7 62:3,12 64:6
**2019** 47:1,3 51:13
  52:23
**21** 1:11
**241** 3:9

       **3**
**3rd** 43:23 47:1,3
  51:13 52:23
**30** 13:4
**300** 3:9
**301** 2:10
**330** 3:3
**34** 4:6

       **4**
**4** 4:3 44:16
**400** 2:10
**41** 4:7
**43** 31:14 63:16
**48** 30:4 31:12

       **5**
**5** 44:17 63:25
  66:11
**5B** 18:22 27:15,17
  30:6 33:11
  37:24 38:14

62:13 64:7,21
  66:9,11
**53072** 1:8 2:5
**53202** 2:11 3:4,10
**54301** 2:17
**55** 4:6 34:19,21
**56** 4:7 41:25 42:2
  43:4 51:8
**575** 3:3

       **6**
**6** 46:14 48:3
**6:00** 9:11
**615** 2:16
**64** 30:3
**66** 4:3,4

       **7**
**74** 44:6

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF BRIAN COLLINS,
By DAVE LANG, Special Administrator;
BREON JAESHAUN GORDON-COLLINS (A MINOR),
AJANAE EMANI GORDON-COLLINS (A MINOR),
BRANDON AESHAUN GORDON-COLLINS (A minor),
AND CAHRON JAYAIR GORDON-COLLINS (A minor)

        Plaintiffs,

Case No.21-CV-01438-NJ

    v.

MILWAUKEE COUNTY, C.O. PALMER, LT. ARTUS,
C.O. S. JOHNSON, C.O. DERRICK SPIDELL,
C.O. TABATHA BLOMBERG, C.O. JEFF ANDRYKOWSKI,
WISCONSIN COUNTRY MUTUAL INSURANCE CORPORATION,
ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
N.P. JACQUELINE ALOMEPE, NURSING SURPERVISOR
LYNDA KARASZEWSKI, R.N. LIANA GRAMZA, DR. JONATHON
BRODY, EVANSTON INSURANCE COMPANY, and INJURED
PATIENTS AND FAMILIES COMPENSATION FUND,
DERRICK SPIDELL WISCONSIN HEALTH CARE LIABILITY
INSURANCE PLAN,
CANDACE DZIEOZIC,

        Defendants.

## AMENDED NOTICE OF VIDEO DEPOSITION DUCES TECUM

TO:    Correctional Officer Palmer
       c/o Andrew Jones
       Hansen Reynolds LLC
       301 N. Broadway
       Suite 400
       Milwaukee, WI 53202

      Pursuant to Wis. Stats., §805.07, §885.44 and §885.46 the deposition of Correctional Officer Palmer is hereby commanded to appear in person for deposition, that will also be recorded by video, at Gende Law Office N28W23000 Roundy Dr., Ste.200, Pewaukee, WI von **March 15, 2023 at 11:00 a.m.** to give evidence in the above captioned matter. You are further commanded to bring with you a copy of all documents you reviewed in preparation for your deposition and all documents you have in your possession related to this incident. This deposition may be subject to continuance from time to time and place to place until completed. **Failure to appear may result in punishment for contempt, which may include monetary penalties, imprisonment and other sanctions.**

      Dated at Pewaukee, Wisconsin this 16th day of February, 2023



GENDE LAW OFFICE, S.C.
Attorneys for Plaintiffs

By: _____
James J. Gende II
State Bar No. 1030921

**MAILING ADDRESS:**
N28 W23000 Roundy Drive, Ste. 200
Pewaukee, WI 53072
Telephone:  262.970.8500
Facsimile:   262.970.7100

one, and asked where it was needed. He said the request was for a wheelchair to
be delivered to either 5B or 6B; he could not recall exactly which Pod.
Andrykowski said that upon arrival to Pod 5, cell 5, a nurse and Lieutenant
Artus were already on scene along with the Pod Officer. Andrykowski could not
recall who the Pod Officer was. Andrykowski entered the cell where Collins was.
Collins stood up under his own power and sat in the wheelchair. He wheeled
Collins to the jail clinic, and doesn't remember Collins saying anything to him.
Upon arrival to clinic room #1, Collins was turned over to an awaiting nurse,
and CO Andrykowski resumed his normal duties. About one hour later, Andrykowski
stated that he escorted Bell Ambulance to the clinic and Bell Ambulance staff
placed Collins onto a gurney. Andrykowski then escorted Bell Ambulance and
Collins to the sally port, and he again resumed his normal duties from there.
No other information of evidentiary value was obtained from Andrykowski.


Summary of interview with Correctional Officer S. Johnson:
On 01-03-19 WKSO Detective O'Toole performed a recorded interview with
Correctional Officer S. Johnson while in the MCSO administration conference
room. A copy of the interview is available for review. During this interview,
CO Johnson stated that on both Monday 12-17-18 and Tuesday 12-18-18, she was
assigned to the jail clinic. In regards to her knowledge of Collins, on
12-18-18 CO Johnson heard the medical emergency for Collins. She could not
recall what the details of the medical emergency were. She said that shortly
thereafter Collins was brought into the clinic in a wheelchair. CO Johnson saw
that Collins was in and out of sleeping, and that she asked him if he was okay.
He simply replied, "Yeah". She said Collins complained of abdominal pain and
that he was seated in the wheelchair near her desk for some time. She sat with
him until Bell Ambulance later arrived, and stated that Collins did not say much
to her during that time. No other information of evidentiary value was obtained
from CO S. Johnson.


