UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF BRIAN COLLINS, *et al.*,

        Plaintiff,

v.                                 Case No. 21-cv-1438-pp

MILWAUKEE COUNTY, *et al.*,

        Defendants.

---

**ORDER GRANTING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 194), GRANTING DEFENDANTS BRODIE AND EVANSTON INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 205), GRANTING DEFENDANT INJURED PATIENTS AND FAMILIES COMPENSATION FUND'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 207), GRANTING DEFENDANTS ALOMEPE AND DZIEDZIC'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 212), ORDERING THAT DEFENDANTS KARASZEWSKI AND GRAMZA ARE ENTITLED TO SUMMARY JUDGMENT AND DISMISSING CASE**

---

On December 17, 2021, the plaintiffs filed a complaint alleging that the defendants violated Brian Collins's constitutional, civil and/or statutory rights, causing Collins to unnecessarily suffer damages, injuries and ultimately death while in custody at the Milwaukee County Jail. Dkt. No. 1. The plaintiffs brought the following claims: Count 1 (against all defendants)—under 42 U.S.C. §1983, violation of the Fourth, Eighth and Fourteenth Amendments; Count 2—"<u>Monell</u> Liability,"[1] including (A) failure to train and adequately supervise against defendants Milwaukee County and Armor Correctional Health Services; (B) policies, practices and/or customs of allowing untrained correctional staff to make decisions concerning the need for appropriate

---

[1] <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690-91 (1978).

1

medical treatment and the housing of incarcerated individuals with medical needs against Milwaukee County and Armor; (C) polices, practices and/or customs of ignoring the requirements of the consent decree and failing to follow recommendations of a court-approved medical monitor which created a culture in which Milwaukee County employees were deliberately indifferent to the constitutional rights of incarcerated individuals and disregarded proper policy and procedure against Milwaukee County; and (D) policies, practices and/or customs of not conducting security rounds/checks in a timely and/or meaningful manner which created a culture in which Milwaukee County employees were deliberately indifferent to the constitutional rights of incarcerated individuals and disregarded proper policy and procedure against Milwaukee County; Count 3—state law negligence claim against Artus, Johnson, Andrykowski, Palmer, Spidell and Blomberg; and Count 4—wrongful death in violation of Wis. Stat. §895.03 against Artus, Johnson, Andrykowski, Palmer, Spidell and Blomberg. Dkt. No. 1 at ¶¶71-116. On November 7, 2022, the court granted in part Armor's motion to dismiss and dismissed the claims brought against Armor which the plaintiffs had brought under a theory of *respondeat superior* liability. Dkt. No. 68. The court denied Armor's motion to dismiss the plaintiffs' claims brought under <u>Monell</u>. <u>Id.</u>

The following defendants have filed motions for summary judgment: (1) Armor, Steven Artus, Tabatha Blomberg, Sherita Johnson, Milwaukee County, Russell Palmer, Derrick Spidell and Wisconsin County Mutual Insurance Corporation (County Defendants), dkt. no. 194; (2) Jonathan Brodie and Evanston Insurance Company, dkt. no. 205; (3) Injured Patients and Families

Compensation Fund, dkt. no. 207; and (4) Jacqueline Alomepe and Candace Dziedzic, dkt. no. 212.[2]

## I.    **Facts**[3]

### A.    Defendants

Milwaukee County is a municipal corporation organized under the laws of the State of Wisconsin. Dkt. No. 195 at ¶4. In December 2018, Russell Palmer, Sherita Johnson, Derrick Spidell and Tabatha Blomberg were employed by Milwaukee County as corrections officers in the Milwaukee County Jail and Steven Artus was employed by Milwaukee County as a lieutenant in the jail. Id. at ¶¶5-9. Wisconsin County Mutual Insurance Corporation (WCMIC) issued a policy of liability insurance to Milwaukee County. Id. at ¶10. In 2018, Armor held a contract with Milwaukee County to provide medical services to incarcerated individuals in the jail and the medical staff to deliver such services. Id. at ¶11. Under the contract, Armor was responsible for providing the necessary medical staff for the jail and for ensuring their licensure and training. Id. at ¶12.

In December 2018, Jacqueline Alomepe was a nurse practitioner employed by Armor to work in the jail; Lynda Karaszewski, Liana Gramza and Candace Dziedzic were registered nurses employed by Armor to work in the jail; and Jonathan Brodie was a physician contracted by Armor to work in the jail. Dkt. No. 195 at ¶¶13-17. Evanston Insurance Company issued a policy of

---

[2] Defendants Lynda Karaszewski and Liana Gramza, who are unrepresented, did not file their own motion for summary judgment but the County Defendants argue that they are entitled to summary judgment.

[3] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

liability insurance that provided certain insurance coverage to Brodie. <u>Id.</u> at ¶18.  The Injured Patients and Families Compensation Fund is a statutory entity created by Chapter 655 of the Wisconsin Statutes; it provides coverage to health care providers for claims of malpractice brought under Chapter 655. <u>Id.</u> at ¶19. Brodie is the only Chapter 655 health care provider covered by the Fund who is named in this lawsuit. <u>Id.</u>

       B.      <u>Events Underlying Plaintiff's Claims</u>

On May 12, 2018, Collins—then thirty-two years old—was booked into the jail on two counts of armed robbery. Dkt. No. 195 at ¶20. At booking, Collins reported that he was a daily cocaine user and that he took no medications. <u>Id.</u> at ¶21. His intake screening reflected that he was medically cleared and identified no present medical conditions. Dkt. No. 229 at ¶21.

On December 5, 2018, after he became dizzy and fell in his housing pod, Collins was taken to the jail's medical clinic. Dkt. No. 195 at ¶22. In the clinic, Dr. Hena Kausar (not a defendant) examined Collins. <u>Id.</u> at ¶23. Collins reported that he had not passed out, but that he was still feeling a bit confused because he hit his head when he fell. <u>Id.</u> at ¶24; Dkt. No. 229 at ¶24. Collins's vital signs were normal other than an elevated pulse rate; he had no chest pain or shortness of breath and his abdomen was not tender. Dkt. No. 195 at ¶25. Dr. Kausar's note suggests that Collins's dizziness might have been either vasovagal or due to orthostatic hypotension. <u>Id.</u> at ¶26; Dkt. No. 229 at ¶26. Kauser counseled Collins to stay hydrated, and she ordered that neuro and blood pressure/heart rate checks be performed on the plaintiff three times a day for three days, that an EKG be performed and that various blood labs be performed. Dkt. No. 195 at ¶27.

After Collins left the clinic on December 5, 2018, Armor medical staff checked his signs three times on December 5, once on December 6 and two times on December 7, 2018; the results of those checks were not abnormal. Dkt. No. 195 at ¶28. Neuro checks also were performed on Collins; he received one on December 5, one on December 6 and two on December 7, 2018. Id. at ¶29. On December 6, 2018, during one check of his vital signs, an Armor nurse wrote, "No complaints at this time. Patient stated 'I feel a lot better.' RN writer educated patient on making sure he is eating enough and drinking enough water." Id. at ¶30. The results of the EKG performed under Kausar's December 5, 2018 order were normal, showing only borderline tachycardia (elevated heart rate). Id. at ¶31.

On December 15, 2018, at 11:30 p.m., Collins fainted in his housing pod. Dkt. No. 195 at ¶32. Licensed Practical Nurse Kyna Taylor (not a defendant) took Collins's vital signs, tested his blood sugar level and noted that he appeared to be a little lethargic and cold/clammy to the touch. Id. at ¶33. Nurse Taylor's medical note states:

> CO stated that the IM fainted and others witnessed what could have been a seizure. Writer took vitals and B.S., 103. IM appeared a little lethargic and was cold/clammy to the touch. IM doesn't take any medications at this time, states he doesn't have a medical hx and denies an[y] drug use. Nursing sup aware of situation and if the IM continues to have issues throughout the night to let staff know. IM is scheduled to be seen in the clinic tomorrow morning, 12/16.