Summary of interview with Lieutenant Artus:
On 01-03-19 WKSO Detective O'Toole performed a recorded interview with
Lieutenant Artus while in the MCSO administration conference room. A copy of
the interview is available for review. During this interview, Lieutenant Artus
recalled that a medical emergency was initiated for Collins at about 06:32 hours
due to stomach pains. Collins was in his cell at the time, and when Lieutenant
Artus arrived nurses began a patient assessment of him. He said that Collins
was complaining that he did not want to go to the clinic just to receive another
I.V. like yesterday. Lieutenant Artus was able to convince Collins to go to the
clinic again, and he was transported there via wheelchair. Lieutenant Artus did
not have any other information of evidentiary
value to provide.


Summary of interview with Correctional Officer Palmer:
On 01-03-19 WKSO Detective O'Toole performed a recorded interview with
Correctional Officer Palmer while in the MCSO administration conference room. A
copy of the interview is available for review. During this interview, CO Palmer
stated that on 12-18-18 immediately after roll call he went directly to fifth
floor control. Upon arrival to floor control, CO Palmer recalled receiving a
briefing from third shift staff asking that he check on the inmates in either
cell four or cell five. He could not recall which cell it was. Those officers
told CO Palmer that an inmate in the cell had been hitting the emergency
button, but that they could not hear anything said into the intercom due to
static. Third shift stated that they checked on the inmate and he stated he
needed to see the nurse, but CO Palmer was unsure if a nurse had been called.
After he was briefed, he went into the Pod and Collins' cellmate, Blakes, was at
the door stating that Collins could not breathe. CO Palmer said that Blakes
told him that they were pushing the button all night, but no one responded. It

PLAINTIFF'S
EXHIBIT
51

02/20/19

should be noted that review of the pod surveillance video revealed that
Correctional Officers did patrol the pod routinely throughout the night. CO
Palmer told Blakes that he would do his initial inspection of the Pod and then
return to call a medical emergency for Collins. CO Palmer did do that, and then
immediately went to Pod control to open the door for responding staff. CO
Palmer recalled his Lieutenant responded to the call along with CO Grutza who
brought an orange medical supplies bag and AED. He also recalled that after
some time Collins was transported to the clinic, and Blakes told CO Palmer that
Collins had been sick for a few days. CO Palmer also offered that sometime
between 06:00 hours and 06:15 hours third shift did the last check of the Pod.
He recalled that a third shift officer had written on the Pod sheet "keep eye on
inmate he faints". CO Palmer did not have any other information of evidentiary
value to provide.

Summary of interview with jail Nurse Practitioner Jacqueline Alomepe:
On 12-18-18 while at the Criminal Justice Facility for this investigation, WKSO
Detective O'Toole performed an interview with jail Nurse Practitioner Alomepe.
During this interview, Alomepe remembered that at around 06:45 hours there was a
call for a medical backup for an inmate suffering from upper quadrant pain. The
patient was eventually identified as Collins, who was brought to the clinic in a
wheelchair. Alomepe said that she ordered Collins be sent out to a hospital for
continued care. Alomepe believed that at roughly 07:45 hours Bell Ambulance was
requested for the conveyance to the hospital, and that between about 12:30 hours
and 13:00 hours she was advised that the hospital called to report that Collins
had an enlarged gallbladder. Alomepe did not have any other information of
evidentiary value to provide, please refer to her recorded interview for more
information.

Summary of interview with Froedtert RN Ashley Berg:
On 12-18-18 while at Froedtert, WKSO Detective Chmielewski performed an
interview with Froedtert Hospital Registered Nurse Ashley Berg. This interview
was done within the PACU, and was recorded. A copy of the interview is
available for review. On the date in question, Berg recalled that she was
working on a different unit when she received "nurse assist" alarm for the PACU.
She responded to that call, which was said to be in PACU room 31, where she
observed Collins seizing. Berg said that she provided Collins with the proper
amount of Versed medication to help with anxiety and to help stop seizures. She
recalled that another nurse provided Collins with the proper amount of Ativan,
and that Collins initially woke up and was conscious and breathing, however he
was not responding appropriately. Berg also said that Collins had two more
seizures, becoming unresponsive after the third. She observed that Collins'
pupils were "fixed and dilated", and that his breathing was agonal. He had a
tube placed into his mouth to assist him with breathing, however he eventually
became pulseless. She said that she and other staff members performed CPR on
Collins for 25-30 minutes, stating that during that time Collins would "come
back" a few times with a pulse however within a minute would become pulseless
again. After what Berg described as "extensive amounts of CPR", Doctor Suneeta
Gollapudy called a time of death and there was nothing more medical staff could
do. Berg referred Detective Chmielewski to the medical records and reports
completed by the facility for patient Collins for more information. Those
documents were obtained and have been included with this report. Please refer
to that documentation and the audio recording of this interview for more
information.

Summary of interview with Jail Nursing Supervisor Lynda Karaszewski:
On 12-18-18 while at the Criminal Justice Facility, WKSO Detective Loberg
performed a recorded interview with Nursing Supervisor Karaszewski. A copy of
the interview is available for review. During this interview, Karaszewski

02/20/19