Dkt. No. 196-16; Dkt. No. 230 at ¶¶2-4. Collins's medical chart reflects that he was not seen in the clinic on December 16, 2018. Dkt. No. 230 at ¶5.

On the morning of December 17, 2018, Armor medical staff were called to Collins's housing unit because he was complaining of feeling dizzy and having breathing issues. Dkt. No. 195 at ¶36; Dkt. No. 229 at ¶36. Lieutenant Artus responded to Collins's housing pod, along with Nurse Dziedzic. Dkt. No.

195 at ¶37. Collins initially was assessed by Dziedzic, and her assessment note includes the following "Physical findings":

> A&Ox3. BP stable. Tachycardic. No signs of acute distress. Denies any pain. "I just get dizzy every time I stand up or lay on my side." Patient reports "This has been going on for over a week." Skin tenting on forearm. Perrla. Responds appropriately to verbal stimuli; no slurring of speech. Respirations even, unlabored. Breath sounds clear to auscultation throughout all lung fields. Apical pulse regular rate and rhythm; s1, s2 noted. Mucous membranes moist and pink. Negative jvd.

Id. at ¶39; Dkt. No. 196-18. In contrast to this assessment note, the plaintiffs assert that Collins complained of pain during the medical call on December 17 and that Dziedzic was aware of this. Dkt. No. 229 at ¶43. Based on her assessment, Dziedzic believed that Collins was dehydrated. Dkt. No. 195 at ¶45.

Collins was taken from his housing unit to the medical clinic by wheelchair. Dkt. No. 195 at ¶47. Dziedzic notified Nurse Practitioner Mahita Gone (not a defendant) of Collins's condition, and Gone directed that an EKG be performed, that Collins receive an IV of one-liter normal saline and that he be seen by an Armor provider before returning to his housing unit. Id. at ¶48. Gramza administered the EKG and started the IV. Id. at ¶49.

After the EKG was performed and the IV was administered, Collins was seen by Dr. Brodie. Dkt. No. 195 at ¶51. Brodie noted that Collins's EKG was within normal limits, except for Collins having borderline tachycardia with a pulse rate of 100. Id. at ¶52. Brodie noted that Collins was complaining of dizziness when standing and right upper quadrant pain in his abdomen over the previous two days, and that he reported feeling much better after having received the IV. Id. at ¶¶53-54. On assessment, Brodie noted that Collins had orthostatic hypotension (a drop in blood pressure brought about by changing

6

position), with higher measurements when standing. Id. at ¶55. He concluded that Collins's tachycardia was sinus tachycardia, which is not typically associated with a higher risk of blood clots or stroke. Id. at ¶56. Collins's blood pressure was 124/82, and his pulse was 124. Dkt. No. 196-14 at 1.[4] Collins's abdomen was soft, with moderate tenderness to the right upper quadrant upon palpation, but Collins was negative for "Murphy's sign," a test for acute cholecystitis (an inflamed gallbladder). Dkt. No. 195 at ¶58. Collins also was negative for CVAT (costovertebral angle tenderness test), a physical maneuver test in which pain is elicited by percussion of the area of the back overlying the kidney.[5] Dkt. No. 196-14 at 1.

On December 17, 2018, the following conditions were listed as "current problems" in Armor's medical chart for the plaintiff: "N17.9 Acute kidney failure, unspecified; R79.9 Abnormal finding of blood chemistry, unspecified; GI-Abdominal Pain; I95.1 Orthostatic hypotension; and E86.0 Dehydration Moderate." Dkt. No. 230 at ¶7. Based on his assessment, Brodie concluded that Collins had orthostatic hypotension caused by dehydration, and he noted that Collins had right upper quadrant abdominal pain of unclear etiology. Dkt. No. 195 at ¶59. Brodie concluded that Collins did not have an acute abdominal condition or other medical emergency and did not need to be transported to the hospital for additional care. Id. at ¶60. Brodie encouraged Collins to drink fluids and ordered that lab work be done, an ultrasound be performed, Collins

---

[4] The defendants state that Collins's blood pressure was "within normal limits" and that his pulse was borderline elevated but improved from before he was administered the IV. Dkt. No. 195 at ¶57. The plaintiffs assert that Collins's blood pressure and pulse were elevated. Dkt. No. 229 at ¶57.
[5] See healthline.com/health/costovertebral-angle (last visited Mar. 29, 2026); see also Stedmans Medical Dictionary, §41340 (West 2014).

be placed in a lower bunk and Collins's blood pressure be measured three times a day for three days and his weight be taken once per day. Id. at ¶61.

According to the plaintiffs, Brodie failed to acknowledge or treat Collins for repeated syncopal events, as well as a history of elevated pulse rate, bloody sputum and the fact that Collins had lost consciousness and possibly suffered a seizure two days prior or that Collins was not presented for his scheduled medical clinic on December 16. Dkt. No. 229 at ¶52. In response to being asked at his deposition what Brodie would have to have seen to send the plaintiff to the emergency room on December 17, 2019, he testified:

> That list is very long, but some of the reasons might have included hypotension that did not respond to fluids, you know, after—if the patient did not feel better or worsened, instead of feeling better; if he has had new symptoms, like complained of sudden onset chest pain, shortness of breath, and observing or difficulty breathing; if he suddenly became unresponsive, lost consciousness; if he had had a seizure; if he had exhibited any signs—neurologic signs that indicate he had a concussion.

Dkt. No. 228-16 at 43, Tr. p. 169:2-11. Brodie did not send the plaintiff to the emergency room on December 17, 2018. Dkt. No. 230 at ¶14.

Officer Johnson was on duty in the clinic on December 17, 2018. Dkt. No. 195 at ¶62. When Armor medical staff finished treating Collins in the clinic that day, Johnson walked with Collins back to his housing pod; Collins was joking and walking normally. Id. at ¶¶63-64.

Later on December 17, at about 8:11 p.m., Collins was recorded making a phone call to his girlfriend. Dkt. No. 230 at ¶20. Collins asserted that "[t]hese people are trying to fucking kill me" and asks his girlfriend to call the jail.[6] Id.

---

[6] The defendants object to plaintiffs' reliance on the referenced statements by Collins, arguing that they are hearsay under Federal Rule of Evidence 801(c), and the exceptions under Fed. R. Evid. 801(d), Fed. R. Evid. 803 and 804 do

at ¶21. Collins asserted that he had put in three "slips" in the past month, but that jail staff kept insisting that he was dehydrated, which Collins stated wasn't working out. Id. at ¶22. Collins stated on the recording that he was suffering from a "fat ass knot" in his stomach and that it felt like a tumor. Id. at ¶23. Collins complained that he couldn't breathe and that when he lay down, he felt like he was going to die, and that he had told staff this. Id. at ¶24. He stated that jail staff would not take him across the street to the hospital. Id. at ¶25. Collins said that every five to six steps he took he felt like he was going to pass out. Id. at ¶28. He stated that he did not trust jail staff, that he had a swollen stomach and that they just kept telling him to drink water. Id. at ¶31.

The next morning, December 18, 2018, Officer Palmer arrived for work at the jail at about 6:00 a.m. Dkt. No. 229 at ¶67. A night shift officer told Palmer that Collins had pressed the call button in his cell and to check on him. Id.; Dkt. No. 230 at ¶33. The officer told Palmer that they could not hear what Collins was saying because the call was "staticy." Dkt. No. 229 at ¶68; Dkt. No. 230 at ¶34. When Palmer entered the housing unit at 6:20:05 a.m., he first went to the desk to set up for logging into the computer and to get his pod sheet ready to start an initial count. Dkt. No. 230 at ¶36. He did this to begin his initial inspection of the housing unit, which included checking on Collins. Dkt. No. 242 at ¶36. Palmer began his initial inspection at 6:24:30 a.m. and he first spoke to Collins and Collins's cellmate at 6:25:00 a.m. Id. When Palmer spoke with Collins's cellmate, Palmer could see Collins, alert and breathing, sitting on his bunk in the cell with his back to the wall. Dkt. No. 195 at ¶69. Collins's cellmate told Palmer that they had pressed the emergency button all

---

not apply. (The defendants assert this same argument regarding all statements made to others.)

night to get Collins help, but that no one had responded to their calls. Dkt. No. 230 at ¶40. Palmer asked Collins if he was okay, and Collins responded that he was having trouble breathing. Id. at ¶41. Palmer completed his initial inspection rounds in the housing pod, which took about four minutes, then called over the radio for a medical response to the housing pod for Collins. Dkt. No. 195 at ¶70; Dkt. No. 230 at ¶¶42-43, 48. At 6:31 a.m., the jail's master control called a medical emergency in response to Palmer's radio call. Dkt. No. 195 at ¶66.

Palmer understood that having problems breathing is a serious medical condition. Dkt. No. 230 at ¶39. Milwaukee County Policy states that a count may be interrupted for an emergency. Id. at ¶47.

Lieutenant Artus and Nurses Karaszewski and Gramza arrived in Collins's housing pod about three minutes after the call for a medical response. Dkt. No. 195 at ¶71. Artus stood by for security purposes as the nurses assessed Collins. Id. at ¶72. Gramza initially asked Collins what was wrong, and he responded that his abdomen hurt. Id. at ¶73. Gramza physically examined Collins's abdomen to determine the source of the pain. Id. at ¶74. Gramza took Collins's vital signs, which were within normal limits. Id. at ¶75. Collins's condition did not worsen during the time Gramza was assessing him. Id. at ¶76. Karaszewski stood by to assist, if necessary, as Gramza assessed Collins. Id. at ¶77. Gramza concluded that Collins needed to be taken to the clinic in the jail and then the hospital so the source of his pain could be determined. Id. at ¶79. At 6:41 a.m., Collins left his housing pod to be transported by wheelchair to medical clinic. Id. at ¶81. Gramza called Nurse Practitioner Alomepe in the clinic to inform her of Collins's condition and that he was being transported there. Id. at ¶82.

Collins arrived in the jail's medical clinic at 6:43 a.m. Dkt. No. 195 at ¶83. His condition did not worsen as he was being transported to the clinic. Id. at ¶84. Karaszewski had no additional involvement in Collins's care and treatment because her shift had ended. Id. at ¶86. In the clinic, Alomepe assumed responsibility for Collins's care. Id. at ¶87. Alomepe had not treated Collins prior to December 18, 2018. Id. at ¶88. Gramza informed Alomepe of her interactions with Collins on December 17, 2018 and the care he had received that day. Id. at ¶89.

When Alomepe assessed Collins, Collins reported that he began having abdominal pain two days prior, with dizziness. Dkt. No. 195 at ¶90. Collins said that the pain was in the right upper quadrant of his abdomen and was at ten on a scale of one to ten. Id. at ¶91. Alomepe noted that Collins had been treated the day before for dehydration and that the results of lab tests were still pending. Id. at ¶92. On examination, Collins's vital signs were within normal limits and his breathing was unlabored. Id. at ¶¶93-94. Collins's abdomen was positive for bowel sounds, was soft and non-distended and was sensitive to touch in the right upper quadrant. Id. at ¶95. Unlike the day prior, Collins's abdomen was positive for Murphy's sign. Id. at ¶96. Based on her assessment, Alomepe determined that Collins should be sent to the hospital to determine the source of his abdominal pain and to rule out choledocholithiasis (gallstones). Id. at ¶97. Alomepe also ordered that a dose of pain medication be administered to Collins to relieve his pain, and Gramza administered the medication. Id. at ¶98. After Collins received the pain medication, his pain subsided and he was sitting, talking and saying he did not want to go to the hospital. Id. at ¶99.

11

At 7:15 a.m., master control at the jail notified the Milwaukee Fire Department that an ambulance was needed to transport Collins to the hospital. Dkt. No. 195 at ¶102. The ambulance received the call for service at 7:23 a.m. Dkt. No. 229 at ¶102. An ambulance from Bell Ambulance arrived at the jail at approximately 7:31 a.m. Dkt. No. 195 at ¶103. The Bell Ambulance crew arrived in the medical clinic at 7:38 a.m.  Id. at ¶104. When the crew initially assessed Collins, his chief complaint was abdominal pain. Id. at ¶105. During the assessment by the ambulance crew, Collins was alert and oriented and his respirations were normal. Id. at ¶106. His blood pressure was 130/100, his pulse was 109, strong and regular, his respirations were normal and regular, his temperature was 100.4, and his oxygen level was 93% on room air. Id. at ¶107. Collins was able to stand and pivot onto the ambulance stretcher without assistance. Id. at ¶108. The Bell Ambulance crew left the medical clinic with Collins at 7:47 a.m. and left the jail at 7:52 a.m. Id. at ¶¶109-10.

Officers Blomberg and Spidell were assigned to accompany Collins to the hospital. Dkt. No. 195 at ¶111. The Bell Ambulance crew transported Collins to Froedtert Hospital at a Code-2 level (without lights and sirens). Id. at ¶113. They arrived at Froedtert Hospital at 8:13 a.m. Id. at ¶114. Before Collins arrived at Froedtert, Alomepe called the hospital to inform medical staff that she was sending a patient who likely needed abdominal surgery. Id. at ¶115. To Blomberg's observation, Collins's condition did not worsen during the transport to the hospital, and the transport was uneventful. Id. at ¶116. On assessment by the Bell Ambulance crew at 8:10 a.m., Collins's blood pressure was 128/96, his pulse was 98, strong and regular, his respirations were normal and regular and his oxygen level was at 94% on room air. Id. at ¶117.

Blomberg and Spidell remained with Collins while he was at Froedtert Hospital. Dkt. No. 195 at ¶118. Collins was given an EKG (which was normal) and an ultrasound. Id. at ¶119. Medical personnel in the Froedtert emergency department concluded that Collins had cholecystitis (inflammation of the gallbladder), and Collins was scheduled for laparoscopic surgery that afternoon to remove his gallbladder. Id. at ¶120. At Froedtert, at 12:50 p.m, Collins was transferred from the emergency department to pre-op. Id. at ¶121. In pre-op, Collins suffered multiple seizures. Id. at ¶122. Collins then coded, and efforts to revive him were unsuccessful. Id. at ¶123. Collins was pronounced dead at 2:21 p.m. Id. at ¶124. Based on an autopsy, the cause of death was found to be a pulmonary thromboembolism (a blood clot that blocked the flow of blood in a lung artery). Id. at ¶125. His autopsy report included a toxicology panel that was negative "for the following drugs or drug classes: such as Amphetamine/Methamphetamine type compounds, Benzodiazepines, Buprenorphine, Cocaine and related compounds, Cannabinoids, Fentanyl, Methadone, Opiates and Oxycodone." Dkt. No. 230 at ¶61.

At no time while at the jail did Collins present as having had a pulmonary embolism or venous thromboembolic event. Dkt. No. 195 at ¶126. No reasonable healthcare provider, including those at the jail, would reasonably be expected to have suspected a pulmonary embolism prior to Collins's collapse in the pre-op department at Froedtert Hospital. Id. at ¶127.

All security posts in the jail were fully staffed between first shift on December 17, 2018 and first shift on December 18, 2018. Dkt. No. 195 at ¶130. The two officers assigned to conduct rounds in Collins's housing pod on the night shift from December 17 to 18, 2018 conducted at least fourteen

separate rounds through the housing pod between 10:48 p.m. on December 17, 2018 and 6:00 a.m. on December 18, 2018. Id. at ¶131.

On March 22, 2019, D.P., a minor child of Brian Collins, filed a notice of injury with the Office of the Milwaukee County Clerk. Dkt. No. 195 at ¶132. No other individual filed a notice of injury or circumstance with Milwaukee County regarding Collins's stay in the jail or his death, and no individual filed a claim regarding Collins's incarceration at the jail or his death. Id. at ¶133.

The plaintiffs named Registered Nurse Elaine Dyer as their only retained expert witness. Dkt. No. 195 at ¶135. Nurse Dyer's expert reports did not provide any criticism of Dr. Brodie or conclude that he had breached the standard of care or that any alleged breach caused Collins any injury. Id. at ¶137. At her deposition, Dyer confirmed that she was not offering any opinions as to the standard of care applicable to Brodie and that she was not qualified to offer opinions as to the medical judgments of a physician. Id. at ¶138. The plaintiffs also named Milwaukee County Assistant Medical Examiner Dr. Jessica Lelinski as a non-retained expert witness and cited her autopsy report regarding Collins as her report in this case. Id. at ¶139. Dr. Lelinski's autopsy report does not offer opinions regarding Brodie's care and treatment of Collins. Id. at ¶140.

Nearly two decades ago, as a result of a class action lawsuit brought by incarcerated individuals alleging constitutional deprivations, Milwaukee County entered into a consent decree governing conditions and medical care at the Milwaukee County Jail and the Milwaukee County Community Reintegration Center (then the House of Corrections), which included certain terms governing medical staffing levels and training (see Christensen v. Sullivan, 320 Wis. 2d 76 (Wis. 2009)). Dkt. No. 230 at ¶76. As part of the

14

consent decree, the Milwaukee County Circuit Court maintained jurisdiction over the parties to enforce the decree's terms, and the parties agreed to Dr. Ronald Shansky—a leading authority and expert witness on correctional healthcare—acting as a medical monitor to assist Milwaukee County in taking necessary steps to comply with the decree. Id. at ¶77. Shansky visited the jail and House of Corrections once to twice per year and authored periodic reports regarding his visits. Dkt. No. 242 at ¶79.

From April 2017 until December of 2022, Aaron Dobson was the deputy inspector of the jail in charge of administrative and operation oversight. Dkt. No. 230 at ¶¶66-67. Dobson met with medical staff regularly regarding all manner of medical services, was "very involved with the healthcare program" at the jail and met with Shansky for consent decree visits. Id. at ¶68. Dobson testified that nurse staffing was always an issue at the jail. Id. at ¶69. Shansky's report provided notice to Milwaukee County and Armor in December 2018 that at the time of his October 2018 visit, 8.2 of 10 nurse practitioner positions were filled and that this "may have contributed to the delays in timely histories and physicals based on the acuity of the problems . . . [.]" Dkt. No. 242 at ¶70. The report also said that of eighteen sick call requests that Shansky reviewed (of the 168 received), the responses to 61% of the requests were timely. Id. at ¶71. Dobson testified that during his tenure as commander at the jail, Armor never had its full allotment of RN and LPN positions. Id. Shansky's October 2018 report found that in urgent/emergent care a timely follow-up occurred in only thirteen of nineteen cases, three of which received no follow-up care. Dkt. No. 230 at ¶74.

## II. Analysis

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B.   County Defendants' Motion (Dkt. No. 194)

The County Defendants contend that the individual Milwaukee County defendants are entitled to summary judgment on the plaintiffs' denial of adequate medical care claim. Dkt. No. 204 at 3, 6. They contend that the

plaintiffs cannot establish that any alleged constitutional violation caused Collins's death and that the individual defendants are entitled to qualified immunity. Id. at 9-12. The County Defendants contend that Nurse Gramza and Nurse Karaszewski, who are unrepresented, are entitled to summary judgment. Id. at 12-14. They contend that Milwaukee County and Armor are entitled to summary judgment with respect to the plaintiffs' Monell claims. Id. at 14. The County Defendants contend that any §1983 claim directly against Wisconsin County Mutual Insurance Corporation fails as a matter of law. Id. at 26. And they contend that the plaintiffs' claims under Wisconsin law fail as a matter of law. Id. at 26-29.

The plaintiffs concede dismissal of all claims against Officers Johnson, Blomberg, Artus and Spidell. Dkt. No. 232 at 1. And they acknowledge that they did not assert a §1983 claim against Wisconsin County Mutual Insurance Company. Id. at 26. The court will grant Milwaukee County's motion for summary judgment in favor of defendants Johnson, Blomberg, Artus, Spidell and Wisconsin County Mutual Insurance Company.

The plaintiffs contend that defendant Palmer failed to provide constitutionally adequate care because he did not timely respond to Collins's medical emergency and Collins had to needlessly suffer in pain for five minutes. Dkt. No. 232 at 11-17. The plaintiffs assert that the court should not grant summary judgment in favor of defendants Gramza or Karaszewski because neither of them moved for summary judgment. Id. at 17. The plaintiffs argue that the record precludes resolution of the Monell claims at summary judgment. Id. at 18. Regarding their state law claims, the plaintiffs contend that they have established negligence against Palmer, that they substantially

17

complied with Wis. Stat. §893.80(1d) and that Palmer is not entitled to governmental immunity. Id. at 26-28.

A §1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause.[7] James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. County of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. Id. (citing Miranda, 900 F.3d at 352). The plaintiffs bear the burden to demonstrate objective unreasonableness and must make a two-part showing. Id. First, they must show that the defendants acted purposefully, knowingly or recklessly when considering the consequences of their response to the medical condition at issue in the case. Id. (citing McCann v. Ogle County, Ill., 909 F.3d 881, 886 (7th Cir. 2018)). Second, they must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id.

     1.    *Palmer*

The plaintiffs claim that Palmer did not call for a medical response quickly enough on the morning of December 18, 2018, which they assert violated Collins's constitutional rights. It is undisputed that when Palmer arrived for work at 6:00 a.m., third shift officers told him that Collins had been pressing his cell's call button during the night, that they could not hear what he said because it was "staticy" and that Palmer should check on him. Palmer

---

[7] In the complaint, the plaintiffs alleged they brought claims against the defendants under the Fourth, Eighth and Fourteenth Amendments. Dkt. No. 1 at ¶4. The Fourteenth Amendment applies to the plaintiffs' claims because at the time of his death, Collins had pled guilty to the charges against him but had not yet been sentenced. Dkt. No. 204 at 3 n.1; Lewis v. Downey, 581 F.3d 467, 474 (7th Cir. 2009).

entered the housing unit at 6:20:05 a.m., began his initial inspection of the housing unit at 6:24:30 a.m. and first spoke to Collins and his cellmate at 6:25:00 a.m. When he got to the cell, Palmer could see Collins, alert and breathing, sitting on his bunk in the cell with his back to the wall. Collins's cellmate told Palmer that they were pressing the emergency button all night to try and get Collins help, but that no one responded to their calls. Palmer asked Collins if he was okay, and Collins responded that he was having trouble breathing. Palmer completed his initial inspection rounds in the housing pod, which took about four minutes, then called over the radio for a medical response to the housing pod for Collins.

Palmer did not know about Collins's medical condition until he spoke to Collins and his cellmate at 6:25:00 a.m. on December 18, 2018. The plaintiffs contend that given Collins's medical condition, Palmer should have called for a medical emergency right away, and that it was objectively unreasonable for Palmer to finish his rounds before doing so. They cite Estate of Swayzer v. Milwaukee County, Case No. 16-cv-1703, 2022 WL 656884 (E.D. Wis. Mar. 4, 2022), and state that even short delays have been determined to be unconstitutional. Dkt. No. 232 at 13. In Swayzer, the court concluded that there were factual issues regarding whether a defendant officer knowingly ignored an incarcerated individual's complaint that she was in labor, resulting in her delivering her baby on her own in her cell. Swayzer, 2022 WL 656884, at *19. This case is distinguishable from Swayzer; there is no evidence that Palmer ignored Collins's medical condition. Rather, after seeing Collins in his cell and talking with him, Palmer took four minutes to complete his initial rounds before calling for a medical emergency. The plaintiffs have not submitted evidence that Collins's condition worsened because of the four

minutes Palmer took to complete his rounds. See Knight v. Wiseman, 590 F.3d 458, 466-67 (7th Cir. 2009) (action for delay of treatment will not lie unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay); Moore v. Williams, 835 F. App'x 143, 145 (7th Cir. 2021) (three-hour delay in call to initiate treatment not deliberate indifference; Constitution does not mandate immediate care).

A reasonable factfinder could not conclude that Palmer violated Collins's constitutional rights. The court will grant the County Defendants' motion for summary judgment as to the plaintiffs' Fourteenth Amendment claim against Palmer.

### 2. *Gramza and Karaszewski*

The Milwaukee County Defendants contend that the court should grant summary judgment in favor of Nurses Gramza and Karaszewksi, who are unrepresented. Dkt. No. 204 at 13. The plaintiffs respond that the court should reject these defendants' attempt to "back door" a summary judgment motion for the unrepresented defendants when those defendant did not move for summary judgment. Dkt. No. 232 at 17. They argue that Fed. R. Civ. P. 56(f)(1) can be invoked only by the court and that it requires the court to provide them with an opportunity to respond. Id.

The court may grant summary judgment for a nonmovant after giving notice and a reasonable time to respond. Fed. R. Civ. P. 56(f)(1). Granting summary judgment *sua sponte* "generally requires that the party against whom summary judgment is entered have notice and an opportunity to present its evidence." Golden Years Homestead, Inc v. Buckland, 557 F.3d 457, 462 (7th Cir. 2009); see also Pactiv Corp. v. Rupert, 724 F.3d 999, 1001 (7th Cir. 2013) ("[A] district judge must notify the litigants, and invite the submission of

evidence and legal arguments, before resolving a case on a ground the parties have bypassed or using a procedure they did not propose."); Williams v. City of Chicago, 733 F.3d 749, 755 (7th Cir. 2013) ("It is not appropriate to grant summary judgment based on facts the moving party did not rely on, at least without giving the losing party advance notice and an opportunity to be heard.").

The plaintiffs had notice and an opportunity to respond to the County Defendants' arguments regarding Gramza and Karaszewski. The defendants' joint proposed findings of fact address Gramza's and Karaszewski's involvement in Collins's medical care, and the plaintiffs responded to those facts. The plaintiffs could have substantively responded to the County Defendants' arguments that Gramza and Karaszewski are entitled to summary judgment. See Osler Inst., Inc. v. Forde, 333 F.3d 832, 837 (7th Cir. 2003) (Once there is "sufficient notice that summary judgment [is] afoot . . . a squandered opportunity is not grounds for reversal."). As explained below, Gramza's and Karaszewksi's involvement in the events described in the complaint was limited. Because the factual record regarding Gramza and Karaszewski appears to be complete, the plaintiffs will not be prejudiced by the court addressing the County Defendants' arguments that Gramza and Karaszewski are entitled to summary judgment. See Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1035 (7th Cir. 2019) (Even where a trial court errs in granting summary judgment under Rule 56(f)(1) by failing to give notice, such a "technical error does not compel a remand" when "summary judgment for [the nonmovant] was clearly appropriate.").

It is undisputed that on the morning of December 17, 2018, Collins was taken by wheelchair from his housing unit to the medical clinic at the jail. Dkt.

No. 195 at ¶47. Nurse Dziedzic notified NP Gone of Collins's condition and her assessment, and Gone directed that an EKG be performed, that Collins receive an IV of one-liter normal saline and that he be seen by an Armor provider before he was discharged from the medical clinic back to his housing unit. Id. at ¶48. Gramza administered the EKG and started the IV. Id. at ¶49. Gramza's only involvement in Collins's care on December 17, 2018 was administering the EKG and starting the IV. (After that, Dr. Brodie assessed Collins.)

The morning of December 18, 2018, after Palmer called for a medical emergency, both Gramza and Karaszewski saw Collins. Gramza initially asked Collins what was wrong, and he responded that his abdomen hurt. Gramza physically examined Collins's abdomen to determine the source of the pain. She took Collins's vital signs, which were within normal limits. Collins's condition did not worsen while Gramza assessed him. Karaszewski's role was to stand by to assist, if necessary, as Gramza assessed Collins. Gramza concluded that Collins needed to be taken to the clinic at the jail and then to the hospital so the source of his pain could be determined. Collins left his housing pod to be transported by wheelchair to the medical clinic at 6:41 a.m. Before leaving the housing pod with Collins, Gramza called NP Alomepe in the clinic to inform her of Collins's condition and that he was being transported there.

Based on these undisputed facts, Gramza did nothing more (or less) than administer an EKG and start an IV for Collins on December 17, 2018, after which his care was turned over to Brodie. The next morning, Gramza and Karaszewski spent about ten minutes with Collins during which time Gramza medically assessed him and determined that he needed to be sent to the clinic and the hospital for escalated care; Karaszewski stood by in case Gramza

22

needed help while assessing Collins. A reasonable factfinder could not conclude that Gramza or Karaszewski violated Collins's constitutional rights. The court will enter summary judgment for these defendants.

        3.     *Monell Claims*

Section 1983 provides a private right of action to incarcerated individuals seeking to enforce their constitutional rights. Feazell v. Wexford Health Sources, Inc., 140 F.4th 438, 442 (7th Cir. 2025) (citing Dean v. Wexford Health Sources, Inc., 18 F.4th 214, 235 (7th Cir. 2021)); 42 U.S.C. §1983. Municipalities are not vicariously liable for constitutional torts committed by their employees, so to invoke §1983 against a municipality the plaintiffs must prove that a government policy or custom caused their constitutional deprivation. Feazell, 140 F.4th at 442-43 (citing Monell 436 U.S. at, 690-91); see also Howell v. Wexford Health Sources, Inc., 987 F.3d 647, 653 (7th Cir. 2021). Private corporations acting under color of state may be subject to Monell-style claims. Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1035 (7th Cir. 2019) (citing Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 664 (7th Cir. 2016)). The plaintiffs must point to a Milwaukee County or an Armor policy or custom that was the "moving force" behind the federal civil rights violation. Feazell, 140 F.4th at 443 (citing Dean, 18 F.4th at 235). "This 'rigorous causation standard' requires 'a direct causal link between the challenged municipal action and the violation of [Collins's] constitutional rights.'" Id. (quoting Dean, 18 F.4th at 235).

In the complaint, the plaintiffs advanced Monell claims against Milwaukee County and Armor on several bases, such as alleged failure to work toward compliance with National Commission on Correctional Health Care (NCCHC) standards, failure to abide by the Christensen consent decree, failure

to adequately staff the jail and failure to train. Dkt. No. 1 at ¶¶83-113. At summary judgment, the plaintiffs assert that they are proceeding under the Monell theory that Collins repeatedly was subjected to delays and missed/ignored medical orders between December 5 and 18, 2018. Dkt. No. 232 at 18-19. The plaintiffs contend that the Christiansen consent decree and Shansky's reports are admissible to show municipal notice of delays in medical care and that a reasonable factfinder could conclude that Armor's inaction was the "moving force" behind a constitutional violation. Id. at 20-25.

The plaintiffs emphasize that Collins received only one set of vital and heart rate checks on December 6, and that he received only two on December 7, 2018, instead of the three per day for three days directed on December 5, 2018. Dkt. No. 232 at 19. The plaintiffs also assert that after Collins fell in his cell on December 15, 2018 and was medically assessed, he did not receive a follow-up appointment the next day, as the medical records said he would. Id. The plaintiffs assert that Collins should have been sent to the hospital immediately after his medical visit with Brodie on December 17, 2018. Id. at 19-20. Next, they assert that on the morning of December 18, 2018, the third-shift officers did not respond to calls from Collins's cell. Id. at 20. They reiterate their assertion that Palmer delayed calling for a medical emergency. Id. Finally, the plaintiffs say that Brodie, Alomepe and the nurses failed to look at Collins's medical history or call an ambulance for over an hour despite his need for immediate medical attention. Id.

The shortcomings alleged by the plaintiffs do not constitute or prove a widespread custom of deficient medical care. The plaintiffs point to different sets of interactions to purportedly establish a custom of delays and missed/ignored medical orders related to Collins's medical care over the course

24

of about two weeks. Although the various alleged deficiencies all are related to Collins's medical care, they do not amount to a cohesive custom or practice. See Terry v. County of Milwaukee, Case No. 17-CV-1112, 2018 WL 2567721, at *8 (E.D. Wis. Jun. 4, 2018) (citing Connick v. Thompson, 563 U.S. 51, 64 (2011) ("To be capable of identification, the challenged practice must be comprised of incidents that share common features.")).

In addition, the plaintiffs reference only Collins's medical care. Although "it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience[,]" "it is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" Grieveson v. Anderson, 538 F.3d 763, 774 (7th Cir. 2008). The plaintiffs state that they have established a custom based on the failure to do the required number of vital checks on December 6 and 7; a missed clinic appointment on December 16; alleged failure to review Collins's medical chart; and decisions not to send him to the hospital on December 15 and 17. Dkt. No. 232 at 18-19. As explained elsewhere in this decision, the plaintiffs have not established that Collins received inadequate medical care at the jail. Even if he had, these interactions do not show that Milwaukee County or Armor has a custom of delay and missed/ignored medical orders. The interactions involve different alleged deficiencies, and some involve medical judgments. Municipal liability based on one incarcerated individual's experience ordinarily must involve the repeated occurrence of the same or similar incidents. See Gill v. City of Milwaukee, 850 F.3d 335, 344 (7th Cir. 2017); Wilson v. Cook County, 742 F.3d 775, 780 (7th Cir. 2014); see also Hildreth v. Butler, 960 F.3d 420, 427

25

(7th Cir. 2020) (three delays in incarcerated individual receiving his medication over nineteen months was insufficient); Grieveson v. Anderson, 538 F.3d 763, 774 (7th Cir. 2008) (four problems with medication distribution over eleven months insufficient to show a widespread practice or custom).

The Christiansen consent decree and the Shansky reports do not help the plaintiffs. The plaintiffs concede that they cannot use these materials to *establish* an underlying custom or practice. Dkt. No. 232 at 20. But they argue that they can use the materials to demonstrate that Armor and Milwaukee County had notice of the County's pattern of missing ordered medical checks/examinations of Collins. Id. at 21 (citing Wesley by Wesley v. Armor Corr. Health Servs. Inc., No. 19-CV-918, 2022 WL 16748861, at *7 (E.D. Wis. Nov. 7, 2022) (finding that the plaintiff could introduce the Christiansen consent decree and Shansky's reports to demonstrate that Armor and the County had notice of jail's failure to ensure regular availability and delivery of psychotropic medications). The plaintiffs state that Shansky's reports preceding the December 2018 failures related to Collins's medical needs provided notice to Milwaukee County and Armor that medical staffing shortages "may have contributed to the delays in timely histories and physicals [for other inmates] based on the acuity of the problems . . . ." Dkt. No. 232 at 21. But Collins's interactions with Armor staff in December did not involve delays in timely histories and physicals. Moreover, Shansky said he wasn't making any judgment about the *quality* of the care provided in response to sick calls, and he concluded that the urgent/emergent care components of the jail's medical program were in substantial compliance with the consent decree. The plaintiffs cite no evidence to establish that the vitals checks Collins missed and his

26

missed appointment on December 16, 2018 were related to staffing deficiencies.

The plaintiffs have not established that defendants Milwaukee County and Armor had an unlawful custom that violated Collins's constitutional rights. The court will grant their motion for summary judgment as to the plaintiffs' constitutional claim against them.

### 4. *State Law Claims*

The plaintiffs brought Wisconsin state negligence and wrongful death claims against the individual officer defendants. Dkt. No. 1 at ¶¶108-116. Palmer is the remaining individual officer defendant.[8]

The County Defendants contend that the plaintiffs did not comply with Wisconsin's notice of claim statute, Wis. Stat. §893.80(1d), regarding their state law claims against Palmer. The plaintiffs respond that they substantially complied with §893.80(1d) because on March 22, 2019, D.P., a minor child of Collins, filed a notice of injury with the Office of the Milwaukee County Clerk. Dkt. No. 232 at 26-27; see also Dkt. No. 195 at ¶132. They also assert that Milwaukee County was aware of circumstances regarding Collins because the County underwent an investigation. Dkt. No. 232 at 26-27.

Wisconsin's notice of claim statute provides in relevant part:

(1d) Except as provided in subs. (1g), (1m), (1p) and (8), no action may be brought or maintained against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or agency thereof nor against any officer, official, agent or employee of the corporation, subdivision or agency for acts done

---

[8] The plaintiffs did not bring state law claims against Milwaukee County or Armor. Dkt. No. 1 at ¶¶108-116. Because there was no need to, the court has not considered the County Defendants' arguments that Milwaukee County and Armor did not violate Collins's rights under Wisconsin state law. See Dkt. No. 204 at 26-27.

in their official capacity or in the course of their agency or employment upon a claim or cause of action unless:

(a) Within 120 days after the happening of the event giving rise to the claim, written notice of the circumstances of the claim signed by the party, agent or attorney is served on the volunteer fire company, political corporation, governmental subdivision or agency and on the officer, official, agent or employee under s. 801.11. Failure to give the requisite notice shall not bar action on the claim if the fire company, corporation, subdivision or agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant fire company, corporation, subdivision or agency or to the defendant officer, official, agent or employee; and

(b) A claim containing the address of the claimant and an itemized statement of the relief sought is presented to the appropriate clerk or person who performs the duties of a clerk or secretary for the defendant fire company, corporation, subdivision or agency and the claim is disallowed.

Wis. Stat. §893.80(1d)(a), (b).

Arguably, the March 22, 2019 notice of injury filed by D.P. substantially complies with §893.80(1d)(a) because, although it was not served on Palmer, it provides notice to Milwaukee County of the circumstances surrounding the plaintiffs' claims. See Townsend v. Neenah Joint Sch. Dist., 358 Wis. 2d 618, 632 (Wis. Ct. App. 2014). But the plaintiffs do not argue that they substantially complied with §893.80(1d)(b), nor did they file a separate notice of claim that complies with that section. The plaintiffs' failure to comply with §893.80(1d)(b) precludes them from proceeding on their state law claims against Palmer.

Even if the plaintiffs had complied with §893.80(1d)(b), the state law claims would have failed on the merits. The plaintiffs contend that the fact that a jury could find that Palmer violated the Fourteenth Amendment necessarily implies his exposure to negligence liability. Dkt. No. 232 at 26. They assert that Palmer had a duty to immediately report a serious medical issue to medical

28

personnel, and that he violated that duty when he allegedly valued his own convenience over providing Collins with medical care. Id. at 28.

Negligence comprises four elements: "'(1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.'" Wesley, 2022 WL 16748861 at *15 (quoting Martindale v. Ripp, 246 Wis. 2d 67, 89 (Wis. 2001)). The court already has concluded that Palmer is not liable for violating Collins's constitutional rights, and his action of calling for an emergency four minutes after seeing Collins at his cell was not unreasonable. The record shows that Palmer did not ignore Collins; after seeing and speaking with Collins, Palmer promptly called for a medical emergency. The plaintiffs have not established that Palmer acted with negligence. The court will grant the County Defendants' motion for summary judgment as to the plaintiffs' state law claims against Palmer.

C. Brodie and Evanston Insurance Company's Motion (Dkt. No. 205)

Dr. Brodie and Evanston Insurance Company (Evanston) contend that the plaintiffs have not established a claim that Brodie's medical treatment of Collins violated the Constitution.[9] Dkt. No. 218 at 8. They assert that, at best, the plaintiffs state a medical malpractice claim against Brodie but, even then, the claim must fail for lack of causation. Id. Brodie and Evanston contend that Brodie's decision-making was reasonable and appropriate. Id. at 8-14. They point out that Collins's medical condition significantly changed after Brodie's

---

[9] Brodie and Evanston contend that the Eighth Amendment applies to Collins's claim against Brodie because he already had pled guilty for an offense when the events described in the complaint occurred. Dkt. No. 218 at 6. As the court already has explained, the Fourteenth Amendment applies to Collins's medical care claims.

assessment. Id. at 14-16. Brodie and Evanston also contend that Collins's medical malpractice claim fails.[10] Id. at 16-18. They contend that he cannot prove liability or causation under any standard. Id. at 16-23.

The plaintiffs respond that Brodie was aware Collins suffered from a serious medical need and that a jury could conclude that Brodie consciously failed to take reasonable measures to provide constitutionally adequate care for Collins's serious medical need. Dkt. No. 231 at 10-18. They contend that Collins was harmed as a result of Brodie's conduct. Id. at 18-20.

It is undisputed that when Brodie saw Collins on December 17, 2018, Collins had just received an EKG and IV fluids. Brodie assessed Collins's condition, noting that Collins complained of dizziness when standing and pinching pain in the right upper quadrant (RUQ) of his abdomen for the last two days. Brodie performed a thorough physical examination. Following testing, he determined that Collins did not show signs of gallbladder issues, and he noted, "[c]linically doubt acute abdomen." Dkt. No. 196-14 at 1. Brodie determined that Collins had two issues that required follow-up: dehydration and RUQ pain. To address these issues, Brodie created a treatment plan to encourage fluids, repeat the creatine level, check liver, kidney and gallbladder function by ultrasound of the RUQ, complete a hepatitis panel, perform urinalysis and follow-up in forty-eight hours. He also ordered blood pressure checks three times daily for three days and daily weight checks for three days. Brodie noted that Collins was feeling much better after the IV fluid. He also

---

[10] The plaintiffs did not plead a medical malpractice claim against Brodie, dkt. no. 1, and they concede that they are not bringing a state-law medical malpractice claim against him, dkt. no. 231 at 21. Again, because it did not need to, the court has not considered Brodie and Evanston's arguments related to a medical malpractice claim.

noted that most of Collins's questions were answered to Collins's satisfaction, and that Collins understood and agreed with the treatment plan.

The plaintiffs assert that a jury must determine "whether after Dr. Brodie's diagnosis of Collins's acute kidney failure, dizziness, and tachycardia, when considered in conjunction with his documented previous spells of fainting, losing consciousness, possible seizure, falling in his cell, undetermined abdominal pain, and lack of on-site testing, he should have hospitalized Collins." Dkt. No. 231 at 13-14. The plaintiffs argue that Brodie makes no attempt to justify his "inexplicable delay" in securing the urgent care he knew Collins needed. Id. at 15. They maintain that Collins pleaded for help to his girlfriend on the phone call the night of December 17. Id. at 17. The plaintiffs state that Brodie is liable under §1983 for his unreasonable delay in sending Collins to a hospital where the necessary diagnostic tools and care were available, as opposed to leaving him to suffer in his cell all night followed by a second medical emergency being called the next morning. Id. They argue that this unreasonable delay significantly increased the chances of further harm and death to Collins. Id. Regarding causation, the plaintiffs point out that they do not have to prove that Brodie's actions caused Collins's death but, rather, that they caused him harm. Dkt. No. 231 at 19 (citing Ortiz v. Chicago, 656 F.3d 523, 535 (7th Cir. 2011) ("Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad: 'the constitutional violation in question here is the failure to provide adequate medical care [] in response to a serious medical condition, not 'causing her death.'").

Contrary to the plaintiffs' assertions, the record shows that Brodie thoroughly treated and assessed Collins on December 17. Brodie did not

31

diagnose Collins with acute kidney disorder; he ruled out and expressed doubt that Collins had an "acute abdomen." Collins identified two medical issues, and he created a comprehensive plan to address those issues. That plan included ordering an ultrasound which would have required Collins to go to the hospital in the next day or two. Brodie answered Collins's questions about the plan, and Collins understood and agreed with the plan. When Collins left Brodie, his medical issues had been addressed, and he was stable.

The facts that nine hours after this appointment, Collins reported to his girlfriend that he was in serious pain and that the next morning he was taken to the emergency room, do not show that Brodie's treatment was unreasonable. The plaintiffs' reliance on Collins's call to his girlfriend to show that Brodie mistreated Collins is misplaced. The record does not support a finding that Collins reported to Brodie the physical condition that he described to his girlfriend on the phone call. It is possible that Collins's condition changed between the time that Brodie saw him and the time he called his girlfriend. The plaintiffs cannot rely on the call beyond Collins's statements about his then-existing physical condition. Any other statement by Collins, if offered for its truth, would be inadmissible hearsay, which the court cannot consider at summary judgment. Cairel v. Alderden, 821 F.3d 823, 830 (7th Cir. 2016).

Brodie did not believe that Collins's condition the morning of December 17, 2018 warranted a trip to the hospital or emergency room. The plaintiffs have not shown that Brodie's failure to send Collins to the hospital on December 17 caused or contributed to Collins's death on December 18, or otherwise caused him harm. Collins's condition was stable when he left Brodie on December 17, and he had a clear plan to be monitored and tested. The evidence shows that Collins's condition significantly worsened that night and

32

he was taken to the hospital the next morning. The plaintiffs point to a list of Collins's medical conditions and contend that it was objectively unreasonable for Brodie not to send him to the hospital based on those conditions. But Brodie considered Collins's overall medical condition when he assessed and examined him on December 17. See McCann, 909 F.3d at 887 (nurse's diligent and attentive care fell well short of objective unreasonableness despite her failure to take vital signs before she ultimately and unforeseeably found incarcerated individual unresponsive and not breathing). The plaintiffs did not present evidence to support their contention that Brodie delayed treatment or unreasonably persisted in ineffective treatment. See Vogelsberg v. Kim, Appeal No. 20-2926, 2022 WL 1154767, at *3 (7th Cir. Apr. 19, 2022).

While at the jail, Collins did not present as having had a pulmonary embolism or a venous thromboembolic event. No reasonable healthcare provider, including those at the jail, would reasonably be expected to have suspected a pulmonary embolism prior to Collins's collapse in the pre-op department at Froedtert Hospital. The court cannot conclude that Brodie's treatment of Collins was objectively unreasonable. James, 959 F.3d at 318 (jail administrator not objectively unreasonable for deciding that incarcerated individual's condition did not warrant being sent to emergency room where he was receiving ongoing treatment for his medical condition).

A reasonable factfinder could not conclude that Brodie violated Collins's constitutional rights. The court will grant defendants Brodie and Evanston's motion for summary judgment as to Collins's Fourteenth Amendment claim against Brodie. The parties do not address Evanston's involvement other than saying that there are no substantive allegations against Evanston. Dkt. No. 218

at 1 n.1. Because the court is dismissing Brodie, it also will grant summary judgment as to Evanston.

D. Injured Patients and Families Compensation Fund's Motion (Dkt. No. 207)

The Injured Patients and Families Compensation Fund (IPFCF) contends that the court should grant summary judgment in its favor because Brodie is the only defendant covered by it and because the plaintiffs did not plead a medical malpractice claim against him. Dkt. No. 208 at 3. The plaintiffs did not respond to the IPFCF's motion.

The IPFCF provides coverage for only one defendant—Brodie—and only with respect to state-law medical malpractice claims. Dkt. No. 208 at 1; Wis. Stat. §655.27. Defendant Brodie is not proceeding on any state-law claims. The court will grant the IPFCF's unopposed motion for summary judgment.

E. Alomepe and Dziedzic's Motion (Dkt. No. 212)

Defendants Alomepe and Dziedzic contend that they are entitled to summary judgment because they were not purposefully, knowingly or recklessly objectively unreasonable to any serious medical need of Collins. Dkt. No. 213 at 5-9. They also assert that the plaintiffs cannot meet their burden on causation. Id. at 10-11. And they argue that the plaintiffs' wrongful death claim against them must fail as a matter of law.[11] Id. at 11-12.

The plaintiffs respond that a jury could conclude Alomepe and Dziedzic consciously failed to take reasonable measures to provide constitutionally adequate care for Collins's serious medical needs. Dkt. No. 233 at 11-18. They

---

[11] The plaintiffs did not bring a wrongful death claim against Alomepe and Dziedzic in the complaint. Dkt. No. 1 at ¶¶114-116. Again, because it is not necessary to do so, the court has not considered the defendants' arguments regarding thar claim.

contend a jury could find that Alomepe's unexplained, forty-three-minute gap between when she first saw Collins suffering a life-threatening condition and when she ordered an ambulance was objectively unreasonable. Id. at 11. The plaintiffs also fault Alomepe for not looking at Collins's medical records before assessing him. Id. According to the plaintiffs, their expert, Dyer, was critical of the significant delay in transporting Collins to the hospital on December 18, 2018; of Alomepe's failure to review Collins's chart history; and of Alomepe's self-described failure to understand jail protocols. Dkt. No. 233 at 13. The plaintiffs contend that Alomepe caused Collins harm because Collins suffered pain longer than necessary. Id. at 16. Regarding Dziedzic, the plaintiffs contend that Dziedzic knew that Collins required urgent care but did not ensure that he received that care. Id. at 18.

It is undisputed that on the morning of December 17, 2018, Armor medical staff were called to Collins's housing unit because he was complaining of feeling dizzy and having breathing issues. Dkt. No. 195 at ¶36; Dkt. No. 229 at ¶36. Dziedzic initially assessed Collins, and her assessment note includes the following "Physical findings":

> A&Ox3. BP stable. Tachycardic. No signs of acute distress. Denies any pain. "I just get dizzy every time I stand up or lay on my side." Patient reports "This has been going on for over a week." Skin tenting on forearm. Perrla. Responds appropriately to verbal stimuli; no slurring of speech. Respirations even, unlabored. Breath sounds clear to auscultation throughout all lung fields. Apical pulse regular rate and rhythm; s1, s2 noted. Mucous membranes moist and pink. Negative jvd.

Dkt. No. 196-18. After assessing Collins, Dziedzic had him transported to the medical unit and explained his symptoms to NP Gore, who assumed care for him.

Dziedzic's treatment of Collins was reasonable in that she assessed him at his cell, decided based on his symptoms that he needed more care and had him transferred to the medical unit for that care. Shortly after that, Gore and Dr. Brodie saw Collins. Dziedzic did not ignore Collins's medical condition, nor did she fail to take action to address his medical needs. Rather, she summarized his condition and had him transferred to the clinic where he was seen by a nurse practitioner and a doctor. Based on these undisputed facts, a reasonable factfinder could not conclude that Dziedzic violated Collins's constitutional rights.

Turning to Alomepe, it is undisputed that on December 18, 2018, Collins arrived in the clinic at 6:43 a.m., and he remained there for thirty to thirty-five minutes before Bell Ambulance was notified of a call for service at the jail. The ambulance arrived at 7:31 a.m. and the ambulance personnel took over Collins's care. While Collins was in the clinic, Alomepe assessed him, and Collins reported to her that he had begun having abdominal pain with dizziness two days prior. Collins reported that the pain was in the right upper quadrant of his abdomen and was at ten on a scale of one to ten. Alomepe noted that Collins had been treated the day before for dehydration and that the results of lab tests were still pending. On examination, Collins's vital signs were within normal limits; his breathing was unlabored; his abdomen was positive for bowel sounds, was soft and non-distended and was sensitive to touch in the right upper quadrant. Unlike the day prior, Collins's abdomen was positive for Murphy's sign. Alomepe determined that Collins should be sent to the hospital to determine the source of his abdominal pain and to rule out gallstones. She ordered that a dose of pain medication be administered to Collins to relieve his pain, and Nurse Gramza administered the medication.

36

After Collins received the pain medication, his pain subsided and he was sitting up, talking and saying he did not want to go to the hospital.

Alomepe did not fail to act regarding Collins's medical condition, nor did she delay in sending him to the hospital. Rather, she assessed Collins, diagnosed him, directed that he receive pain medication and escalated his care to Froedtert where he could receive the treatment he needed for his gallbladder. A reasonable factfinder could not conclude that Alomepe violated Collins's constitutional rights. The court will grant defendants Alomepe and Dziedzic's motion for summary judgment.

### III. Conclusion

The court **GRANTS** the County Defendants' motion for summary judgment. Dkt. No. 194.

The court **GRANTS** defendants Brodie and Evanston Insurance Company's motion for summary judgment. Dkt. No. 205.

The court **GRANTS** defendant Injured Patients and Families Compensation Fund's motion for summary judgment. Dkt. No. 207.

The court **GRANTS** defendants Alomepe and Dziedzic's motion for summary judgment. Dkt. No. 212.

The court **ORDERS** that defendants Gramza and Karaszewski are entitled to summary judgment.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this

37

deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* <u>See</u> Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. <u>Id.</u>

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of March, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**